**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES BYRD, JR. and DARRELL BYRD, for themselves and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No.: 1:20-cv-06447 |
| v. | Hon. Harry D. Leinenweber |
| MCDONALD'S USA, LLC, a Delaware limited liability company, and MCDONALD'S CORPORATION, a Delaware corporation, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION................................................................................................1

THE PARTIES.................................................................................................11

JURISDICTION AND VENUE.......................................................................17

FACTUAL ALLEGATIONS...........................................................................18

    A.    The McDonald's Franchise Model:  Unequal Bargaining, Captive Tenants, Discriminatory Franchise Agreements, and Misleading Financial Disclosures ....18

        (i)    The Franchise Agreement ................................................19

        (ii)    Entry into the McDonald's Franchise System ...............................23

        (iii)    The Cost to Own and Operate a McDonald's Franchise ..............24

        (iv)    The Cost to Own and Operate a Black McDonald's Franchise: A Financial Suicide Mission......................................................26

    B.    McDonald's History of Discrimination Against Black Franchisees.....................27

        (i)    Boycott in Cleveland 1969.............................................27

        (ii)    Trouble under the Golden Arches: Black Franchisee Sues McDonald's for Racial Steering ....................................................28

        (iii)    McDonald's Admits Racial Steering and Need for Parity............30

        (iv)    Change in McDonald's Leadership in 2015: Reverse Course for Discrimination and Mass Exodus of Black Franchisees...............33

        (v)    McDonald's Leadership is Once Again on Notice of Ongoing Disparate Treatment of Black Franchisees; Continues Making False Promises.........................................................................34

    C.    "Big Mac Attack" on Black Franchisees: McDonald's Pattern and Practice of Intentional and Covert Racial Discrimination ......................................................35

(i) Take it or Leave it: Racial Steering and Redlining to High-Cost and Low-Volume Locations ..........................................35

(ii) McDonald's Requires Black Franchisees to Make Renovations to Locations it Knows Will Not Generate a Return on Their Investment.....................................................................37

(iii) McDonald's Arbitrarily Denies Black Franchisees Opportunities for Growth to Profitable Locations within the Franchise System..40

(iv) McDonald's False Promise of "Rent Relief" and Misleading Financial Assistance.......................................................42

(v) Targeted and Unreasonable Inspections and Grading ..................43

(vi) No Choice But to Sell or Operate at a Loss: McDonald's Forced Exit Scheme and Fear Tactics .......................................44

**CLASS ALLEGATIONS** ..........................................................46

A. Class Definition ..........................................................46

B. Numerosity and Ascertainability ...........................................47

C. Predominance of Common Issues .........................................48

D. Typicality ................................................................48

E. Adequacy of Representation ...............................................49

F. Superiority................................................................50

**COUNT I – Violation of 42 U.S.C. § 1981** ...................................51

**PRAYER FOR RELIEF**.............................................................56

**DEMAND FOR JURY TRIAL**......................................................57

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, James Byrd, Jr. and Darrell Byrd ("Plaintiffs"), individually and on behalf of all other similarly situated franchisees (collectively, "Class Members" or the "Class"), by and through undersigned counsel, hereby file this Amended Class Action Complaint, based on Plaintiffs' personal knowledge and upon information and belief as to the Class, against Defendants McDonald's USA LLC, a Delaware limited liability company, and McDonald's Corporation, a Delaware corporation (collectively, "McDonald's" or "Defendants"), and allege as follows:

## INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1981 by Plaintiffs, current Black McDonald's franchisees, on behalf of themselves and one-hundred and eighty-six (186) Black McDonald's franchisees, who currently own and operate McDonald's restaurants in the United States, seeking racial justice and economic equality by holding McDonald's accountable for violations of their constitutional rights in denying Black franchisees equal franchise opportunities.

2. Plaintiffs are brothers who own and operate four (4) McDonald's restaurants in Tennessee. James Byrd has been a McDonald's franchisee for thirty-one (31) years, with an organization that has dwindled down from ten (10) to two (2) underperforming restaurants, and his brother, Darrell, has been a McDonald's franchisee for twenty-two (22) years, with an organization that has been cut down from four (4) to two (2) restaurants.

3. The Byrd brothers operate restaurants in the Nashville Region, the McDonald's Region with the **highest** cash flow disparity between White and Black McDonald's franchisees in the nation. For decades, the Byrd brothers comprised half of only four (4) total Black McDonald's franchisees in their local co-op. James Byrd is now the **only** remaining Black McDonald's franchisee in Memphis.

4. Although the Byrds risk retaliation (and potentially any chance at saving their only remaining restaurants) in bringing forth this action, they cannot allow other Black McDonald's franchisees to be misled and injured by the same pipeline of discrimination that has plagued Black franchisees for decades.

5. Beginning in the 1960s, with an unprecedented expansion of real estate ownership into Black communities on the heels of the American civil rights movement through crudely-termed "zebra" partnerships with silent, White investors, and continuing with targeted marketing campaigns aimed at Black consumers, from "*Do Your Dinnertimin' at McDonald's*" advertisements in the late 1970s, to Calvin commercials in the 1990s, to its recruitment of Black icon Michael Jordan in 1992, as recently revived through a collaboration with Rap artist Travis Scott, McDonald's has perpetuated a decades-long fraud by selling itself as a friend of Black America, yielding billions in profits to the company, at the expense of its own Black franchisees.

6. McDonald's led aspiring Black entrepreneurs to believe franchise ownership was a "Golden Opportunity," their ticket to the American dream. The reality was the opposite. Black franchisees signed up for financial suicide missions.

7. As alleged herein, McDonald's growth strategy has been predatory in nature, targeting Black consumers, markets, and territories by steering Black franchisees to Black neighborhoods with high overhead costs—including higher security, insurance, and employee turnover—where White franchisees refused to own and operate restaurants.

8. By placing Black franchisees in predominantly Black neighborhoods, McDonald's is able to both increase its capital through the acquisition of real estate in areas with lower market prices, and increase sales to Black consumers, resulting in higher company profits, which are based only on gross sales and do not account for the higher operational costs associated with these

locations. McDonald's shifts the entire risk of loss to Black franchisees through high rents and ongoing fees that pay for McDonald's acquisition and development of real estate and generate consistent company profits. Black franchisees are solely responsible for all related occupancy costs, as well as renovations and/or rebuilds, despite these locations historically underperforming. When Black franchisees are inevitably unable to pay McDonald's rent and fees, and McDonald's wants them out, it holds all of the power, and benefits by keeping the real estate with all improvements paid for by Black franchisees.

9.      McDonald's primary weapon is fear—fear of termination, fear of being denied expansion, fear of having McDonald's open a restaurant across the street or down the block, and fear of non-renewal. Putative Class Members who wish to join this action are also afraid.

10.      Plaintiffs and Class Members remain in the McDonald's franchise system as captive tenants, subject to, and in fear of, McDonald's unfettered discretion to determine their eligibility status for growth and renewal of their franchises, enabling McDonald's to continue to restrict Black franchisees to Black neighborhoods and to deny them equal opportunities to more profitable locations.

11.      This model pushes Black franchisees further into debt, allowing McDonald's to deem Black franchisees ineligible for growth and/or renewal, while offering White franchisees newer, safer, and more profitable locations. Through this vicious cycle, Black franchisees go in and out of locations with consistent profit shortfalls, on land and buildings owned by McDonald's, operated by Black franchisees to better target Black consumers, with improvements paid for by Black franchisees, maximizing McDonald's profits. The only way to break this cycle is to force McDonald's to stop treating Black franchisees differently than White franchisees.

12.     Otherwise, and if left unremedied, McDonald's systematic pattern and practice of discriminatory acts will continue to result in a mass exodus of Black franchisees from the McDonald's franchise system and an increasing cashflow disparity between Black and White McDonald's franchisees.

13.     McDonald's racial discrimination has resulted in an increasing cash flow gap between McDonald's Black franchisees as compared to White ones that has **more than tripled** from 2010 to 2019, per the National Black McDonald's Operators Association ("NBMOA") data.

14.     Plaintiffs' and Class Members' annual sales, on average, fall below McDonald's national average sales of $2.7 million between 2011 and 2016, and $2.9 million in 2019, and are insufficient to cover the expenses associated with their substandard locations, resulting in consistent profit shortfalls and accumulating debt.

15.     As a result, the historic high of approximately 400 Black McDonald's franchisees in 1998 has been **more than cut in half**.  Today, there are less than 200 Black franchisees.  *See* Figure 1 below, based on NBMOA and McDonald's data.

16.     At the same time, from 1998 to date, the total number of McDonald's franchised restaurants **more than doubled**.  *See* Figure 2 below, based on data from McDonald's Corporation.

17.     These statistics are not isolated examples; they are demonstrative of the systematic failure of McDonald's to comply with the mandates of Section 1981 and are the result of racial bias and barriers within the McDonald's franchise system, effectuated by McDonald's through systematic and covert racial discrimination targeted against Black franchisees.

**Exodus of Black Franchisees 1998 – 2020**

| END OF YEAR | BLACK FRANCHISEES |
|---|---|
| 1998 | 377 |
| 1999 | 368 |
| 2000 | 350 |
| 2001 | 347 |
| 2002 | 333 |
| 2003 | 319 |
| 2004 | 320 |
| 2005 | 313 |
| 2006 | 305 |
| 2007 | 304 |
| 2008 | 304 |
| 2009 | 294 |
| 2010 | 285 |
| 2011 | 283 |
| 2012 | 276 |
| 2013 | 270 |
| 2014 | 261 |
| 2015 | 255 |
| 2016 | 236 |
| 2017 | 222 |
| 2018 | 207 |
| 2019 | 194 |
| 2020 | 186 |

Figure 1:  Number of Black McDonald's Franchisees

**Total Number of Franchised McDonald's Restaurants 1998 - 2020**

| YEAR | TOTAL FRANCHISES |
|---|---|
| 1998 | 15,086 |
| 1999 | 15,949 |
| 2000 | 16,795 |
| 2001 | 17,395 |
| 2002 | 17,864 |
| 2003 | 18,132 |
| 2004 | 18,248 |
| 2005 | 18,334 |
| 2006 | 22,880 |
| 2007 | 24,471 |
| 2008 | 25,465 |
| 2009 | 26,216 |
| 2010 | 26,338 |
| 2011 | 27,075 |
| 2012 | 27,882 |
| 2013 | 28,691 |
| 2014 | 29,544 |
| 2015 | 30,081 |
| 2016 | 31,230 |
| 2017 | 34,108 |
| 2018 | 35,085 |
| 2019 | 36,059 |
| 2020 | 38,999 |

Figure 2: Number of McDonald's Franchised Restaurants

5

18. McDonald's knowingly and covertly discriminates against Plaintiffs, current Black McDonald's franchisees, and similarly-situated Black McDonald's franchisees, a protected class under federal law (42 U.S.C. § 1981), through an ongoing pattern and practice of denying Black franchisees equal franchise opportunities by, *inter alia*:

  a. Steering and restricting Black franchisees' growth beyond predominantly Black, inner city, and/or rural neighborhoods, with higher expenses and lower sales, because of their race;

  b. Excluding Black franchisees from the purchase of restaurants in the open market because of their race;

  c. Providing Black franchisees with misleading financial information to induce them to purchase McDonald's least desirable franchises;

  d. Requiring Black franchisees to invest in rebuilds and/or renovations in locations they know will not generate a return on investment;

  e. Excluding Black franchisees from the same growth opportunities to higher-volume, lower-cost restaurants offered to White franchisees;

  f. Failing to provide any legitimate business reasons for repeated denials of franchise opportunities to Black franchisees;

  g. Denying Black franchisees meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

  h. Depriving Plaintiffs of the same legacy opportunities offered to White franchisees through McDonald's Next Generation ("Next Gen") program;

  i. Retaliation against Black franchisees for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through targeted, increased, and unreasonable inspections;

  j. Disparate treatment with respect to inspections, grading, and business reviews of Black franchisees' restaurants as pretext for forcing them out of the McDonald's franchise system; and/or

  k. Placing Black franchisees in untenable positions of economic duress,

denying them eligibility for growth and/or renewal of their agreements, so that Black franchisees have no choice but to continue to operate substandard locations or sell on McDonald's terms, at a loss.

19.     Through this consistent and ongoing practice of discrimination against Black franchisees, Defendants deprived Plaintiffs and Class Members of the same rights enjoyed by White franchisees to the creation, performance, modification, and termination of their agreements and the enjoyment of all benefits, privileges, terms, and conditions of their franchise relationships with Defendants.

20.     But for their race and McDonald's unjustifiable refusal to provide equal franchise opportunities to Black franchisees, Plaintiffs and putative Class Members would not have incurred excessive operational expenses and insufficient sales volume, resulting in lost profits, lost business opportunities, emotional distress, humiliation, and damage to their professional reputations.

21.     McDonald's has concealed its renewed pattern and practice of discrimination following its false promise of "parity" for Black franchisees in the late 1990s, through a campaign of misinformation and by isolating Plaintiffs and a putative Class of similarly-situated Black franchisees, as it continues to propagate a false narrative of diversity and racial equality.

22.     It is no coincidence that McDonald's is currently defending four (4) race discrimination lawsuits in less than one (1) year at all levels of its operations: employees, workers, and now franchisees, former and current.

23.     Plaintiffs and Class Members did not know that that they were denied equal franchise opportunities because they are Black. At all times material to Plaintiffs' and Class Members' claims, McDonald's led them to believe—and some continue to believe—that they have equal access to locations, terms, benefits, privileges, and conditions of the McDonald's franchise relationship as White franchisees.

7

24.     Indeed, it was not until the January 7, 2020, filing of a racial discrimination lawsuit by Black McDonald's senior executives, Victoria Guster-Hines and Domineca Neal, that Plaintiffs and the Class learned of inside corporate information **_for the first time_** that revealed, at an executive level, that McDonald's deliberately divests opportunities from Black franchisees, implements business plans with a discriminatory impact on Black franchisees, grades Black Consumer Market restaurants "differently, in a negative way," and has overall abandoned its commitment to racial equality on a company-wide basis. *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1], ¶¶ 65, 75 (N.D. Ill. Jan. 1, 2020).

25.     The discriminatory character of McDonald's conduct has not been apparent to Plaintiffs or to Class Members when committed on an individual basis because McDonald's practice is to systematically isolate Black franchisees throughout their franchise term, leading them to believe that their financial losses are caused by individual deficiencies as "bad operators," or operational deficiencies within their organizations, rather than discrimination.

26.     Plaintiffs and Class Members are not bad businesspeople, as McDonald's has led them to believe; they are victims of McDonald's targeted discrimination against Black franchisees, which McDonald's covered up during years of parity deals and false promises.

27.     Defendants have maintained that McDonald's is committed to racial equality, through the Company's Standards of Business Conduct, advertisements, and promises of parity.

28.     McDonald's Chief Executive Officer, Christopher Kempczinski, appeared on CNBC's "Mad Money with Jim Cramer" this year, and stated that, "*McDonald's has created more millionaires within the Black community than probably any other corporation on the planet.*"

29.     Likewise, in response to the murder of George Floyd and the Black Lives Matter movement, McDonald's proclaimed, "*We do not tolerate inequity, injustice, or racism.*"

8

McDonald's advertisements read, "They were all one of us. We see them in our customers. We see them in our crew members. *We see them in our franchisees*. And this is why the entire McDonald's family grieves. It's why we stand for them and any other victims of systematic oppression and violence."

30.     Even in McDonald's Corporation's Verified Complaint against its former CEO, Stephen J. Easterbrook, it continues to represent to the public that "ethical operation of its business is not just a legal imperative, but also a cherished value." *McDonald's Corporation v. Easterbrook*, Case Id. 2020-0658, Verified Compl. [D.E. 1], at ₱ 11 (Del. Ch. Aug. 10, 2020).

31.     In response to the lawsuit filed by former franchisees on September 1, 2020, McDonald's Black Board of Director's member, John Rogers, publicly espoused that "there is no finer example of an equitable business model in America than the one McDonald's has."[1]

32.     McDonald's continues to mislead current Black franchisees through a narrative that is patently **false**. Defendants publicly proclaim, "McDonald's is only as successful as its franchisees: it wants every franchisee in its system to thrive, and it provides extensive support to its franchisees to help them succeed." In reality, McDonald's definition of success is one-sided: McDonald's business model is that of a real estate company that profits on sales and the fees and rent it charges to franchisees, without any consideration for higher expenses associated with the substandard locations it offers to Black franchisees, and their resulting profit loss and accumulating debt.

33.     Behind the scenes, in response to these mounting allegations, McDonald's has been offering current Black franchisees the same opportunities it denied to former Black franchisees,

---

[1] John W. Rogers, Jr., *Why McDonald's sets the standard for equitable business models*, Fortune, (Sept. 16, 2000) https://fortune.com/2020/09/16/mcdonalds-black-franchisees-lawsuit-diversity/ (last visited Sept. 25, 2020) .

including permanent rent relief, expansion into high-volume restaurants, and assistance with debt relief, demonstrating it had the control to apply these measures in accordance with its policies and chose not to. Not surprisingly, these offers come coupled with take-it-or-leave it releases of liability to any Black franchisee who accepts assistance.

34.    After outright and structural racism in the administration of the franchise system, Plaintiffs and Class Members operate in fear of McDonald's power to take away franchises many of them have dedicated their lives to. Today, Plaintiffs can no longer sit silent, lending their voice to current Black McDonald's franchisees through this lawsuit.

35.    To remedy McDonald's systemic failure to comply with federal law, this action requests that the Court, *inter alia*:

> (a) Require McDonald's to provide Black franchisees open and equal access to the geographic market of locations that meet or exceed McDonald's disclosed national average sales;
>
> (b) Require McDonald's to conform to the mandates of Section 1981 and implement objective standards for decisions relating to Black franchisees, including: (i) rewrite decisions; (ii) terminations; (iii) rent adjustments and other financial assistance, accounting for higher operating costs and lower volume sales in certain locations; and/or (iv) rebuild and renovation requirements;
>
> (c) Require McDonald's to ensure that Black franchisees are offered growth opportunities to the same extent that such growth opportunities are available to other franchisees in the same geographic area; and/or

(d) Require McDonald's to ensure its grading and inspection standards are fairly and uniformly applied.

36.     Plaintiffs seek declaratory and injunctive relief from these practices; compensatory and punitive damages; equitable remedies of restitution and disgorgement; and an award of costs, expenses, expert and attorneys' fees, for themselves individually and on behalf of the Class they seek to represent, to redress McDonald's failure to provide Black McDonald's franchisees with equality in their franchise agreements in violation of 42 U.S.C. § 1981 (Count I).

## PARTIES

### A.      Individual Plaintiffs and Class Representatives

37.     Plaintiffs are members of a federally-protected class who own and operate McDonald's domestic franchised restaurants.

38.     Plaintiff James ("Jim") Byrd, Jr. and his brother, Darrell Byrd (together, the "Byrds"), are Tennessee residents and McDonald's franchise owner/operators.

39.     The Byrds currently own and operate four (4) McDonald's restaurants in the Memphis and Nashville Regions.

40.     For decades, the Byrds made up half of only four (4) total Black franchisees in the Memphis Region and are now the sole remaining Black franchisees. The Nashville Region, where the Byrds operate, is well known to McDonald's as having the highest cash-flow disparity of approximately $135,000 between Black and White franchisees in the nation.

41.     Not surprisingly, the Byrds have lost **more than half** of their organization of restaurants: James Byrd owned and lost eight (8) restaurants, while Darrell Byrd owned and lost two (2) restaurants, due to McDonald's misconduct. The Byrds are now left with only four (4)

remaining restaurants and no way out other than to sell to McDonald's at a financial loss or continue to operate in fear of retaliation.

(i)    *James Byrd, Jr.*

42.    Plaintiff James Byrd is a Black McDonald's franchisee who owns and operates two (2) McDonald's franchises located at 3675 S. Houston Levee Road, Collierville, TN, NSN 22859, L/C 41-0597 ("Houston Levee") and 1206 N. Houston Levee Road, Cordova, TN, NSN 31693, L/C 41-1029 ("Macon").

43.    James Byrd began with one (1) McDonald's restaurant in the Memphis, Tennessee area, and had a total of ten (10) McDonald's restaurants at the height of his career.

44.    Mr. Byrd was also elected Chair of the Nashville Regional Leadership Council, by a group of all other McDonald's Owner/Operators in the Nashville Region.

45.    Yet, upon entry and throughout his franchise term, McDonald's has restricted Mr. Byrd's franchise opportunities through steering and restrictions on growth beyond locations in predominantly Black, inner-city, or rural and economically depressed neighborhoods, with higher operational costs and insufficient sales to offset those costs.  These stores were primarily located in areas that McDonald's needed Black franchisees like Mr. Byrd to operate because of security concerns by White franchisees, who historically rejected these locations, and to better target the Black McDonald's consumers who live there.

46.    In contrast, a White franchisee in the same Region, Fred Tillman, who entered the McDonald's franchise system just a few years before Mr. Byrd, was awarded franchise opportunities in approximately twenty (20) profitable locations by McDonald's throughout the course of his franchise term, without similar restrictions to locations solely because of his race.

12

47.     At all relevant times, Mr. Byrd did not know and had no way to discover that McDonald's intentionally limited his opportunity to own and operate a franchise in the open market because of his race.

48.     McDonald's sold Mr. Byrd the Houston Levee and Macon restaurants based on projections of $1.8 million and $1.5 to $1.6 million in 2003 and 2008, respectively.

49.     Although Mr. Byrd's Macon and Houston Levee restaurants are subject to higher expenses than similarly-situated White franchisees, and currently average $1 million and $700,000 **_less than_** McDonald's national average sales, respectively, McDonald's escalated Mr. Byrd's rent to original rents on or after 2015, at rates of 8.56% on Houston Levee and 13.94% on Macon, which continue to date.

50.     Mr. Byrd also remains solely responsible for payment of all operational expenses and renovations required by McDonald's, without any growth opportunities to offset these costs.

51.     Despite the geographic and financial limitations imposed by McDonald's, Mr. Byrd's operational standards record consistently met performance objectives.

52.     Nevertheless, and despite devoting decades to the McDonald's franchise system, Mr. Byrd has become a captive tenant of McDonald's no way out but to sell on McDonald's terms at a loss or operate at a loss.  By continually denying Mr. Byrd profitable locations, which were instead given to White franchisees, and isolating him every step of the way, McDonald's placed Mr. Byrd in a financial hole that only McDonald's can get him out of.

53.     For example, on or about August 20, 2014, Mr. Byrd sold two (2) of his restaurants to help his financial situation as part of a "4-store package deal," along with Darrell Byrd, to Fred Tillman and his son, Chad, the same White McDonald's franchisees who became the largest franchisee operators in the U.S., with the organization of close to seventy (70) stores,

predominantly located in Memphis. Unlike Mr. Byrd, however, McDonald's granted the Tillmans profitable locations to enable them to offset the high costs associated with the riskier locations it systematically offered to Mr. Byrd.

54. McDonald's was aware at all times material of the Tillman's market domination of profitable locations in the Region, which made it impossible for Black franchisees like Plaintiffs to grow their organizations. As a result, James Byrd now has an increasingly smaller voice in his local advertising co-op to vote on marketing that directly impacts his remaining restaurants. It is no surprise that Mr. Byrd is the only Black McDonald's franchisee left standing in Memphis.

55. Likewise, when McDonald's implemented a nationwide consolidation of the total number of franchise organizations across all demographic groups, only those franchisees with the largest organizations of restaurants remain. This of course disproportionately impacts the Class of Black franchisees like Mr. Byrd whose growth has been systematically restricted.

56. In 2018, when McDonald's approved the opening of two (2) new franchised restaurants in Mr. Byrd's area, it conducted impact studies that showed a high impact on Mr. Byrd's sales. Despite this knowledge, McDonald's told Mr. Byrd that he would have to wait a year before receiving any impact relief. Mr. Byrd was forced to go to the Ombudsman for help relief and, even then, McDonald's only awarded him relief on Macon, not Houston Levee.

57. On November 12, 2019, McDonald's notified Mr. Byrd that his Houston Levee restaurant is not eligible for a new term franchise, known as "Rewrite." Pursuant to the notification, Mr. Byrd is required to sell or give his restaurant to McDonald's by June 23, 2022.

58. When Mr. Byrd spoke out against McDonald's treatment in response to the denial, inspections of his restaurants grew exponentially.

14

59.     During a March 2020 meeting, Jim Schugars, a McDonald's Operations Officer for the Nashville Field Office, threatened Mr. Byrd for seeking legal counsel, telling him, that "he hoped his attorneys weren't charging him by the hour because McDonald's had a building full of attorneys that would outlast him."

60.     Mr. Byrd's Macon restaurant is subject to a 20-year lease term, expiring 2028, with eligibility for Rewrite three calendar years prior, in 2025.

61.     James Byrd is currently operating the Houston Levee and Macon restaurants.

#### (ii)     *Darrell Byrd*

62.     Plaintiff Darrell Byrd is a Black McDonald's franchisee who owns and operates two (2) McDonald's franchises located at 11590 Highway 70, Arlington, TN, NSN 29403, L/C 41-0784 ("Arlington") and 16630 US Hwy. 64, Somerville, TN, 38068, NSN 34976, L/C 41-1097 ("Somerville").

63.     Darrell Byrd became an approved McDonald's owner operator when he joined his brother's organization.

64.     Darrell Byrd's restaurants, like his brother's, were in predominantly rural or Black neighborhoods with higher operational costs and revenues that fail to cover expenses over time.

65.     Although Mr. Byrd's Arlington location appears to be "high volume" from McDonald's perspective based on gross sales, his sales are still below the sales of White franchisees in his Region, and they fail to make him any profit because of high operational costs, such as security costs. On December 8, 2020, there was a deadly shooting at his Arlington restaurant, leaving one person dead.

66.     Mr. Byrd continues to be subject to base and percentage rent based solely on McDonald's acquisition and development costs, with percentage rent set as high as 14.5%.

67.     McDonald's leveraged Mr. Byrd's economic hardship to scare him and his brother into accepting a "packaged deal" sale that included Darrel Byrd's most profitable store, Oakland, resulting in even further economic hardship.

68.     Despite several requests for rent reduction to McDonald's USA Regional Office, McDonald's USA told Mr. Byrd "not to even bother" formally applying.

69.     In a May 2019 business review, which McDonald's controls and engages with franchisees on an individual basis, McDonald's Operations Officer for the Nashville Field Office, Jim Schugars, and McDonald's Franchise Business Partner, Clyde Neville, deemed Mr. Byrd as "ineligible for growth," giving him a financial score of 5 (on a scale of 10).

70.     In contrast, similarly-situated White franchisees in the same Region, during the same time period, such as Michael Retzer, were given overrides by Messrs. Schugars and Neville, despite having financial scores of 5 and as low as a 2.  This ongoing practice has enabled White franchisees to meet financial standards and continue to grow, while McDonald's has deprived Mr. Byrd and other similarly-situated Black franchisees of equal opportunities for growth to offset their substandard locations, serving as cover for McDonald's continued practice of strongarming Black franchisees like Mr. Byrd out of the McDonald's franchise system towards the end of their franchise terms once they are not able to pay McDonald's increasing rents and service fees.

71.     Once McDonald's labeled Mr. Byrd as "ineligible for growth," he lost any remaining leverage and has not been able to improve his financial situation through profitable restaurant locations.

72.     Mr. Byrd has remained in this position to the present date with no meaningful assistance from McDonald's.

73.     Darrell Byrd is currently operating the Arlington and Summerville restaurants.

16

**B.** **Defendants**

74.     Defendant McDonald's USA, LLC ("McDonald's USA") is a Delaware limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 110 North Carpenter Street, Chicago, Illinois.

75.     McDonald's USA is a wholly-owned subsidiary of McDonald's Corporation and the franchisor of the McDonald's franchise system, which develops, operates, franchises, and services a system of fast-food restaurants in the United States.

76.     Defendant McDonald's Corporation ("McDonald's Corporation") is a publicly traded Delaware corporation with its principal place of business located at One McDonald's Plaza, Oak Brook, Illinois.  McDonald's Corporation is the sole member of McDonald's USA, and is the worldwide franchisor of the McDonald's franchise system.

77.     McDonald's Corporation is the franchisor of agreements entered into by Plaintiffs and the putative Class (and not later amended or superseded) prior to approximately 2005, and McDonald's USA is the franchisor of agreements entered into by Plaintiffs and the putative Class since approximately 2005.

78.     McDonald's Corporation and McDonald's USA are collectively referred to as "McDonald's" or "Defendants," with respect to any allegations regarding their franchise relationship with Plaintiffs and the putative Class.

## JURISDICTION AND VENUE

79.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based on the federal question arising under Section 1981, 42 U.S.C. §§ 1981 *et seq*.

80.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d) because this is a class action subject to the Class Action Fairness Act ("CAFA"), Pub.L. No. 109-2, 119

Stat. 4 (codified in various sections of 28 U.S.C.), with an aggregate amount in controversy in excess of Five Million Dollars ($5,000,000.00) (exclusive of interest and costs), members of the Class in excess of one hundred (100), and with at least one (1) member of the putative Class that is a citizen of a state different from that of one of the Defendants.

81.     This Court has personal jurisdiction over Defendants because their principal place of business is in the State of Illinois and because they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction.

82.     Venue is proper pursuant to 28 U.S.C. § 1391 and 18 U.S.C. §1965, because a substantial part of the events or omissions giving rise to the claim have occurred and are occurring in the Northern District of Illinois, and each Defendant transacted affairs and conducted activity that gave rise to the claim of relief in this District, where their principal place of business is located, and they are headquartered. 28 U.S.C. § 1391(b); 18 U.S.C. §1965(a).

## FACTUAL ALLEGATIONS

### A.     McDonald's Franchise Model: Unequal Bargaining, Captive Tenants, Discriminatory Franchise Agreements, and Misleading Financial Disclosures

83.     McDonald's business model is highly franchised, allowing it to become one of the largest commercial real estate owners in the world: 93% of McDonald's restaurants are franchised globally, with 95% of all U.S. restaurants franchised to independent franchisees and about 5% franchised to McOpCo companies by McDonald's USA.

84.     McDonald's Corporation owns and controls approximately 55% of the land and 80% of the buildings for restaurants in its consolidated markets.

85.     According to McDonald's Corporation's 2019 Annual Report, net property and equipment under franchise arrangements totaled $19.2 billion (including land of $5.4 billion) *after* depreciation and amortization of $10.9 billion at year-end 2019.

86.     In 2019, consolidated revenues for McDonald's Corporation totaled $21.1 billion, returning approximately $8.6 billion to shareholders through a combination of shares repurchased and dividends paid at year-end 2019. McDonald's revenues consist of rents, royalties, and initial fees; franchised sales are *not* recorded as revenues of McDonald's Corporation.

87.     McDonald's is the leading quick-service restaurant ("QSR") chain in the United States, with a brand value of $146.1 billion, according to Forbes, and total assets of $47.5 billion, according to McDonald's Corporation's 2019 Annual.

88.     At the same time, capital expenditures decreased $348 million or 13% in 2019, primarily due to lower reinvestment in existing restaurants. McDonald's Corporation's total capital expenditures in the U.S. totaled approximately $1.4 million in 2019, $1.8 million in 2018, and $861,000 in 2017.

89.     Under this business model, McDonald's USA obtains new capital as well as profits from its franchisees, with little to no investment of its own. By using franchisees' fees and rent to acquire land and build restaurants that McDonald's now owns, McDonald's creates captive tenants out of its franchisees, requiring them to pay extremely high rent over long lease terms, without any right to renew, to develop its own real estate without investment, using the franchisee to lever leaseback financing, thereby allowing McDonald's Corporation to reap tremendous profits.

90.     McDonald's Corporation has grown to become the world's leading global foodservice retailer, with 39,000 restaurants globally in over 100 countries at year-end 2019. *See* "McDonald's Reports Second Quarter 2020 Results," McDonald's Company News, July 28, 2020.

        **(i)     *The Franchise Agreement***

91.     Under McDonald's standard franchise agreement, McDonald's owns or secures a long-term Operator's Lease for the land and building of the restaurant location for 20-year terms

(the Franchise Agreement, Operator's Lease, FDD, and any amendment(s) thereto are collectively referred to as, the "Franchise Agreement").[2]

92.     Under the Franchise Agreement, McDonald's owns or leases the franchised premises, so that the franchisee is always the tenant. Franchisees are granted the right to operate a restaurant using the McDonald's system through a license and, in most cases, the use of a restaurant facility, through the Lease, which is coterminous with the Franchise Agreement. Failure to renew therefore includes eviction and loss of the franchisee's business.

93.     Franchisees pay initial fees upon the opening of a new restaurant or grant of a new franchise, as well as continuing rent and royalties to McDonald's based upon a percent of sales with minimum rent payments. This structure enables McDonald's to generate significant and predictable levels of cash flow.

94.     Additionally, franchisees pay all occupancy costs, including, fire and casualty insurance on the real estate, naming McDonald's as the insured, liability insurance protecting McDonald's, equipment and fixtures on the real estate (signs, seating, and décor), property taxes, and site maintenance of the real estate, at franchisees' **sole cost and expense**, as well as improvements of McDonald's real estate at no cost to McDonald's.

95.     At the end of the 20-year term, McDonald's maintains control of the underlying real estate and building and can either enter into a new 20-year franchise agreement with the existing franchisee or a different franchisee, or close the restaurant.

96.     Through McDonald's standard Franchise Agreement, McDonald's agrees to make available to Franchisee **all** additional services, facilities, rights, and privileges relating to the

---

[2] Upon information and belief, Plaintiffs' standard Franchise Agreements contain the same or substantially similar terms as each of the Franchise Agreements entered into with Class Members.

operation of the Restaurant which McDonald's makes generally available, from time to time, **to all its franchisees** operating McDonald's restaurants.

97.     Through McDonald's Franchise Disclosure Document ("FDD"),[3] McDonald's provides prospective franchisees[4] with "Financial Performance Representations," that include *pro forma* statements with the national average sales of domestic traditional McDonald's restaurants opened at least one (1) year prior.  For example, the most recent 2020 FDD provides, in pertinent part, as follows:

> ### All Domestic Traditional Restaurants
>
> Of the approximately 12,032 domestic traditional McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 79% had annual sales volumes in excess of $2,300,000; approximately 70% had annual sales volumes in excess of $2,500,000; and approximately 60% had annual sales volumes in excess of $2,700,000.  The average annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was $3,009,000 during 2019.  The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively.  The median annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,910,000 during 2019**.
>
> ### Traditional Franchised Restaurants
>
> Of the approximately 11,435 domestic traditional franchised McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 78% had annual sales volumes in excess of $2,300,000; approximately 68% had annual sales volumes in excess of $2,500,000; and approximately 58% had annual sales volumes in excess of $2,700,000.  The average annual sales volume of domestic

---

[3] McDonald's has possession of the disclosure documents it provided to Plaintiffs and Class Members.

[4] McDonald's provides disclosure documents not only upon entry, but also throughout the franchise term with respect to any additional purchases of a franchise and/or in connection with a sale of a franchise.  A "prospective franchisee" is defined by the Franchise Rule as "any person (including any agent, representative, or employee) who approaches or is approached by a franchise seller to discuss the possible establishment of a franchise relationship."  16 C.F.R. Part 436.

traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was $2,970,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,867,000 during 2019**.

### *Traditional Company Owned Restaurants*

Of the approximately 597 domestic traditional McOpCo restaurants opened at least 1 year as of December 31, 2019, approximately 99% had annual sales volumes in excess of $2,300,000; approximately 98% had annual sales volumes in excess of $2,500,000; and approximately 95% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was $3,758,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McOpCo restaurants was $8,182,000 and $2,047,000, respectively. The median annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was **$3,629,000 during 2019**.

Emphasis added.

98.    At all times material hereto, and upon information and belief, Class Members' average annual sales are below McDonald's disclosed national sales averages of $2.7 million between 2011 and 2016, and $2.9 million in 2019.

99.    McDonald's dictates uniformity of the operational structure and revenue expectations of all its franchisees' restaurants, even though they are cognizant that Black-owned and operated McDonald's franchises generate significantly lower revenue and assume higher operational costs than the national average due to the low-income and high-cost locations it steers its Black franchisees to.

100.    McDonald's knew that these differential revenue and operating costs of Black-operated franchises as compared to White-operated franchises are not random or due to poor

management.  These differences are statistically significant and are the result of the historical racial bias and barriers built into the McDonald's franchise system.

101.    Acquisition of a McDonald's franchise under these conditions was nothing short of a financial suicide mission.

(ii)    *Entry into the McDonald's Franchise System*

102.    Before McDonald's will consider candidate for any McDonald's franchise opportunity, a candidate must first satisfactorily complete McDonald's Franchise Applicant Training and Evaluation Program, which may exceed a period of two years on a part-time basis, without compensation, or any commitment or promise of a McDonald's franchise.

103.    According to McDonald's website, the decision to offer any franchise opportunity is within McDonald's ***sole*** discretion.  *See* https://www.mcdonalds.com/us/en-us/about-us/franchising.html (last visited on Jan. 25, 2021).

104.    McDonald's does not offer franchise territories and will ***not*** work with applicants who want a specific geographic location.  *See* McDonald's Franchising FAQ ("We do not franchise territories and do not work with applicants who desire a specific restaurant location or limited geographic area."), at  https://www.mcdonalds.com/us/en-us/about-us/franchising/franchising-faq.html (last visited Jan. 25, 2021).

105.    According to "Your Path to Becoming a McDonald's Franchisee," prospective franchisees can only enter the Franchisee Training Program if they meet the following requirements:

    a.    Ability to invest a minimum of $500,000 in non-borrowed personal funds;

    b.    Divestiture of all existing business interests;

      c.  Commitment to an extensive training program that can range from 12-18 months, with a minimum of 20 hours per week;

      d.  Relocation based on availability of restaurants.

*See* McDonald's "*Your Path to becoming a McDonald's franchisee*," at p. 23, https://www.mcdonalds.com/content/dam/usa/nfl/documents/franchising/Your_Path_to_Becoming_a_McDonalds_Franchisee.pdf (last visited on Jan. 25, 2021).

### (iii)    *The Cost to Own and Operate a McDonald's Franchise*

106.    To purchase a McDonald's franchise, McDonald's requires an initial down payment of 40% of the total cost for a new restaurant, or 25% of the total cost for an existing restaurant. *See* McDonald's *Buying a Franchise*, https://www.mcdonalds.com/us/en-us/about-us/franchising/acquiring-franchising.html.  The balance of the purchase price may be financed for no more than seven years. *Id.*

107.    Pursuant to McDonald's 2020 FDD, McDonald's estimates a franchisee's Estimated Initial Investment to be between $1,314,500 to $2,306,500, which do not include ongoing percentage rate or service fees.

108.    In addition to these initial fees, McDonald's requires franchisees, including Plaintiff and Class Members, to pay the following ongoing fees:

      a.  **Service fee**:  A monthly service fee based upon the restaurant's sales, which, as of this filing date, is an amount equal to four percent (4.0%) of the Gross Sales[5] of the restaurant for the preceding month immediately ended; and

      b.  **Rent**:  Monthly base rent and any pass thru rent, if applicable, plus percentage rent in amounts calculated as a percentage of monthly Gross Sales, and any applicable rent escalations.

---

[5] "Gross Sales" is defined in the Franchise Agreement as all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant.

109.    Gross sales are not impacted by operational costs and neither is McDonald's service fee and/or monthly rent.  Operational costs only impact the franchisee's profit, not McDonald's.

110.    Plaintiffs and putative Class Members are required to lease the restaurant premises from McDonald's, under an Operator's Lease that is incorporated into the Franchise Agreement. Prospective franchisees must agree to use and occupy the leased premises solely for a McDonald's Restaurant selling only such products and operating in a manner that may be designated by McDonald's and in a manner that will maximize gross sales.

111.    Under the Operator's Lease, franchisees are required to pay rent every month of the franchise to McDonald's, along with the related occupancy costs, which include property taxes, insurance, maintenance, and structural repairs.

112.    Under this formula, McDonald's derives significant revenue without any significant risk of loss.  The base rent gives McDonald's a minimum guarantee of profit, with additional profits obtained through percentage rent.

113.    McDonald's also requires franchisees to rebuild, renovate, and/or make major remodels to their restaurants at franchisees' **<u>sole</u>** cost and expense.  McDonald's therefore owns the real estate, franchisees' money pays for it, and all improvements on the real estate by franchisees benefit McDonald's as the owner.

114.    Franchisees are also **<u>solely</u>** financially responsible for advertising and promotion through contributions set at a **<u>minimum</u>** of 4% of Gross Sales each calendar year through the U.S. cooperative of McDonald's Owner/Operators known as the Operator's National Advertising ("<u>OPNAD</u>") Fund.  While participation is technically "voluntary," franchisees' consistent involvement with OPNAD and local cooperatives is one of several factors McDonald's uses to

measure compliance with the Operator Involvement standard, which Plaintiffs and Class Members **must** meet to be eligible for growth and rewrite.

### (iv) *The Cost to Own and Operate a Black McDonald's Franchise: A Financial Suicide Mission*

115.  Unequal bargaining power characterizes the relationship between franchisees and McDonald's and this bargaining disparity is even more palpable for Black applicants and franchisees like Plaintiff and Class Members.

116.  This unequal bargaining position made it easy for McDonald's to historically award Black franchisees entering the system the oldest restaurants, in need of the most reinvestment, in tough and depressed areas, that had been routinely rejected by White franchisees, many of which McDonald's wanted to close, but needed someone to operate until McDonald's could sell its real estate.

117.  McDonald's offered Plaintiff and Class Members locations with higher operating costs, such as security, insurance, and employee training and turnover, and which are historically underperforming in sales to offset these expenses.

118.  McDonald's discriminatory practices led to low cash flow and decreased equity for Black owner/operators, forcing Black owner/operators, including Plaintiff and Class Members, into significant debt.

119.  According to documents from the NBMOA, the cash-flow gap between Black and White McDonald's franchisees **more than tripled** between 2010 and 2019.

120.  Indeed, Black franchisees have been all-but forced into substandard locations, under long-term contracts, isolated every step of the way by McDonald's business practices.

121.  For McDonald's, it was a win-win strategy to collect high rent and fees for substandard restaurants, built upon a history of discrimination it successfully executed for decades.

B.     **McDonald's History of Discrimination Against Black Franchisees**

122.   The McDonald's franchise system was established in 1955, but Black franchisees were denied entry until 1968, following the assassination of Dr. Martin Luther King Jr., at the height of civil unrest.

123.   Through crudely-coined "zebra" and "salt and pepper" partnerships with silent, White investors, McDonald's used its Black franchisees to expand its real estate footprint into predominantly Black, inner-city neighborhoods where White franchisees refused to operate, particularly in the face of mounting racial tension in the United States.

124.   On December 21, 1968, Herman Petty opened his first restaurant in the inner-city of Chicago, becoming the first Black Owner/Operator of a McDonald's franchise.

        **(i)     *Boycott in Cleveland 1969***

125.   A boycott of McDonald's in 1969 made headlines in Ohio and led to the first Black franchisees in the McDonald's system opening restaurants in depressed areas of Cleveland.

126.   In a January 25, 1970, article regarding the first Black owned and operated McDonald's franchise, the New York Times reported: "Spokesman for Negro groups, who banded together to form Operation Black Unity have been demanding black ownership of four existing McDonald's units … ***All are in predominantly Negro areas***." *Cleveland Negro Wins a Franchise*, N.Y. Times (Jan. 25, 1970), https://www.nytimes.com/1970/01/25/archives/cleveland-negro-wins-a-franchise-9month-controversy-over-restaurant.html (emphasis added).

127.   In 1972, the National Black McDonald's Operators Association, also known as the NBMOA, was founded to help promote growth in the industry by Black owner/operators.

128.   During hearings held on April 7 and 8, 1976, before the United States Senate Committee on Commerce regarding the Fairness in Franchising Act, Donald R. Conley, President

of the McDonald's Operator's Association, testified that McDonald's primary tool used to force franchisees to sell prior to expiration of their agreements is their power over renewal of franchise agreements, entirely within McDonald's control and discretion, allowing them to discriminate against franchisees. *See* U.S. Senate, Hearing of the Committee on Commerce, S. 2335 (1996), at pp. 381–397.

129. Mr. Conley testified that McDonald's inhibits franchisees' expansion, while encroaching on their territories, with new McDonald's restaurants that cut sales volume, thereby depressing the resale value of the franchise at franchisee's loss and McDonald's gain. *Id*. He explained that because McDonald's franchise agreement has a restrictive covenant that prevents the franchisee from owning any business other than his own McDonald's operation, the franchisee is locked into the McDonald's store as his only business such that cutting the sales volume or profitability of that one business by siphoning off sales to additional units is a process employed by McDonald's to devalue the business interest and drive the franchisee out of business. *Id*.

130. In the same hearing, Vice President of McDonald's Corporation is cited in an excerpt from the company's in-house publication, "Insight," as stating that pursuant to McDonald's renewal policy, being a good operator, having high sales volume, and/or being favorably regarding by customers does ***not*** entitle a franchisee to renewal. *Id*. at 382. According to McDonald's, renewal can be denied for other completely subjective evaluations at the whim of management, such as "stamina," "attitude," "cooperation," and the like; "McDonald's reserved the right to discriminate against existing franchisees as to renewal." *Id*. at 387.

### (ii) *Trouble Under the Golden Arches: Black Franchisee Sues McDonald's for Racial Steering*

131. By the 1980s, Black franchisees were operating in the McDonald's franchise system, but McDonald's did not treat Black franchisees as equals to White franchisees.

28

132. In 1983, Charles Griffis, a Black McDonald's owner/operator in the Los Angeles market, filed a race discrimination countersuit against McDonald's, alleging, among other things, that McDonald's systematically excluded Black franchisees from buying stores in White neighborhoods.

133. In a March 12, 1984, New York Times article, Griffis detailed his experience:

> **My stores are in hellholes**, he said. They get robbed once or twice a month, and I pay $20,000 a month in security services they don't pay in good neighborhoods. We had a murder in one and we still get the windows smashed and the bathrooms vandalized. **I've upgraded my stores a lot and I don't see why I shouldn't have a shot at a store in a good neighborhood**.

Tamar Lewin, *McDonald's is Battling with Black Franchisee*, N.Y. Times, March 12, 1984,

*available at* https://www.nytimes.com/1984/03/12/business/mcdonald-s-is-battling-with-black-franchisee.html; *see also* excerpt of the article below (emphasis added).



"Charles Griffis came to California in 1977 when he heard he might be able to buy a McDonald's franchise in Santa Barbara… It turns out, though, that the store was in Los Angeles on Santa Barbara Street, right in the middle of the ghetto… It was an old store in real bad shape."

". . .[Rev. Jesse] Jackson wrote McDonald's on behalf of his Operation PUSH to complain that blacks felt they were 'being subjected to a double standard' in that they were **confined to inner-city areas with high maintenance and security costs, and were usually offered only recycled stores, which are generally more expensive and less profitable than new ones**. . .

134.    In response to McDonald's racial practices, and Griffis' situation, the New York chapter of the NBMOA also wrote to McDonald's New York Regional Vice President at the time to advise that, "**black McDonald's owner-operators are primarily confined to ghetto areas and not allowed to expand as fast as their white counterparts**." *Id*. (emphasis added).

135.    As of the publication of the March 1984 article, there were 137 Black McDonald's operators nationwide, with 267 restaurants, totaling approximately two (2) stores per Black operator, as compared to the average of five (5) stores per McDonald's White operator. *Id*.

136.    Today, McDonald's has dwindled down to a similarly low number of Black franchisees, following false promises of parity and a reverse course back to discrimination.

**(iii)    *McDonald's Admits Racial Steering and Need for Parity***

137.    In the late 1990s, McDonald's leadership admitted that McDonald's excluded Black franchisees from franchise opportunities afforded to White franchisees.

138.    Specifically, through Executive Vice President, Thomas S. Dentice, McDonald's admitted, "**[T]he company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers**."



I am also highly frustrated that Black Franchisees have been part of the McDonald's system for almost thirty years and as a group have not achieved the same level of success as other franchisees that have the same tenure. . . . **[F]or business reasons we thought were valid at the time, the company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers**.

I am personally tired of this lack of progress by my company. I am tired of being the person that has to listen to your calls for help and not seeing progress. I am tired of making excuse[s] for myself and others and I am tired of working my tail off to achieve our mutual goals and being considered the enemy.

- A full course press will be applied to fix all of the existing under performing locations that are owned by African American Franchisees-----second chances for all African American Franchisees will be the rule, not the exception for the rest of 1996 and beyond, if necessary, until we get the current problems fixed.

- The company in concert with the Black Franchisees, will create and implement a strategy designed to achieve parity for African American franchisees. It will be aggressive, focused, have a short period to reach its objectives, be measurable and have the endorsement and full backing of the TMT.

- There will be rewards for success and sanctions for failure in achieving plan targets and goals.

- The company will meet with the NBMOA on a regular basis to review progress..

- The strategic plan will be announced and implemented by July 1, 1996 and achieve meaningful results by year end.

- We will not try to reach consensus on what the "right decision" is to fix financial and franchising problems. That authority will rest in the hands of a few individuals.

- This process will be viewed for what it is; achieving parity for our Black Franchisees, not reaching a comfortable financial or franchising solution for the company.

- The company will also work in concert with the NBMOA to develop a comprehensive strategy for African Americans that includes purchasing and marketing.

Reggie, I know that we can achieve our common purpose. We may disagree at times on the what's and how's as we move forward, but I know that we do not and will not disagree on what we want to accomplish-----Parity.

Sincerely yours,

> This process will be viewed for what it is; achieving parity for our Black Franchisees, not reaching a comfortable financial or franchising solution for the company.
> ***
> We may disagree at times on the what's and how's as we move forward, but I know that we do not and will not disagree on what we want to accomplish-----Parity.

A true and correct copy of the April 18, 1996, Letter to NBMOA Chairman, Reggie Webb, is attached as **Exhibit "A"** hereto, with excerpts above (emphasis added).

138.    Yet, parity was never truly achieved. McDonald's spent the next decade instituting aspirational and temporary measures and promising Black franchisees, including Plaintiffs, that it was working to achieve parity between Black and White McDonald's franchisees.

31

139.   Plaintiffs and Class Members relied on these representations and had no reason to believe McDonald's was discriminating against them.

140.   On November 14, 2002, NBMOA leadership addressed McDonald's past discriminatory practices in a letter from NBMOA Chairman and CEO, Larry C. Tripplett, to NBMOA Membership, which described its negotiations with McDonald's Leadership "to ensure that Parity is met and maintained."  *See* Nov. 14, 2002 Tripplett Letter, **Exhibit "B"** hereto, with excerpts below.



First, let me remind you of what you already know. **We are "Free People."**  We have the right to expect not to be discriminated against by anyone.  Discrimination is illegal in this Country.  We make significant contributions to the McDonald's System every day.   In some cases, these contributions are made under very difficult dangerous environmental circumstances.  We do so proudly and professionally as we all desire the American Dream of successful Business Ownership.  We deserve and will demand nothing less than equal treatment.   **We must continue to stand United and Strong**.  We have nothing to fear.

As you are aware, the NBMOA Executive Committee is in earnest negotiations with the Leadership of McDonald's Corporation to ensure that Parity is met and maintained.  We believe that each and every African American Franchisee should receive real assurances that when Parity is met, the discriminatory practices of the past will not reoccur.

141.    In 2006, after a decade of fighting for parity, Don Thompson became the first Black President of the Western Division of McDonald's and went on to serve as the first Black President and CEO of McDonald's from 2012 to 2015.

### (iv)    *Change in McDonald's Leadership in 2015:  Reverse Course for Discrimination and Mass Exodus of Black Franchisees*

142.    In 2015, Easterbrook replaced Thompson as McDonald's President and CEO, and hand-picked Christopher Kempczinski, McDonald's current CEO and then President of McDonald's USA.

143.    Under Easterbrook and Kempczinski's leadership, McDonald's instituted discriminatory policies including, but not limited to, rejecting advertising budget modifications to target Black consumers, denying Black franchisees opportunities for growth, confining Black franchisees to inner-city or urban areas with higher costs, denying Black franchisees' requests for rent relief, and implementing initiatives such as the Bigger Bolder Vision 2020 ("BBV2020") modernization plan that negatively and disproportionately impacted Black franchisees, including Plaintiff and Class Members, in order to force them out the McDonald's franchise system.

144.    These discriminatory practices and policies led to the cash flow gap between Black franchisees in comparison to White franchisees tripling from 2010 to 2019, and a mass exodus of more than half of McDonald's Black franchisees from the McDonald's franchise system.

145.    On January 7, 2020, a lawsuit filed by two Black McDonald's senior executives against McDonald's for intentional racial discrimination, brought to light this renewed pattern and practice of covert and systemic discrimination against Black franchisees post-parity. *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1] (N.D. Ill. Jan. 1, 2020).

146. The same pervasive racial discrimination, disparate treatment, and substantial wealth gap for Black franchisees continues today under the leadership of Christopher Kempczinski.

      **(v)**    ***McDonald's Leadership is Once Again on Notice of Ongoing Disparate Treatment of Black Franchisees; Continues Making False Promises***

147. On March 12, 2019, Tripplett, as Chairman and CEO of the NBMOA, notified McDonald's USA Division Presidents, Charlie Strong and Mario Barbosa, of McDonald's discriminatory actions, in a letter which raised "serious concerns regarding the status of African American Owners within McDonald's Corporation." A copy of the March 12, 2019 Tripplett Letter to McDonald's is attached as **Exhibit "C"** hereto. Specifically, Tripplett advised McDonald's leadership that "**the trajectory of the treatment of African American Owners is moving backwards**. Through no fault of our own we lag behind the general market in all measures. This is reflected in the loss of sales to African American consumers. **We believe that the loss of sales is closely correlated to how African Americans are treated within the Company**." *Id*., at p. 1 (emphasis added).

148. Tripplett called for "urgent progress now," given, "[t]he current state of affairs for African American Owners [which] can only be described as hostile." *Id.*, at p. 3. The letter ended with a strong call for action: "**[W]e need change now**." *Id.* (emphasis added).

149. On November 4, 2019, following Easterbrook's firing, Tripplett provided an "Informational Update" to NBMOA Members, a copy of which is attached as **Exhibit "D"** hereto. Tripplett advised NBMOA members that McDonald's current CEO, Kempczinski, and Joe Erlinger, President of McDonald's USA, called him directly to assure him as follows: "[Kempczinski] expressed his plans to continue to work on our cash flow gaps as he and Steve Easterbrook agreed to do at our convention in Houston," and "[Erlinger] expressed his desire to

work with the NBMOA in achieving our initiatives." *Id*., at p. 1. "We are cautiously optimistic," Tripplett advised NBMOA members. *Id*.

150. Despite McDonald's empty promises and assurances to the NBMOA, intended to induce Black franchisees like Plaintiffs to operate its substandard restaurants, McDonald's knowingly continued institutional, systemic, and covert racial discrimination against its Black franchisees.

**C.** **"Big Mac Attack" on Black Franchisees: McDonald's Pattern and Practice of Intentional and Covert Racial Discrimination**

151. McDonald's sets Black franchisees up for financial failure through a pattern and practice applicable to Plaintiffs and the putative Class of covert, systemic, and continuous discrimination that includes, among other things: (i) steering and restricting Black franchisees' to predominantly Black inner-city and/or rural locations; (ii) excluding Black franchisees from growth opportunities to profitable locations made available to White franchisees; (iii) demanding Black franchisees to reinvest in locations that McDonald's knew would never reap the return on investment; (iv) failing to approve Black franchisees' reasonable requests for financial assistance and/or restructuring plans to account for the substandard locations it steers them to; (v) conducting harassing and targeted inspections and generating bad business reviews of Black franchisees' restaurants as pretext for termination and/or denial of rewrite; and/or (vi) employing fear and isolation tactics to force Black franchisees out once they were no longer profitable to McDonald's.

**(i)** ***Take it or Leave it: Steering and Redlining to High-Cost and Low-Volume Locations***

152. Upon entry into the McDonald's franchise system, and throughout their franchise terms, McDonald's systematically steered and/or restricted Plaintiffs and Class Members to

locations with lower margins and greater and more frequent capital expenditures than similarly situated White franchisees.

153.    These predominantly Black neighborhoods are located in the inner cities and/or rural areas, often filled with high-crime, patrons with little to no means to purchase significant meal tickets, leading to low-volume cash sales and high operating costs in the form of higher insurance rates, security costs, and employee turnover.

154.    In comparison, McDonald's offers White franchisees profitable locations and continued growth opportunities.

155.    McDonald's forced these less desirable locations on Plaintiffs and Class Members by, among other things, rushing Plaintiffs and Class Members, telling them that it could take months, if not years, to be offered another restaurant if they turned down a site. McDonald's made Plaintiffs and, upon information and belief, Class Members believe that these substandard locations were their only way to obtain a restaurant or continue in the system.

156.    Based on McDonald's misrepresentations and omissions regarding the availability of restaurants, their locations, and future growth opportunities, Plaintiffs and Class Members believed that if they did not take the restaurant(s) McDonald's offered them, their chances of entering McDonald's franchise system would be extremely limited. Plaintiffs and Class Members believed that they had equal access to locations within the McDonald's franchise as Whites.

157.    Unbeknownst to Plaintiffs and Class Members, McDonald's offered Black franchisees geographic locations in Black neighborhoods where White franchisees did not want to own or operate. Conversely, and upon information and belief, White franchisees were routinely given preferred locations and were able to buy and sell restaurants without restriction, allowing them to prosper.

36

158.    Through this process, McDonald's covertly restricts Plaintiffs and Class Members to substandard locations throughout their franchise terms, excludes them from purchasing restaurants in the open market, and thereby deprives them of the ability to achieve the same level of economic success as White franchisees.

159.    What is more, Plaintiffs and Class Members had to risk their own safety in these high-crime areas, often contending with drug dealers selling controlled substances inside and outside the restaurant, vagrants hassling customers, and multiple incidents of fights.

160.    Plaintiffs and Class Members often had to carry licensed firearms for their personal security.  These dangerous environments made it difficult for Plaintiffs and Class Members to attract and retain experienced managers and employees.

161.    Plaintiffs and Class Members took the bad to get the good, as McDonald's intentionally misled them by, among other things:  (i) providing financial representations that McDonald's knew did not—and could not—accurately reflect the net revenues of the locations it steered Plaintiffs and Class Members to; (ii) assurances that these restaurants would be profitable if Plaintiffs and Class Members made significant initial investments in rebuilds and/or renovations, encouraging debt to force Plaintiffs and Class Members into debt, bankruptcy, and/or economic duress, and more easily cycle them out of the system at a lower buy-back price; and (iii) assurances that any losses would be offset by growth opportunities to better locations, which was the key to any successful McDonald's franchise model.

> **(ii)    *McDonald's Requires Black Franchisees to Make Renovations to Locations it Knows Will Not Generate a Return on Their Investment***

162.    Despite placing Plaintiffs and Class Members in locations McDonald's knew could not succeed under its own franchise model, McDonald's required Plaintiffs and Class Members to invest in rebuilds and/or renovations within a short time, offering initial short-term lower rent, but

then rapidly escalating for the remaining franchise term, setting Plaintiffs and Class Members up for financial failure.

163.   McDonald's knew or should have known that the rebuilds and/or renovations it required would not provide increased sales to Plaintiffs and Class Members' locations sufficient to offset their upfront losses.

164.   Plaintiffs and Class Members paid for the costs associated with any rebuilds, renovations, and major remodels, often seeking outside financing, and driving them into debt.

165.   McDonald's compounded the financial pressure caused by these significant initial investments by later demanding long-term franchisees, including Plaintiffs and Class Members, to make significant and substantial capital investments pursuant to McDonald's modernization programs, such as Big Bolder Vision 2020 ("BBV2020"), or assume sole financial responsibility for compliance with McDonald's Corporation's modernization standards, such as Experience of the Future ("EOTF"), which McDonald's knew or should have known put disproportionate financial stress on Black franchisees.

166.   McDonald's imposed these modernization plans on Plaintiffs and, upon information and belief, Class Members, without regard for the financial feasibility or benefits for locations it knows or should know cannot sustain the costs and will have the effect of eliminating the older restaurants it steered Black franchisees to.

167.   The renovation requirements imposed by McDonald's on Plaintiffs and Class Members under threat of termination are unreasonable, financially untenable, and ultimately discriminatory.

168.    In addition to imposing these unreasonable renovation demands on Plaintiffs and Class Members, upon information and belief, McDonald's imposes related costs in connection with these renovations, such as equipment purchases it requires, in excess of market prices.

169.    Even in certain instances where McDonald's contributed to the rebuild and/or renovation costs, McDonald's charged Plaintiffs escalating rent it knew Plaintiffs and Class Members could not afford.

170.    Upon information and belief, White franchisees were not immediately required to rebuild and McDonald's placed White franchisees on a voluntary reinvestment program without the same time restrictions.

171.    Once McDonald's USA deems a franchisee ineligible for growth and/or rewrite in its sole discretion, the franchisee is left to foot the bill of any and all rebuild and/or renovation costs imposed by McDonald's Corporation's modernization standards, without any ability to offset the costs through growth opportunities.

172.    While Plaintiffs and Class Members were required to spend millions rebuilding and/or renovating their older restaurants, White franchisees spent their money buying additional McDonald's restaurants and expanding their franchise network.

173.    Even McDonald's company-owned "McOpCo" restaurants were kept in disrepair for years until McDonald's turned around and immediately required Plaintiffs and Class Members to reinvest in significant rebuilds and/or renovations as a condition of purchase.

174.    McDonald's rebuild and renovation requirements forced Plaintiffs and Class Members to sink their own funds into locations McDonald's knew would not provide any return on investment, benefitting McDonald's as the owner of the real estate, while driving Plaintiffs and Class Members into significant debt.

175. McDonald's further benefitted through targeted sales to Black consumers in locations where White franchisees reject and/or otherwise do not want to operate, at the expense of Plaintiffs and Class Members' net revenue, safety, and ultimate viability as McDonald's franchisees through little to no individual profit and lost growth opportunities into more profitable locations throughout their franchise terms.

      (iii)    ***McDonald's Arbitrarily Denies Black Franchisees Opportunities for Growth to Profitable Locations within the Franchise System***

176. The economics of owning McDonald's franchises is to own more than one location so that overhead costs can be absorbed by the multiple locations and yield a profit to the franchise owners.

177. McDonald's new restaurant investments are concentrated in markets with strong returns and/or opportunities for long-term growth, according to its annual reports.

178. Even after Plaintiffs and Class Members entered the system through substandard locations, McDonald's continued to deny Plaintiffs and Class Members the opportunity to own and operate franchises in more profitable locations, unless these more profitable locations were packaged with low-volume, high-cost locations.

179. McDonald's knew that to grow a profitable franchise organization in its franchise system, Plaintiffs and Class Members needed restaurants with higher sales volume and cash flow to offset the low-volume, high-cost restaurants it offered them.

180. Yet, McDonald's refused reasonable proposals from Plaintiffs and Class Members to expand within the McDonald's system by opening McDonald's restaurants at sites Plaintiffs and Class Members were ready, willing, and qualified to operate, offering these profitable locations to White franchisees instead.

40

181.     McDonald's thwarted the Plaintiffs' and Class Members opportunities to grow within the system through the purchase of additional high-volume restaurants in their Region, which were instead offered to White operators.

182.     For no reason other than Plaintiffs' and Class Members' race, McDonald's systematically rejected Plaintiffs and Class Members' sites and/or failed to provide Plaintiffs and Class Members with any meaningful assistance to locate better restaurants in better neighborhoods.

183.     Plaintiffs and Class Members would wait years before McDonald's made an offer for another store, only to find out they were offering another "hood" restaurant, meaning it was a low-volume store, in an economically distressed community, with a high crime rate.   These substandard restaurants were consistently offered to Black owner/operators over White owner-operators.

184.     In certain instances where Plaintiffs and Class Members were given the opportunity to purchase a profitable store, it was at a significantly higher premium, with oppressive conditions attached, such as an agreement to purchase other substandard locations as part of a "packaged deal."

185.     Despite McDonald's representations and continued assurances to Plaintiffs and Class Members that it would assist in growth opportunities, McDonald's continued to intentionally deprive Plaintiffs and Class Members of any meaningful assistance to find other viable expansion locations over the course of their franchise relationship.

186.     Indeed, McDonald's did the opposite of what it assured Black franchises and went as far as to saturate the market and encroach upon Plaintiffs and Class Members' locations by opening McDonald's restaurants just miles apart.

187.    While McDonald's offered impact funds to offset new store competition to White operators up front before the new, competing restaurant became operational, Plaintiffs and Class Members were made to "wait and see," until the actual impact could be assessed.  This forced Plaintiffs and Class Members to continue to operate at a loss, sometimes for more than a year, while they waited for the full impact of the competing restaurants to be realized and assessed.

188.    For no reason other than Plaintiffs' and Class Members' race, McDonald's intentionally limited Plaintiffs' and Class Members' ability to grow and expand their franchise organization throughout their franchise terms.

189.    Upon information and belief, McDonald's denied Plaintiffs and Class Members opportunities for growth, while it gave those opportunities to White franchisees.

### (iv)    *McDonald's False Promise of "Rent Relief" and Misleading Financial Assistance*

190.    Despite Plaintiffs and Class Members' significant investments and hard work over decades in the McDonald's franchise system, when Plaintiffs and Class Members, upon information and belief, requested financial assistance to reduce the rent, McDonald's either denied their requests or rent was temporarily reduced and then escalated causing further financial harm.

191.    By offering temporary financial assistance to Black franchisees throughout their franchise terms, McDonald's set Plaintiffs and Class Members up for perpetual debt in order to leverage their position against them in all future negotiations and lead them to believe that they are "bad operators" and individually responsible for any financial difficulties.

192.    Following temporary rent relief, McDonald's escalated Plaintiffs' and Class Members' rents, despite knowing that their locations have high costs and low-volume sales, as compared to locations offered to White franchisees.  McDonald's refused to provide Plaintiffs with permanent rent relief.

42

193. Through the FDD, in Item 6, McDonald's provides Plaintiffs and Class Members with a table of total acquisition and development costs, along with Fixed Percentage Rent rates, explaining how McDonald's sets and controls these costs and rent rates as follows:

> The percentages used in computing monthly payments based on Gross Sales are **determined by McDonald's management** in consideration of the rights being granted by the Franchise Agreement, **the drawing power of the McDonald's restaurant**, the value of the McDonald's System as a whole and **McDonald's interests in obtaining a profit in light of competitive conditions**. All payments made by you to McDonald's constitute a single financial arrangement between you and McDonald's which, taken as a whole and without regard to any designation or description, reflect the value of the rights being made available to you by McDonald's and the services being rendered by McDonald's during the franchise term. The percentages may vary among franchises depending upon when the franchise was sold as well as other factors. In unusual circumstances that involve special costs, the fees paid by you may be higher than those outlined in this Item 6.

(Emphasis added).

194. After placing Plaintiffs and Class Members in restaurants with no "drawing power," guided by McDonald's own "interests in obtaining a profit," *id.*, McDonald's denied Plaintiffs and Class Members any legitimate financial assistance, including, but not limited to, repeated requests for permanent rent reductions, financial restructuring, and paying for security not required by White owned and operated restaurants.

195. Tellingly, after the recent filings of discrimination lawsuits, McDonald's began offering retroactive rent relief from 2019, permanent rent reductions, and new high-volume restaurants to Black franchisees, conditioned upon signing a general release of all claims.

**(v)    *Targeted and Unreasonable Inspections and Grading***

196. Once Plaintiffs and Class Members are in dire financial situations and can no longer pay McDonald's its fees and/or rent, or once they refuse to continue to accept restaurants in crime-

43

ridden neighborhoods with low-volume sales, McDonald's pattern and practice is to begin targeted, rigorous, and unreasonable inspections and harsh grading in order to generate negative business reviews of Plaintiffs and Class Members' restaurants as pretext for termination or rewrite denial.

197.   Class Members who speak up, like Jim Byrd, or who have refused to continue to operate in substandard locations, have faced or now face increased and unreasonable inspections by McDonald's, including late at night or at odd hours.

198.   Whereas Plaintiffs and/or Class Members generally have positive business reviews prior to experiencing financial hardship and/or rejecting McDonald's offer to continue to operate in substandard locations, that immediately shifts once McDonald's begins harsh grading in a manner that disproportionately impacts Black franchisees as compared to White franchisees.

199.   McDonald's knows and leverages the fact that Plaintiffs and Class Members' eligibility for growth and renewal, or "rewrite," of their franchise term depends on business reviews and passing inspections.

200.   By instituting harsher grading standards and through unreasonable inspections, McDonald's negatively impacted Plaintiffs' and Class Members' performance ratings as pretext for McDonald's ability to deny Plaintiffs and Class Members growth and/or rewrite opportunities.

### (vi)   *No Choice But to Sell or Operate at a Loss:  McDonald's Forced Exit Scheme and Fear Tactics*

201.   Under the oppressive terms of McDonald's U.S.'s Rewrite (New Term) Policy ("McDonald's Rewrite Policy"), Exhibit K to the FDD, McDonald's has absolute and sole discretion with respect to whether a franchisee may or may not be offered a new term franchise, or "rewrite."

44

202. Pursuant to McDonald's Rewrite Policy, three (3) years prior to the franchise term expiring, the rewrite process begins. McDonald's controls the rewrite process: Only the McDonald's Rewrite Committee has the authority to offer, or decline to offer, a new term franchise. The Rewrite Committee's recommendations are submitted by the Vice President of the Field Office of the Rewrite Committee, compromised of members of McDonald's U.S. management. The decision of the Rewrite Committee is final.

203. There is no appeal process of the Rewrite Committee, and no member from a franchisee organization is a part of the decision committee, leaving operators with no recourse other than to sell the store, normally at loss. McDonald's exercises control in the sale process.

204. When McDonald's concludes that it will not offer a new term franchise, McDonald's will extend an alternative offer, which will give the Owner/Operator the opportunity to sell the restaurant business to a **qualified buyer** prior to the expiration of the current franchise. Subject to the terms stated in the alternative offer, which include a release, McDonald's will commit to offer a new term franchise to the **qualified buyer**.

205. If a franchisee decides to sell the franchise, **McDonald's must consent** in writing, consistent with its customary guidelines for the sale of a McDonald's restaurant franchise, **before** any such transfer may occur.

206. Due to McDonald's controlling the exit process, there is no way for Plaintiffs and/or Class Members to know the valuation of their restaurants and the amount if sold in an open market.

207. With the looming threat of further financial penalties, and no process for disputing qualification denials of buyers in the rewrite process controlled by McDonald's, McDonald's places Plaintiffs and Class Member in an untenable position, without any negotiating power.

45

208.    Plaintiffs and Class Members have suffered substantial damages in amounts that will be proven at trial, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, attorneys' fees, and costs as a result of McDonald's discriminatory practices alleged herein.

## CLASS ALLEGATIONS

### A. Class Definition

209.    Plaintiffs seek to certify and maintain a class action under Rules 23(a), (b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery.

210.    Plaintiffs are members of the proposed class they seek to represent and bring this action on behalf of Black McDonald's franchisees and all other similarly situated franchisees who have contracted with McDonald's to own and operate a McDonald's franchise in the United States that comprise (a) national injunctive classes and/or (b) national damage classes (collectively, the "Class").

211.    Plaintiffs bring this suit individually and on behalf of a proposed national class of all other similarly situated persons ("Nationwide Class") consisting of:

> All persons or entities who are Black members of a federally-protected class, have been denied the same rights enjoyed by White franchisees in the right to enjoy all of the privileges and benefits of established contractual relationships with McDonald's because of their race, and who currently own and operate a McDonald's franchise in the United States between the filing date of this Complaint through and until the discriminatory effects of Defendants' unlawful conduct cease (the "Class Period").

212.    Excluded from the Class are:

> a.    Defendants, their officers, directors, management, legal representatives, employees, assigns, heirs, successors, and wholly owned or partly owned subsidiaries and affiliates;

46

b.      Any judges or justices involved in this action and any members of their immediate families;

c.      Any Class counsel or their immediate family members;

d.      All governmental entities; and

e.      Any former McDonald's franchisees and/or their assignees who terminated and/or sold their franchises prior to the filing date of this Complaint.

213.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into sub-classes, or modified in any other way.

214.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy.

**B.  Numerosity and Ascertainability**

215.    This action meets the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1) because, upon information and belief, the Class includes over one-hundred (100) Black McDonald's franchisees, making individual joinder of Class Members' respective claims impracticable.

216.    While the exact number of Class Members is not yet known, there are currently one-hundred and eighty-six (186) Black franchisees according to NBMOA data. The precise number may be ascertained from NBMOA and/or McDonald's records, and through other appropriate discovery.

217. Locating members of the Class would be relatively simple, since McDonald's maintains records of all franchisees, and providing notice to Class Members could be accomplished by Court-approved notice methods.

**C.** **Predominance of Common Issues**

218. Questions of law or fact are common to all members of the Class. Defendants' illegal pattern of steering and restricting Black franchisees to substandard locations because of their race and unlawful practice of denying Black franchisees the same opportunities given to White franchisees, having a common, adverse effect on all Black franchisees, who suffer substantial damages as a result of McDonald's discriminatory practices, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, attorneys' fees, costs, and any and all unnecessary out-of-pocket expenses.

219. Therefore, common questions of law or fact are prevalent throughout the Class, including, but not limited to:

      a. Whether Defendants engaged in intentional racial discrimination in violation of Section 1981;

      b. Whether the Class has been damaged, and if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or punitive damages to which the Class is entitled.

**D.** **Typicality**

220. Plaintiffs' claims are typical of the claims of Class Members in that they arise from the same course of conduct by Defendants, share the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiffs and Defendants' conduct affecting Class Members, and Plaintiffs have no interests adverse to the interests other Class Members.

221.    Plaintiffs and Class Members sustained damages arising out of the Defendants' wrongful conduct as detailed herein. Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that Defendants have enjoyed ill-gotten gains in the form of real estate McDonald's owns. Plaintiffs and Class Members operate and improve at their expense for decades, allowing Defendants to expand its reach into Black neighborhoods, expand its consumer base, and reap the benefits of improvements by Plaintiffs and Class Members once it ultimately forces Black franchisees out. Plaintiffs and Class Members have been deprived of lost profits and growth opportunities due to money spent in renovation and/or rebuild costs not likewise required of White franchisees as a direct result of Defendants engaging in unlawful conduct. Such damages apply to all Class Members.

222.    Furthermore, the factual bases of Defendants' actions and misconduct represent a common thread of misconduct resulting in the common need for objective franchise standards for all Class Members. Plaintiffs' claims are, therefore, typical of the Class.

**E.  Adequacy of Representation**

223.    Plaintiffs will serve as fair and adequate Class Representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the Class they seek to represent.

224.    Plaintiffs, members of the Class defined above, are committed to be active and vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature.

225.    Further, there is no antagonism or hostility of interests between Plaintiffs and the Class and there will be no difficulty in the management of this litigation as a class action.

**F. Superiority**

226.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.  Without a class action, Class members risk retaliation and Defendants will remain free from responsibility for its course of discriminatory conduct and will be allowed to continue to force Plaintiffs and Class Members to operate in its riskiest locations or sell on McDonald's terms, at a loss.  Without class treatment, Plaintiffs and similar situated franchisees will be forced to conduct protracted, piecemeal litigation that might risk establishing standards of conduct and/or determinations.

227.    Individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

a.    The liability claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

b.    Given the individual Class Members are still under Franchise Agreements with McDonald's, few, if any, Class Members would seek legal redress individually for the wrongs Defendants committed against them for fear of retaliation;

c.    Absent certification, Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

d.    When the liability of Defendants has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

e.    This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and members of the Class can seek redress for the harm caused to them by Defendants.

228.     Because Plaintiffs seek relief for the entire Class, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants.

229.     Further, no unusual difficulties are likely to be encountered in the management of this class action.  Given that a great number of individuals have been impacted by the Defendants' conduct, it is impracticable for Plaintiffs and Class Members to litigate their respective claims individually due to the risk of producing inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources.  Therefore, the class action mechanism minimizes prospective management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

**COUNT I – VIOLATION OF 42 U.S.C. § 1981**
**(On behalf of Plaintiffs and the Nationwide Class)**

230.     Plaintiffs and putative Class Members adopt, reallege, and incorporate the allegations above as if set forth in full herein.

231.     The Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, mandates "[e]qual rights under the law" and prohibits discrimination in the "making and enforcement of contracts" on the basis of race.  42 U.S.C. § 1981(a).  The right "to make and enforce contracts" under Section 1981 "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

232.     Plaintiffs and putative Class Members brings this action to redress the deprivation of rights secured under the laws of the United States, 42 U.S.C. § 1981, individually and on behalf

of the Nationwide Class, for McDonald's company-wide pattern and practice of intentional and systemic racial discrimination against its Black franchisees.

233. Plaintiffs and putative Class Members are members of a protected class due to their race as Black citizens who have the same right to make and enforce contracts as White citizens pursuant to 42 U.S.C. § 1981.

234. Plaintiffs, and putative Class Members are in a contractual franchise relationship with McDonald's, within the meaning of Section 1981, providing that Black citizens have the same right to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the [franchise] relationship" as White citizens." 42 U.S.C. § 1981(b).

235. McDonald's violated Section 1981 by denying Plaintiffs and putative Class Members the same franchise opportunities made available to White franchisees.

236. McDonald's treated Plaintiffs and Class Members differently from other similarly-situated franchisees because they are Black, by a covert and continuing discriminatory acts, including, but not limited to:

    a.    Restricting Plaintiffs and Class Members to older, recycled restaurants, in poor-performing and dangerous locations with high operating costs and low-volume sales;

    b.    Requiring Plaintiffs and Class Members to invest in rebuilds and/or renovations within short timeframes not required of White franchisees;

    c.    Excluding Plaintiffs and Class Members from the same growth opportunities offered to White franchisees;

    d.    Failing to provide any legitimate business reasons for repeated denials of franchise opportunities to Plaintiffs and Class Members over many years;

    e.    Denying Plaintiffs and Class Members meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief

and impact funding;

f.    Depriving Plaintiffs and Class Members of the same legacy of opportunities offered to White franchisees through McDonald's Next Gen program;

g.    Retaliation against Plaintiffs and Class Members for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through targeted, increased, and unreasonable inspections;

h.    Disparate treatment with respect to inspections and grading of Plaintiffs and Class Members' restaurants because of their race; and/or

i.    Placing Plaintiffs and Class Members in untenable positions of economic duress, denying them eligibility for growth, so that they are left with no real choice but to exit on McDonald's terms or continue to operate at a loss.

237.    By the conduct described above, Defendants intentionally and willfully deprive Plaintiffs and Class Members of the same rights enjoyed by White citizens to be free from racial discrimination in the right to enter into contracts and the right to enjoy all of the privileges and benefits of established contractual relationships in violation of 42 U.S.C. § 1981.

238.    But for Plaintiffs' and Class Members' race and McDonald's discriminatory denial of equal franchise opportunities, Plaintiffs and members of the Nationwide Class would not have suffered and would not continue to suffer anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, thereby entitling them to compensatory damages in an amount in excess of the jurisdictional limit, including, without limitation:  special or consequential damages in the form of lost profits and business opportunities; damages for the intangible injury that results from the denial of civil rights under the law; emotional and physical suffering and distress, humiliation, damage to professional reputations and future business prospects; punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future; and an award of attorneys' fees, expert fees, and costs.

239.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) in lost profits per store.

240.     McDonald's has acted and continues to act with malice or reckless indifference to the rights of Plaintiffs and Class Members, thereby entitling them to punitive damages.

241.     At all times material, Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury and/or damage to Plaintiffs and Class Members would result, and despite that knowledge, willfully, wantonly, and recklessly pursued their course of conduct.

242.     Defendants' conduct is so gross and flagrant as to show a reckless disregard or a conscious wanton, reckless indifference to consequences or a grossly careless disregard for the life, safety, and/or rights of Plaintiffs and Class Members, and Defendants actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

243.     Defendants' willful, wanton, malicious, and/or reckless conduct alleged herein warrants the imposition of punitive damages.

244.     Nationwide Class Members shall continue to suffer irreparable injury in the absence of equitable relief.

245.     Plaintiffs and the Nationwide Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct, in seeking to prevent discrimination as described herein, violates Section 1981, and other relief so as to assure that similar discriminatory conduct does not reoccur in the future.

54

246. To remedy McDonald's systemic failure to comply with federal law, Plaintiffs and putative Class Members hereby request declaratory judgment requiring McDonald's to, *inter alia*:

      (a) Provide Black franchisees open and equal access to the market of locations to which they are entitled and that meet or exceed McDonald's national average for revenue;

      (b) Require McDonald's to conform to the mandates of Section 1981 and implement objective standards for decisions relating to Black franchisees, including: (i) rewrite decisions; (ii) terminations; (iii) rent adjustments and other financial assistance, accounting for higher operating costs and lower volume sales in certain locations; and/or (iv) rebuild and renovation requirements;

      (c) Require McDonald's to ensure that Black franchisees are offered growth opportunities to the same extent that such growth opportunities are available to other franchisees in the same geographic area; and/or

      (d) Require McDonald's to ensure its grading and inspection standards are fairly and uniformly applied.

247. Accordingly, Plaintiffs and Nationwide Class Members seek damages from the Defendants and an order with standards above to be implemented by the Court in equity.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for declaratory judgment against Defendants, for compensatory damages, punitive damages, reasonable attorneys' fees, expert fees, costs, and an award of pre-judgment and post-judgment interest, to be determined at trial, and for such other and further relief both at law and in equity to which Plaintiffs and Class Members may show to be justly entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs for themselves and on behalf of all others similarly situated, demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

    a.    Certification that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes;

    b.    Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

    c.    Award compensatory damages to Plaintiffs and the proposed Classes in an amount to be established at trial, including, without limitation:

        (1)    damages in in excess of the jurisdictional limit;

        (2)    lost business opportunities because of McDonald's unjustifiable refusal to offer such opportunities to Plaintiffs and the Class;

        (3)    excessive and unreasonable costs and expenses due to substandard franchise location;

        (4)    insufficient sales volume due to substandard franchise location;

        (5)    loss of profits because of excessive expenses and insufficient sales volume due to substandard franchise location;

        (6)    loss of franchise value because of inability to extinguish debt and meet operating expenses due to substandard franchise location;

        (7)    loss of franchises due to discriminatory conduct; and

        (8)    additional damages for emotional and physical suffering and distress, humiliation, damage to professional reputations, and to future busines prospects.

    d.    Direct Defendants to make Plaintiffs whole for all earnings and benefits they would have received but for Defendants' discriminatory treatment;

    e.    Declaration that the acts and practices complained of herein are violations of 42 U.S.C. § 1981;

f.      An order enjoining McDonald's from engaging in the deceptive, unfair, unconscionable, and unlawful business practices alleged in this Complaint, including, but not limited to requiring Black franchisees to sign broad, general releases in exchange for financial assistance;

g.      Award further injunctive relief, as the Court deems appropriate;

h.      An award of punitive damages in an amount sufficient to deter Defendant's similar wrongful conduct in the future;

i.      An order for an award of attorney's fees, expert fees, and costs, as provided by law;

j.      An award of pre-judgment and post-judgment interest as provided by law; and

k.      For all such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually on behalf of all others similarly situated, demand a trial by jury of all issues so triable as a matter of right.

DATED this 25th day of January 2021.      Respectfully submitted,

**THE FERRARO LAW FIRM, P.A.**
*Attorneys for Plaintiffs*

*/s/ James L. Ferraro*

James L. Ferraro, Esq.
Florida Bar No.: 381659
jlf@ferrarolaw.com
Daryl D. Parks, Esq
Florida Bar No.: 54097
ddp@ferrarolaw.com
Janpaul Portal, Esq.
Florida Bar No.: 0567264
jpp@ferrarolaw.com
Natalia Salas, Esq.
Florida Bar No.: 44895
nms@ferrarolaw.com
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222

William R. Fahey, Esq.
Illinois Bar No.: 3127912
bfahey@cooneyconway.com
COONEY & CONWAY, PC
120 N. LaSalle Street, 30th Floor
Chicago, IL 60602
Telephone: (312) 236-6166
*Designated as Local Counsel Pursuant to Local Rule 83.15*

## <u>CERTIFICATE OF SERVICE</u>

James L. Ferraro, an attorney, hereby certifies that on January 25, 2021, he caused the

foregoing document, and Exhibits submitted in support thereof, to be electronically filed using the

CM/ECF system, which will send notice of this filing to all counsel of record.


<u>/s/ James L. Ferraro</u>
James L. Ferraro
THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
(305) 375-0111

58