**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JAMES BYRD, JR. and DARRELL BYRD,
for themselves and on behalf of all others
similarly situated,

            Plaintiffs,

     v.

MCDONALD'S USA, LLC, a Delaware
limited liability company, and
MCDONALD'S CORPORATION, a
Delaware corporation,

            Defendants.

Case No.: 1:20-cv-06447

Hon. Harry D. Leinenweber


**MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(B)(6)
<u>MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>**


<span style="color:red">**REDACTED—UNREDACTED VERSION
PROVISIONALLY FILED UNDER SEAL PURSUANT TO
LOCAL RULE 26.2(c)**</span>

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................ 2

    **A.**    McDonald's Franchising Model. ................................................. 2

    **B.**    The Plaintiffs. ...................................................................... 5

    **1.**    James Byrd. ....................................................................... 5

    **2.**    Darrell Byrd. ..................................................................... 7

    **C.**    This Lawsuit. ...................................................................... 8

LEGAL STANDARD ........................................................................................ 9

ARGUMENT .................................................................................................. 10

**I.**    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT MCDONALD'S HAD AN INTENT TO DISCRIMINATE AGAINST BLACK FRANCHISEES. .................... 10

**II.**    THE § 1981 ALSO FAILS FOR THE INDEPENDENT REASON THAT PLAINTIFFS' DO NOT ADEQUATELY PLEAD "BUT-FOR" CAUSATION. ..... 18

**III.**    PLAINTIFFS' § 1981 CLAIMS ARE LARGELY TIME-BARRED. ...................... 21

CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*188 LLC v. Trinity Indust., Inc.*,
300 F.3d 730 (7th Cir. 2002) ...................................................................3

*ABN AMRO, Inc. v. Capital Int'l Ltd.*,
No. 04 C 3123, 2007 WL 845046 (N.D. Ill. March 16, 2007) ..................3

*Adams v. City of Indianapolis*,
742 F.3d 720 (7th Cir. 2014) .................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................9, 19

*Astre v. McQuaid*,
804 F. App'x 665 (9th Cir. 2020) ..........................................................20

*Badal v. Ariens Co.*,
No. 17-C-1704, 2018 WL 3037401 (E.D. Wis. June 19, 2018) ..............10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................9

*Bogie v. Rosenberg*,
705 F.3d 603 (7th Cir. 2013) ...................................................................9

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) .............................................................3, 17

*Cada v. Baxter Healthcare Corp.*,
920 F.2d 446 (7th Cir. 1990) ............................................................22, 23

*Cardoso v. Robert Bosch Corp.*,
427 F.3d 429 (7th Cir. 2005) .................................................................15

*Chakonas v. City of Chicago*,
42 F.3d 1132 (7th Cir. 1994) .................................................................22

*Comcast Corp. v. National Ass'n of African Am.–Owned Media*,
140 S. Ct. 1009 (2020)......................................................................10, 19

*Dandy v. UPS Inc.*,
388 F.3d 263 (7th Cir. 2004) ............................................................21, 22

*Daniels v. Fed. Reserve Bank of Chi.*,
  No. 98 C 1186, 2004 WL 419796 (N.D. Ill. Mar. 4, 2004) ....................................................24

*Davis v. Palos Health*,
  No. 18 C 4345, 2019 WL 214916 (N.D. Ill. Jan. 16, 2019) ....................................................14

*Domino v. Kentucky Fried Chicken*,
  No. 19-CV-08449-HSG, 2020 WL 5847306 (N.D. Cal. Oct. 1, 2020) ................................20

*Dyer v. McCormick & Schmick's Seafood Rests., Inc.*,
  264 F. Supp. 3d 208 (D.D.C. 2017) .......................................................................................13

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
  No. 09-CV-5641, 2011 WL 1303387 (N.D. Ill. March 31, 2011) ...........................................3

*Hunter v. Meyer*,
  63 F. App'x 990 (9th Cir. 2003) ............................................................................................21

*Ikedilo v. Statter*,
  No. 19-CV-9967 (RA), 2020 WL 5849049 (S.D.N.Y. Sept. 30, 2020) ................................21

*Jones v. R.R. Donnelly & Sons, Co.*,
  541 U.S. 369 (2004).................................................................................................................22

*Lemon v. Myers Bigel, P.A.*,
  No. 19-1380, 2021 WL 161978 (4th Cir. Jan. 19, 2021) .......................................................19

*Limestone Dev. Corp. v. Vill. of Lemont, Ill.*,
  520 F.3d 797 (7th Cir. 2008) ...................................................................................................9

*Linda Constr. Inc. v. City of Chicago*,
  No. 15-cv-8714, 2016 WL 4429893 (N.D. Ill. Aug. 22, 2016) ..................................11, 13, 14

*Lukovsky v. City & Cty. of S.F.*,
  535 F.3d 1044 (9th Cir. 2008) ...............................................................................................23

*Lynch v. City of Chicago*,
  No. 12 C 9032, 2013 WL 4506886 (N.D. Ill. Aug. 23, 2013)................................................20

*Massey v. Zema Sys. Corp.*,
  No. 95 C 3504, 1998 WL 708913 (N.D. Ill. Sept. 30, 1998)..................................................12

*McReynolds v. Merrill Lynch & Co.*,
  694 F.3d 873 (7th Cir. 2012) ......................................................................9, 10, 12, 15

*Morris v. Office Max, Inc.*,
  89 F.3d 411 (7th Cir. 1996) ....................................................................................................10

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002)...........................................................................................24

*Payne v. Abbott Labs.*,
  999 F. Supp. 1145 (N.D. Ill. 1998) ...................................................................24

*Pillows v. Cook Cty. Recorder of Deeds Office*,
  No. 18-cv-7497, 2019 WL 2524149 (N.D. Ill. June 18, 2019)........................19, 20

*Plair v. E.J. Brach & Sons, Inc.*,
  105 F.3d 343 (7th Cir. 1997) ............................................................................12

*Porter v. Pipefitters Ass'n Local Union 597, U.A.*,
  No. 12-CV-9844, 2013 WL 5162206 (N.D. Ill. Sept. 12, 2013) .........................21

*Ret. Sys. v. Anixter Int'l, Inc.*,
  No. 09-CV-5641, 2011 WL 1303387 (N.D. Ill. March 31, 2011).........................3

*Rosenblum v. Travelbyus.com Ltd.*,
  299 F.3d 657 (7th Cir. 2002) ..............................................................................3

*Rowland v. Haven Properties, LLC*,
  No. 05 C 1957, 2005 WL 2989901 (N.D. Ill. Nov. 7, 2005) ...............................3

*Rivas v. Levy*,
  No. 11 C 02738, 2015 WL 718271 (N.D. Ill. Feb. 18, 2015).........................21, 22

*Rubert v. King*,
  No. 19-CV-2781 (KMK), 2020 WL 5751513 (S.D.N.Y. Sept. 25, 2020) ......19, 20

*Shott v. Katz*,
  829 F.3d 494 (7th Cir. 2016) .............................................................................16

*Snoqualmie Indian Tribe v. City of Snoqualmie*,
  186 F. Supp. 3d 1155 (W.D. Wash. 2016).........................................................18

*Stewart v. A2B Cargo Inc.*,
  No. 20 C 278, 2020 WL 5076716 (N.D. Ill. Aug. 26, 2020)...............................3

*Thurmon v. Mount Carmel High School*,
  191 F. Supp.3d 894 (N.D. Ill. 2016) ..................................................................12

*Tinner v. United Ins. Co. of Am.*,
  308 F.3d 697 (7th Cir. 2002) .............................................................................24

*Washington v. Hughes Socol Pipers Resnick & Dym, Ltd.*,
  No. 18-cv-05162, 2020 WL 1503652 (N.D. Ill. Mar. 29, 2020) ........................10

**STATUTES**

28 U.S.C. § 1658(a) .................................................................................22

42 U.S.C. § 1981 ............................................................................... passim

**OTHER AUTHORITIES**

16 C.F.R. pt. 436 .....................................................................................3

16 C.F.R. pt. 437 .....................................................................................3

16 C.F.R. § 436.5 .....................................................................................3

Fed. R. Civ. P. 10(c) ...................................................................3, 5, 9, 17

Fed. R. Civ. P. 12(b)(6)..............................................................................3, 9

## PRELIMINARY STATEMENT

Faced with McDonald's motion to dismiss the initial class action complaint in its entirety, Plaintiffs conceded the non-viability of Count II (unspecified state franchise claims) and Count III (unjust enrichment), and filed an Amended Complaint that left only Count I (violation of 42 U.S.C. § 1981) intact. The revisions largely end there, however, as there are no new substantive or well-pled factual allegations, and none of Plaintiffs' revisions cure the fatal deficiencies in their § 1981 intentional discrimination claim. Like the original complaint, the Amended Complaint fails to adequately plead the essential elements of a § 1981 claim, relies upon conclusory allegations that are wholly unsupported by facts, and continues to promote the implausible theory that McDonald's implemented a nationwide conspiracy to discriminate against Black franchisees. Plaintiffs' manufactured narrative—designed to garner headlines and generate animosity—is contrary to McDonald's own economic interest and fundamentally inconsistent with McDonald's long-standing history of, and commitment to, providing opportunities to its diverse franchisees in the United States and across the globe. In short, the Amended Complaint remains a conglomeration of incendiary and baseless allegations—with skewed "facts" and cherry-picked information—that unsuccessfully seeks to assert a claim of intentional discrimination.

Plaintiffs are two franchisees who have owned and operated McDonald's restaurants in Tennessee for several decades, at times expanding the number of restaurants in their portfolios and at other times selling off certain restaurants. Despite their years as owner-operators in McDonald's franchise system, including many years of financial success and many instances of financial and other support from McDonald's, Plaintiffs now assert—on behalf of themselves and a putative class of current Black McDonald's franchisees—that McDonald's had a longstanding, company-wide practice of going into business with Black franchisees with the intent of seeing them fail, and that these franchisees have been, and continue to be, victims of this conspiracy. Yet Plaintiffs'

Amended Complaint offers no answer to the question posed by McDonald's initial motion to dismiss: namely, the fundamental implausibility of this theory, given McDonald's inherent economic interest in the success of all of its franchisees. Instead, Plaintiffs proceed with the same conclusory allegations that were previously challenged by McDonald's.

As in their initial complaint, Plaintiffs fail to adequately plead two essential elements of a § 1981 claim: intent to discriminate and but-for causation. The vague and conclusory allegations in Plaintiffs' Amended Complaint do not support a plausible inference that McDonald's discriminated against them because of their race, much less that it engaged in a nationwide conspiracy to discriminate against Black franchisees. Nor do Plaintiffs' allegations support an inference that, but for their race, McDonald's would have taken different actions and Plaintiffs would have been more successful than they were. Moreover, the vast majority of Plaintiffs' § 1981 claims are time-barred under the applicable two- and four-year statutes of limitations.

For all these reasons, discussed more fully below, Plaintiffs' claim should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    McDonald's Franchising Model.

McDonald's restaurants are largely operated through its franchise system, which is designed for the ongoing development, operation, and maintenance of McDonald's restaurants all over the country, with an emphasis on uniform and quality food products, prompt and courteous service, and a clean, wholesome atmosphere attractive to children and families. (Ex. 1-A (McDonald's USA Standard Franchise Agreement (Traditional) and the Operator's Lease (collectively, the "FA")); Ex. 1-B (McDonald's USA Franchise Disclosure Document (the

"FDD")).)[1]  Approximately 95% of McDonald's restaurants in the United States are owned and operated by franchisees.  (Amended Complaint (Dkt. 32) ("AC") ¶ 83; *see also* FDD at 37 (as of December 31, 2019, there were approximately a total of 12,032 domestic McDonald's restaurants that had been opened at least a year, about 11,435 of which were franchised).)

Most franchisees enter into the standard FA, which is specific to a particular restaurant and for a limited period (typically 20 years).  (FA ¶ 2; FDD at 34.)  Defendant McDonald's USA, LLC, a wholly owned subsidiary of Defendant McDonald's Corporation, is the franchisor of McDonald's U.S. based restaurants.  (AC ¶ 75; FDD at 1; FA ¶ 1(b).)[2]

McDonald's provides prospective franchisees with a copy of the FDD before they purchase a restaurant.[3]  (AC ¶ 97.)  Among other things, the FDD notes that "[b]uying a franchise is a complex investment," and advises prospective franchisees to consult with counsel or an accountant

---

[1] Plaintiffs refer to the FA and the FDD throughout the Amended Complaint (*see, e.g.*, AC ¶¶ 91–92, 96–97, 107–110), thereby incorporating them by reference and permitting their consideration on this motion to dismiss.  Fed. R. Civ. P. 10(c); *see Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *188 LLC v. Trinity Indust., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).  Moreover, documents that allow the court to evaluate the disagreement between the parties and are critical for understanding the parties' relationship are properly considered in the context of a Rule 12(b)(6) motion.  *See Stewart v. A2B Cargo Inc.*, No. 20 C 278, 2020 WL 5076716, at *2 (N.D. Ill. Aug. 26, 2020) (Leinenweber, J.) (citing *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 662 (7th Cir. 2002) ("It would have been impossible for the district court or for this court to evaluate the disagreement between the parties without having all of the documentation."); *Rowland v. Haven Properties, LLC*, No. 05 C 1957, 2005 WL 2989901, at *3 (N.D. Ill. Nov. 7, 2005) (considering document attached to motion where "agreement is crucial for understanding the relationships between the parties")).  In the event the Court determines that any of the materials attached to this motion are beyond the scope of McDonald's 12(b)(6) motion, McDonald's respectfully requests that the Court disregard those materials rather than convert the motion to one for summary judgment.  *See, e.g.*, *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *16 (N.D. Ill. March 31, 2011); *ABN AMRO, Inc. v. Capital Int'l Ltd.*, No. 04 C 3123, 2007 WL 845046, at *15–16 (N.D. Ill. March 16, 2007).

[2] Plaintiffs allege that, before "approximately 2005," McDonald's Corporation was the franchisor for U.S. locations.  (AC ¶ 91 n. 2.)  That entity "currently does not offer franchises" (FDD at 1), and, as discussed below, claims under FAs executed in 2005 or earlier would now be time-barred.

[3] The FDD is provided pursuant to the FTC's Franchise Rule, 16 C.F.R. Parts 436 and 437, which requires disclosure of certain information, including fees, the franchisee's obligations, financing, financial performance information, financial statements, and certain contracts.  *See, e.g.*, 16 C.F.R. § 436.5.

before investing. (FDD at 1 (cover page).) To assist with their due diligence, prospective franchisees are also provided with contact information for various franchisee organizations (including the National Black McDonald's Operators Association ("NBMOA")) and franchisees who left the franchise system in the prior fiscal year. (*Id.* at 49 & Ex. R.) The FDD further discloses that:

- The award of a franchise is not guaranteed, and if an initial franchise is granted, the term of that franchise is limited, with "no right to renew or extend." (*Id.* at 15, 23, 29, 34; FDD Ex. J. (the "Preliminary Agreement") ¶¶ 2, 3, 6; FDD Ex. K (the "Rewrite Policy") at 1; *see also* FA ¶ 28(a).)

- The grant of one franchise does not guarantee the award of additional franchises. (FA ¶ 28(h).)

- A franchisee is under no obligation to accept any franchise offered to it. (Preliminary Agreement ¶ 13.)

- Franchisees must operate in compliance with the entire McDonald's System, including through making renovations and remodeling. (FDD at 23; *see also* FA ¶¶ 12(a), 12(d), 12(e).)

- Franchisees must pay fees to McDonald's for the right to operate the franchise, including monthly base and percentage rent, and rental percentages may vary among franchisees. (FDD at 11, 16, 19, 21.)

- McDonald's neither provides guarantees of financial success to franchisees nor makes any representations about performance of individual restaurants. (*Id.* at 37, 39; *see also* FA ¶ 28(c).)

- Transfers of franchises require McDonald's approval, and McDonald's has a right of first refusal to acquire a franchisee's business. (FDD at 34–35; FA ¶¶ 15(c), 15(d).)

The FDD also includes copies of "[a]ll agreements used by [McDonald's] regarding the offering of a franchise" (*id.* at 50), including the FA (*id.* at Ex. B), the Operator's Lease that is incorporated into the FA (the "Lease") (*id.* at Ex. G), the assignment agreement used when a franchise is transferred from one franchisee to another (the "Assignment") (*id.* at Ex. I), the Preliminary Agreement signed by prospective franchisees, and the Rewrite Policy, which is McDonald's policy for the award of new franchises. (*See also* AC ¶¶ 97, 201.)

4

Upon completion of McDonald's training program for new franchisees, interested buyers are connected with available restaurant opportunities and are required to negotiate the terms of a purchase directly with the current owner of the restaurant. (Ex. 1-C at 23.)[4] The purchase price for different restaurants varies greatly based on numerous factors including location, past performance, and condition. (*Id.*) Franchisees must pay a minimum of 25% cash as a down payment and may finance the remaining balance for a period of no more than seven years. (AC ¶ 106.)

### B. The Plaintiffs.

Plaintiffs James and Darrell Byrd are brothers who currently own and operate four McDonald's restaurants in the Nashville and Memphis areas of Tennessee. (*Id.* ¶¶ 2, 39–40.) Both Plaintiffs have bought and sold several restaurants during their decades as McDonald's owner-operators. (*Id.* ¶¶ 2, 53, 67.)

### 1. James Byrd.

James Byrd became a McDonald's franchisee in 1989. (*Id.* ¶ 2.) During his more than 31-year tenure as a McDonald's franchisee, James Byrd owned as many as ten restaurants (*id.* ¶¶ 2, 43), but he currently owns and operates two restaurants in Tennessee—one in Collierville

---

[4] Paragraphs 105 and 106 reference materials for prospective franchisees from the McDonald's website (https://www.mcdonalds.com/us/en-us/about-us/franchising.html), *Your Path to Becoming a McDonald's Franchisee* (attached as Ex. 1-C) and *Buying a Franchise*, thereby incorporating these documents by reference. Fed. R. Civ. P. 10(c).

("Houston Levee") and one in Cordova ("Macon").[5]  (*Id.* ¶ 42; *see also* Ex. 1-H at 10, 41.[6])  The franchise start date for the Houston Levee location was June 24, 2002, and it expires on June 23, 2022. (Ex. 1-H at 41.)  In November 2019, Mr. Byrd was informed that he had been denied rewrite for the Houston Levee location.  (AC ¶ 57.)  The Macon franchise term began on January 27, 2008, and it expires on January 26, 2028.  (Ex. 1-H at 41; AC ¶ 60.)  As such, the rewrite process has not yet begun for the Macon restaurant.  (Ex. 1-H at 41; *see also* AC ¶¶ 60, 202.)

In 2014, James Byrd sold two of his franchises to Fred Tillman, a White franchisee who Plaintiffs allege was "awarded" profitable locations by McDonald's and whose organization allegedly had, at one point, become the largest in the U.S.  (*Id.* ¶¶ 46, 53.)  Documents related to that sale make clear that the decision to sell those locations was driven by the fact that, at the time, James Byrd was in material breach of his FAs and his franchise rights were subject to immediate termination by McDonald's.  (Ex. 1-D at 2–3.) ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[5] James Byrd alleges he purchased the Houston Levee and Macon restaurants based on projections of $1.8 million and $1.5 to $1.6 million, respectively.  (AC ¶ 48.)  By his own account, those restaurants now have average sales of $1.9 million and $2.2 million—exceeding the earlier projections.  (*See id.* ¶¶ 14, 49 (stating national average sales to be $2.9 million in 2019 and that these two restaurants "currently average $1 million and $700,000 less than McDonald's national average sales").)

[6] Because Plaintiffs' business reviews are referred to throughout the Amended Complaint and are critical to the allegations underlying Plaintiffs' § 1981 claim (*see* AC ¶¶ 18(j), 69–70, 151, 196, 198–199), consideration of such documents is appropriate on a Rule 12(b)(6) motion.  *See supra* n.1.

████████████████████████████████████████████████████████████████

████████████████████ Thereafter, on July 18, 2014, Mr. Byrd entered into an agreement in which he agreed to sell two of his four restaurants to the Tillmans for $4,320,000. (Ex. 1-E at 1.)

Despite McDonald's earlier financial assistance and efforts to cure Mr. Byrd's defaults of his FAs, his organization is again materially underperforming. James Byrd's most recent business review was in November 2020. (*See* Ex. 1-H.) At that time, he was deemed ineligible for growth or rewrite, as his organization failed to meet McDonald's National Franchising Standards ("NFS") in the categories of Financial and Reinvestment. (*Id.* at 1 (failure to meet NFS for these two categories consistently since 2017); *id.* at 29 (████████████████████████████ *see also* (Ex. 1-I at 12 (████████████████████████ in 2019 Business Review).) Despite Plaintiffs' allegations that Black franchisees were routinely denied overrides and financial assistance, Mr. Byrd's November 2020 Business Review Report indicates that he received more than ████████████████████████████████████████████████████████████████ ██████████ (Ex. 1-H at 30.) In addition, and despite Plaintiffs' allegation that James Byrd's restaurants were targeted with increased inspections after he complained about being denied rewrite (AC ¶ 58), the November 2020 Business Review Report states that he met the Operations NFS (Ex. 1-H at 1), and his restaurants were inspected a total of six times, which was roughly comparable to the prior review period. (*See* Ex. 1-H at 19; Ex. 1-I at 5.) Notably, at the time of his November 2020 Business Review, Mr. Byrd had accumulated a significant accounts receivable balance, including for rents owed to McDonald's, putting him in material breach of both of his FAs. (Ex. 1-H at 30–31; FA ¶ 18(c).)

### 2. Darrell Byrd.

In 1998, Darrell Byrd became a franchisee with his brother's organization. (AC ¶¶ 2, 63.) He currently operates two restaurants in Tennessee—one in Arlington and another in Somerville.

(*Id.* ¶¶ 62, 73; *see also* Ex. 1-J at 40.)  The Arlington franchise began on July 9, 2009 and expires in 2029, while the Somerville franchise began in November 2012 and expires in 2032.  (*See* Ex. 1-J at 40.)  Neither location has yet been considered in the rewrite process.  (*Id.*)

As with his brother, Darrell Byrd's organization has consistently faced financial and operational difficulties.  In 2014, he also sold two of his restaurants to Mr. Tillman, for a total price of $3,430,000.  (Ex. 1-F at 1; AC ¶ 53.)  At the time, Darrell Byrd was in material breach of his FAs and his franchise rights were subject to termination.  (Ex. 1-G at 2–3.)  Since then, and despite the fact that Darrell Byrd's restaurants have a history of strong sales (*e.g.*, the Arlington restaurant had a sales volume of ████████ in 2019 (Ex. 1-J at 11), in excess of the average and median sales volume for franchised restaurants (AC ¶ 14; FDD at 37)), he has consistently been deemed ineligible for growth and rewrite for failure to meet the NFS, particularly, the Financial standard. (Ex. 1-J at 1 (noting failure to satisfy NFS for the Financial category from 2017–2020).)  Notably, while Darrell Byrd alleges that his financial viability score in his May 2019 Business Review was a five (5) (AC ¶ 69), Mr. Byrd actually received a score of ████████████ (Ex. 1-K at 11–12; *see also* Ex. 1-J at 29–30 (████████████████████████████).)  Similarly, he received financial assistance in both the 2019 review period (████████████████████ ████████████) and the 2020 review period (████████████████████).  (Ex. 1-K at 12; Ex 1-J at 30.)  As with his brother, at the time of the November 2020 Business Review, Darrell Byrd had a significant accounts receivable balance with McDonald's, putting him in material breach of his FAs.  (Ex. 1-J at 31; FA ¶ 18(c).)

### C.     This Lawsuit.

Plaintiffs filed this suit as a putative class action on October 29, 2020, claiming intentional racial discrimination in violation of 42 U.S.C. § 1981 (Count I), violations of (unspecified) state franchise acts (Count II), and unjust enrichment (Count III).  After McDonald's filed its first

motion to dismiss on January 4, 2021 (Dkts. 28, 29), Plaintiffs filed an Amended Complaint, dropping Counts II and III but keeping the § 1981 claim on behalf of themselves and a nationwide class of 186 Black franchisees. (AC ¶¶ 1, 211, 232–238.) Notably, despite McDonald's prior motion to dismiss – which challenged the sufficiency of Plaintiffs' allegations and the fundamental implausibility of their theory—Plaintiffs add no new well-pled, substantive factual allegations to support their claim of intentional discrimination. Because Plaintiffs' Amended Complaint does not remedy the fatal flaws of their prior complaint, it is due to be dismissed with prejudice.

## LEGAL STANDARD

Although the Court must accept as true all well-pled allegations on a motion to dismiss, it need not credit conclusory assertions or legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court is also "free to consider any facts set forth in the complaint that undermine the plaintiff's claim," including "exhibits attached to the complaint, Fed. R. Civ. P. 10(c), or documents referenced in the pleading if they are central to the claim . . . ." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (quotation marks omitted). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012) (quoting *Twombly*, 550 U.S. at 570).

Where, as here, the complexity of the matter indicates that "discovery is likely to be more than usually costly," the Court should insist on "as much factual detail and argument as may be required to show that the plaintiff has a plausible claim." *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 803–04 (7th Cir. 2008); *see also McReynolds*, 694 F.3d at 887 ("the required level of factual specificity rises with the complexity of the claim") (citation omitted); *Badal v. Ariens Co.*, No. 17-C-1704, 2018 WL 3037401, at *10 (E.D. Wis. June 19, 2018) (where discrimination claim is "not straightforward," pleading standard is strictly applied). And a claim

9

of a "complex discrimination *conspiracy*" demands "more than the ordinary allegations." *Washington v. Hughes Socol Pipers Resnick & Dym, Ltd.*, No. 18-cv-05162, 2020 WL 1503652, at \*5 (N.D. Ill. Mar. 29, 2020) (emphasis in original).

## ARGUMENT

Plaintiffs continue to assert the extraordinary and implausible theory that McDonald's—whose entire business model depends on a wide network of successful and diverse franchisees—had a secret strategy spanning decades to undermine Black franchisees across the country. Despite having a second bite at the apple, Plaintiffs still largely rely on sweeping and conclusory allegations—wholly unsupported by facts—that mirror those in another case pending in this District, *Crawford v. McDonald's USA, LLC*, No. 1:20-cv-05132. Their Amended Complaint continues to fall short of the pleading requirements for a § 1981 claim because they have done nothing to address the failure to offer any well-pled allegations supporting an intent to discriminate or but-for causation—both of which are indispensable elements of a viable § 1981 claim. *See Comcast Corp. v. National Ass'n of African Am.–Owned Media*, 140 S. Ct. 1009, 1014, 1019 (2020); *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). Moreover, the applicable two- and four- year statutes of limitations bar most of Plaintiffs' claims. In short, the Amended Complaint does not cure any of the fatal deficiencies with the original complaint and should be dismissed accordingly.

## I. PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT MCDONALD'S HAD AN INTENT TO DISCRIMINATE AGAINST BLACK FRANCHISEES.

Plaintiffs' allegation of a sweeping conspiracy to harm Black franchisees makes no more sense now than it did in the original complaint. Plaintiffs still do not allege any facts supporting a plausible inference that McDonald's—contrary to its economic interest—deliberately undermined

the success of all its Black franchisees. Plaintiffs' individual allegations also do not suggest that anyone at McDonald's acted with the intent to discriminate against them.

### A. Plaintiffs Fail to Plausibly Allege a System-Wide Scheme to Discriminate.

In the Amended Complaint, Plaintiffs have added no concrete facts supporting a plausible inference that McDonald's carried out an expansive scheme to discriminate against Black franchisees. Instead, they continue to rely on vague and conclusory allegations that unspecified McDonald's policies treated Black franchisees worse than White franchisees, including that McDonald's "offered Black franchisees geographic locations in Black neighborhoods where White franchisees did not want to own or operate," while "White franchisees were routinely given preferred locations and were able to buy and sell restaurants without restriction." (AC ¶ 157; *see also* ¶¶ 11, 116, 152, 154, 170, 172, 180–181, 187, 189, 192, 194, 198.) But "saying it is so does not make it so," and Plaintiffs fail to provide a single example to support their claim that McDonald's acted with an intent to discriminate. *See Linda Constr. Inc. v. City of Chicago*, No. 15-cv-8714, 2016 WL 4429893, at *2 (N.D. Ill. Aug. 22, 2016).

*McReynolds* is instructive. There, the plaintiffs alleged that the defendant's company-wide retention bonus program, which determined bonuses based on prior productivity, was the product of intentional discrimination against Black brokers. 694 F.3d at 877–78. To state a claim, the plaintiffs had "to allege some facts tending to support a plausible inference that the retention program *itself* was adopted for a discriminatory purpose." *Id.* at 887 (emphasis in original). However, the Plaintiffs alleged no such facts, instead alleging discriminatory intent at a high "level of generality" that amounted to "merely a conclusion." *Id.* at 886. The Seventh Circuit therefore affirmed the district court's decision to dismiss. *Id.* at 887; *see also Thurmon v. Mount Carmel High School*, 191 F. Supp.3d 894, 897–98 (N.D. Ill. 2016) (dismissing claim where the plaintiff

relied on conclusory allegations and cited only one instance where a student of a different race was treated differently).  The same result should obtain here.

Plaintiffs' other allegations remain facially inadequate to support an inference that McDonald's discriminated against Black franchisees nationwide.  They cite statistical evidence of a decline in the number of Black franchisees since 1998 and a decrease in cash flow for Black franchisees since 2010.  (AC ¶¶ 13–16.)  But "statistics are improper vehicles to prove discrimination in disparate treatment (as opposed to disparate impact) cases."  *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997); *see also Massey v. Zema Sys. Corp.*, No. 95 C 3504, 1998 WL 708913, at *13 (N.D. Ill. Sept. 30, 1998) ("[S]tatistical comparisons showing that one group, on average, earns less than employees in another group, do not in and of themselves, create such an inference [of intentional discrimination].").  Moreover, the statistical data is cherry-picked.  Plaintiffs use a number of different time periods, including periods extending long before the beginning of the four-year limitations period governing their § 1981 claim.  (*Compare, e.g.*, AC ¶ 16, *with* AC ¶ 98).  Plaintiffs also compare apples and oranges, looking at the increase in the number of McDonald's ***world-wide restaurants*** as compared to the decrease in the number of Black ***domestic franchisees*** (*id.* ¶¶ 15–16), which does not account for the number of restaurants operated by each franchisee or the total number of franchisees in the System during that period of time.  Plaintiffs further miss the mark in alleging that annual sales of putative class members fall below a national average in ***some years***—*i.e.*, the cherry-picked years 2011–2016 and 2019.  (*Id.* ¶ 98.)  Notably, Plaintiffs make no such allegation with respect to most of the four-year limitations period.

Finally, Plaintiffs cite a handful of lawsuits and complaints stretching back to the 1960s (*Id.* ¶¶ 22, 30–31, 125, 132–134, 145).  But accusations are not facts, and the filing of a handful of

lawsuits against a Fortune 500 company during the last 50 years is neither unusual nor suggestive of a pattern of discrimination. *See Dyer v. McCormick & Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 233 (D.D.C. 2017) (prior lawsuits against defendant did not show discrimination given "no indication that the cases have any bearing on the specific factual issues in this case, apart from the fact that the relevant defendant is a large, multi-state employer"). Similarly, Plaintiffs cite a 1996 letter in which a McDonald's executive promised to do more to encourage Black ownership. (AC ¶ 138.) Plaintiffs' treatment of this letter as an "admission" by McDonald's does not make sense. When read in full, the letter is a commitment made in 1996 to helping Black franchisees succeed. That is the opposite of intentional discrimination.

### B. Plaintiffs' Do Not Plausibly Allege an Intent to Discriminate Against Them Individually.

Plaintiffs' allegations about their individual struggles also fail to support a plausible claim that McDonald's acted with an intent to discriminate against them. *See Linda Constr., Inc.*, 2016 WL 4429893, at *2. The persistent lack of factual detail underscores the fundamental deficiencies in Plaintiffs' allegations.

### 1. Plaintiff James Byrd

James Byrd's claim of racial discrimination is grounded in the fact that he had less success than Fred Tillman, a White franchisee in the same region, who (together with his son) allegedly "became the largest franchisee operators in the U.S." (AC ¶ 53.) But franchisees—like most businesspeople—have varying levels of success independent of anything McDonald's does. Thus, the mere fact that one White franchisee is more successful than one Black franchisee does nothing to suggest McDonald's treated them differently, or that there was systemic racial discrimination. *Linda Constr., Inc.*, 2016 WL 4429893, at *2 ("Plaintiffs must connect the dots between the alleged cause (their race) and the alleged effect (the discriminatory conduct).").

The only action James Byrd claims that McDonald's took was steering him to less favorable restaurants, but he fails to plausibly allege that this was done on account of his race. He asserts that McDonald's restricted him to locations in "predominantly Black, inner-city, or rural and economically depressed neighborhoods" rejected by White franchisees, while Mr. Tillman was awarded profitable opportunities. (AC ¶¶ 45–46; *see also id.* ¶¶ 52–53.) This wholly conclusory allegation is contradicted by the Amended Complaint itself, which alleges that James Byrd's restaurants (purportedly in undesirable locations) were sold to Mr. Tillman—a White franchisee. (*See id.* ¶ 53.) In an attempt to square this circle, the Amended Complaint now alleges that "McDonald's granted the Tillmans profitable locations to enable them to offset the high costs associated with the riskier locations it systematically offered to Mr. Byrd." (*Id.*) This too makes no sense, because White franchisees could have simply declined to purchase the Byrd locations rather than "offset" the high costs against profits from other restaurants.

In any event, Plaintiffs' theory that James Byrd was treated worse than Mr. Tillman due to racial discrimination is unsupported by well-pled factual allegations. Mr. Byrd does not address the merits of his and Mr. Tillman's respective franchise applications, the specific locations, purchase price, or condition of Mr. Tillman's restaurants, when Mr. Tillman acquired those restaurants, or who at McDonald's purportedly "steered" either Mr. Byrd or Mr. Tillman toward specific restaurants. *See Davis v. Palos Health*, No. 18 C 4345, 2019 WL 214916, at *4 (N.D. Ill. Jan. 16, 2019) (dismissing § 1981 claim for failure to plead basic details like "who" committed the alleged discriminatory acts and "when" they occurred). And as discussed below, this claim, like the others, is obviously time-barred: James Byrd claims this "steering" occurred when he and Mr. Tillman became franchisees ***over thirty-one years ago***. (AC ¶¶ 2, 46.)

James Byrd also alleges that Mr. Tillman's success is an example of how "consolidation" of restaurants has had a disproportionate and unfair impact on Black franchisees. (*Id.* ¶ 55.) However, the Amended Complaint remains utterly bereft of facts suggesting that McDonald's pursued a policy of "consolidation," that it did so with the intent to discriminate against Black franchisees, or more fundamentally, how consolidation has a disproportionate and unfair negative impact on Black franchisees. In any event, it is well settled that disparate impact alone does not support an inference of discriminatory intent. *McReynolds*, 694 F.3d at 880.

The rest of James Byrd's allegations also fail to support his § 1981 claim. He alleges that, on or after 2015, McDonald's raised his rent to "original rents" even though his expenses are higher and his sales were below the national average, but he does not allege that White franchisees whose restaurants had similar expenses and sales did not also pay the "original rents" set forth in the FAs. (AC ¶ 49.) Similarly, he alleges he was denied a rewrite in 2019, but here too, there is no allegation that any White franchisee was treated differently or better. (*Id.* ¶ 57.) Nor does he provide any factual basis to suggest that the denial of rewrite was unjustified or based on pretextual reviews and inspections designed to discriminate against him. Disagreement or disappointment with McDonald's decisions does not provide a basis for a § 1981 discrimination claim. *Cf. Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) ("[T]he court is not a 'super-personnel department' intervening whenever an employee feels he is being treated unjustly.").[7]

---

[7] James Byrd also makes vague assertions suggesting that McDonald's retaliated against him, claiming when he "spoke out," "inspections of his restaurants grew exponentially," and that he was "threatened" for "seeking legal counsel." (AC ¶¶ 58–59.) Count I does not appear to assert a § 1981 retaliation claim (*id.* ¶¶ 230–247); nor does James Byrd plead adequately the elements of such a claim. Among other things, he does not identify "protected activity," provide detail about the alleged adverse actions, or allege facts supporting a causal connection between the alleged adverse actions and the protected activity. *Shott v. Katz,* 829 F.3d 494, 497 (7th Cir. 2016).

Indeed, in documents relating to the sale of two of James Byrd's restaurants to Mr. Tillman in 2014, James Byrd acknowledged a long history of financial mismanagement despite receiving substantial financial assistance from McDonald's, and admitted that he was in material breach and that McDonald's had the right to terminate his Franchises. (Ex. 1-D at 1–4, 6.) Among other things, he had failed to comply with his obligations under the Cure Agreement (pursuant to which McDonald's granted him substantial financial assistance), incurred hundreds of thousands of dollars of debt, and misused restaurant assets to secure loans for his personal residence and his daughter's tuition. (*Id.* at 2–3.) There is no allegation that White franchisees with such a history were treated differently, or any basis to infer that his failures are due to racial discrimination.

### 2.    Plaintiff Darrell Byrd

Darrell Byrd's allegations remain equally insufficient. He continues to make allegations about having low sales and high rents (AC ¶¶ 65–66, 68), without providing concrete facts such as the conditions of his restaurants or when the alleged denial of rent reductions occurred—much less that similarly situated White franchisees were treated differently. Indeed, despite the Amended Complaint's bluster about "older, recycled restaurants" (*id.* ¶ 236(a)), Darrell Byrd does not allege that his restaurants were anything other than brand new when he purchased them. While Mr. Byrd cites to a shooting that took place two months ago at one of his restaurants (*id.* ¶ 65), one tragic incident is not indicative of the general condition of his restaurant or its location, and certainly has no connection with any alleged discrimination by McDonald's. Darrell Byrd also does not allege who "scared" him into accepting the "packaged deal" sale, what specifically was said or done to scare him, the price at which his "most profitable store" sold, and whether or why the price was unfair. (*Id.* ¶ 67.)

As in the original complaint, Darrell Byrd's lone allegation even touching on racial disparity concerns his business review in May 2019, in which he claims to have received a financial

16

score of 5 (out of a possible 10) and was determined to be "ineligible for growth." (*Id.* ¶ 69.)  He alleges that, in contrast, "similarly-situated White franchisees in the same Region" were given "overrides" by McDonald's so that they could "continue to grow," despite financial scores ranging from 5 to 2 (out of 10).  (*Id.* ¶¶ 69–70.)  This claim is fatally flawed because it is factually untrue, as shown by the business review itself (which is relied on by the Amended Complaint and thus can be considered on this motion to dismiss, *see* Fed. R. Civ. P. 10(c); *Brownmark Films, LLC*, 682 F.3d at 690).  According to his May 2019 Business Review Report, Mr. Byrd actually received a financial score of ███████████████████████████████████████████, not a positive five (5) as he claims.  (Ex. 1-K at 10–11.)  As such, Mr. Byrd was not "similarly-situated" to the White franchisees who were allegedly given overrides, where he admits they received financial scores 7 to 10 points higher than his.  (*See* AC ¶ 70.)

The May 2019 Business Review Report also reveals other damaging information about Darrell Byrd's finances that are conveniently omitted from the Amended Complaint.  For example, 2019 was not the first time he had failed to meet McDonald's NFS:  he had failed to do so for ***four consecutive years***, from 2016 to 2019.  (Ex. 1-K at 1.)    Moreover, despite having received financial assistance from McDonald's in the form of rent restructuring, Darrell Byrd owed McDonald's multiple outstanding base rent and interest payments that ranged from 90 to ***301 days past due***, putting him in material breach of his FA.  (*Id.* at 12–13; FA ¶ 18(c).)  Darrell Byrd does not allege that any White franchisee with a similar record of financial delinquency was treated better than he was, and therefore it is impossible to draw the inference that he was denied the opportunity to purchase new restaurants because of his race, much less that McDonald's used denial for growth "as cover" for its alleged conspiracy to "strongarm[]" Black franchisees out of the franchise system (AC ¶ 70).  *See Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp.

3d 1155, 1162–63 (W.D. Wash. 2016) (when a plaintiff "allege[s] that a similarly situated individual or entity outside of the plaintiff's protected group received more favorable treatment from the defendant," he or she "must plead sufficient detail about the proposed comparator so that the court can reasonably infer that racial animus accounts for the difference in treatment").

Darrel Byrd also alleges that McDonald's "leveraged [his] economic hardship" and "scare[d] him" into selling his most profitable restaurant. (AC ¶ 67.) However, as with his brother, Darrell Byrd admitted in documents relating to his financial default that led to the sale in 2014 that he was in material breach of his FAs and McDonald's had the right to terminate his franchises. (Ex. 1-G at 1–4.) Moreover, in exchange for McDonald's agreement to forbear from immediately terminating such franchises, Mr. Byrd agreed to a general release of any claims that he may have had against McDonald's. (*Id.* at 6–7.) Darrell Byrd does not allege that White franchisees with such a history were treated differently, or that there is any basis to infer that his failures were due to racial discrimination.

In sum, neither Plaintiff adequately alleges that McDonald's acted with an intent to discriminate against him based on his race. Nothing in the Amended Complaint plausibly suggests that McDonald's intentionally set up the Plaintiffs, or any Black franchisees, to fail—conduct that would cut against McDonald's own economic interests and its core values. Plaintiffs' § 1981 claim therefore remains fatally flawed and the Amended Complaint should be dismissed in its entirety.

## II.  THE § 1981 ALSO FAILS FOR THE INDEPENDENT REASON THAT PLAINTIFFS' DO NOT ADEQUATELY PLEAD "BUT-FOR" CAUSATION.

The Supreme Court recently confirmed that "but-for" causation is an indispensable element of a § 1981 claim and must be pled under the *Iqbal* standard using concrete facts. *Comcast Corp.*, 140 S. Ct. at 1019; *see also Pillows v. Cook Cty. Recorder of Deeds Office*, No. 18-cv-7497, 2019

WL 2524149, at *3 (N.D. Ill. June 18, 2019) (rejecting "causation allegations" as "bare and conclusory"). To state a viable claim, Plaintiffs must allege facts supporting a plausible inference that race was the factual cause of their alleged injury. As discussed in McDonald's first motion to dismiss (Dkt. 29), Plaintiffs have failed to do so. Nothing in their Amended Complaint cures this fatal deficiency.

In the Amended Complaint, Plaintiffs continue to rely on impermissibly vague and conclusory statements that they would have been treated differently if they were White. (*See, e.g.*, AC ¶¶ 20, 238.) The Supreme Court has made clear that bare legal conclusions cannot support a claim of racial discrimination. *See Iqbal*, 556 U.S. at 678. And multiple courts since *Comcast* have held that Plaintiffs must plead concrete facts to support an inference of but-for causation. *See, e.g.*, *Lemon v. Myers Bigel, P.A.*, No. 19-1380, 2021 WL 161978, at *6 (4th Cir. Jan. 19, 2021) (finding that, "in the absence of plausible allegations that, for example, [] white partners were similarly situated," plaintiff's "allegation that she was subject to a different short-term leave application process than the firm's white partners is by itself insufficient" to plead but-for causation under *Comcast*); *Rubert v. King*, No. 19-CV-2781 (KMK), 2020 WL 5751513, at *7 (S.D.N.Y. Sept. 25, 2020) (finding that "boilerplate assertion[s] unsupported by specific facts" that plaintiff was "fired because defendants saw him as another expendable Hispanic" and that "Walmart has a history of discrimination and illegal conduct" were insufficient to plead but-for causation).

To the extent Plaintiffs allege that two White franchisees, Fred Tillman and Michael Retzer, received better treatment (AC ¶¶ 46, 70), they do not offer concrete factual allegations supporting the assertion that this was because of their race, or that Plaintiffs would have achieved the same level of success as Mr. Tillman and Mr. Retzer but for their race. Indeed, allegations in

the Amended Complaint and documents incorporated by reference suggest that other issues were the true reasons behind the Byrds' business challenges. (*See, e.g.*, *id.* ¶ 69 (low score in Business Review); *id.* ¶ 192 (inability to pay rent); Ex. 1-D at 1–4, Ex. 1-G at 1–4 (financial mismanagement)); *see also Astre v. McQuaid*, 804 F. App'x 665, 667 (9th Cir. 2020) (affirming dismissal where "complaint identifie[d] independent non-discriminatory reasons" for alleged conduct); *Lynch v. City of Chicago*, No. 12 C 9032, 2013 WL 4506886, at *2 (N.D. Ill. Aug. 23, 2013) (dismissing age-discrimination claim where complaint showed fire chiefs' rank, not age, was but-for cause of termination); *Rubert*, 2020 WL 5751513, at *1 (but-for causation not pled where complaint showed non-discriminatory reasons for termination); *Domino v. Kentucky Fried Chicken*, No. 19-CV-08449-HSG, 2020 WL 5847306, at *2 (N.D. Cal. Oct. 1, 2020) (similar).

Plaintiffs' alleged statistical evidence also falls short of supporting but-for causation. The statistical evidence is itself facially flawed (*see supra* at 12–13) and even if it reflected a decline in success for Black franchisees during the relevant time period, there is no basis to conclude that such trends were caused by any (unidentified) McDonald's policy. (*See* AC ¶¶ 13–16); *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (affirming dismissal where "no factual allegations tending to show a causal link between the challenged testing protocols and a statistically significant racial imbalance"). Nor does general statistical evidence support an inference that Plaintiffs would have been treated any differently had they been White. *See Pillows*, 2019 WL 2524149, at *4 (finding no adequate "causal link" between document suggesting improper motive and firing four years later); *Ikedilo v. Statter*, No. 19-CV-9967 (RA), 2020 WL 5849049, at *9 (S.D.N.Y. Sept. 30, 2020) (allegation that defendant "only admitted a few Black residents during her tenure as Program Director" was "far too attenuated" to alleged delay in sending recommendation letter to support inference of but-for causation).

As a result, Plaintiffs have not plausibly alleged that race was the "but for" cause of their injuries and, accordingly, the Amended Complaint must be dismissed.

## III. PLAINTIFFS' § 1981 CLAIMS ARE LARGELY TIME-BARRED.

Finally, as with the original complaint, the majority of Plaintiffs' § 1981 claims continue to be time-barred. Two types of alleged conduct are at issue: (1) pre-contractual activity, namely, "[s]teering and restricting Black franchisees to predominantly Black, inner city, and/or rural neighborhoods, with higher expenses and lower sales" and "[e]xcluding Black franchisees from the purchase of restaurants in the open market because of their race" (AC ¶¶ 18(a)–(b)); and (2) unfair treatment and failure to support Plaintiffs during the terms of their FAs (*id.* ¶ 236).

The first category is subject to Illinois's two-year statute of limitations for personal-injury lawsuits, which governs § 1981 claims relating to ***entry*** into a contract (or refusal to contract). *See, e.g.*, *Dandy v. UPS Inc.*, 388 F.3d 263, 269 n.4 (7th Cir. 2004); *Porter v. Pipefitters Ass'n Local Union 597, U.A.*, No. 12-CV-9844, 2013 WL 5162206, at *4 (N.D. Ill. Sept. 12, 2013). Thus, any such conduct must have occurred after October 29, 2018 to present a viable claim. James Byrd became a McDonald's franchisee in 1989, and Darrell Byrd in 1998. (AC ¶ 2.) Neither of them claims to have signed an FA after October 29, 2018 (nor is McDonald's aware of any). *See Hunter v. Meyer*, 63 F. App'x 990, 991 n.1 (9th Cir. 2003) (vague pleading of dates cannot evade statute of limitations); *Rivas v. Levy*, No. 11 C 02738, 2015 WL 718271, at *5 (N.D. Ill. Feb. 18, 2015) (similar). Accordingly, Plaintiffs' § 1981 claim based on entry into their FAs is time-barred and should be dismissed. *See Rivas*, 2015 WL 718271, at *4 (citing *Logan v. Wilkins*, 644 F.3d 577, 582–83 (7th Cir. 2011)).

The second category—concerning conduct after the FAs were signed—is subject to a four-year limitations period. 28 U.S.C. § 1658(a); *Jones v. R.R. Donnelly & Sons, Co.*, 541 U.S. 369, 382 (2004); *Dandy*, 388 F.3d at 269. This claim must be based on activity that occurred after

October 29, 2016. The Plaintiffs became McDonald's franchisees decades ago, and many of the alleged events occurred before October 29, 2016. (*See, e.g.*, AC ¶¶ 48–49, 53.) Any claim based on conduct predating October 29, 2016, is time-barred.

Plaintiffs try to delay the running of the statute of limitations by stating McDonald's "concealed" the alleged discrimination (AC ¶ 21) and that Plaintiffs could not have discovered their claims until certain other lawsuits were filed in 2020 (*id.* ¶¶ 24–26, 145). However, any invocation of the fraudulent concealment doctrine is meritless here. Plaintiffs identify no fraud, let alone with the requisite specificity, that prevented them from discovering or pursuing their claims. Instead, their theory is that McDonald's failed to admit it was allegedly discriminating and instead stated a commitment to racial equality that allegedly "misled" Plaintiffs. (*See, e.g.*, *id.* ¶¶ 21, 25, 191.) But the Seventh Circuit has rejected such theories, which—if accepted—"would eliminate the statute of limitations in [] discrimination cases." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). That a business says it does not discriminate (*e.g.*, in its policies against discrimination) does not mean the statute of limitations can be evaded by simply alleging the business in fact discriminated. *See Chakonas v. City of Chicago*, 42 F.3d 1132, 1136 (7th Cir. 1994). Instead, courts require "active conduct" by defendants "above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time." *Lukovsky v. City & Cty. of S.F.*, 535 F.3d 1044, 1052 (9th Cir. 2008); *accord Cada*, 920 F.2d at 450–51. Plaintiffs have alleged no such "active conduct."

Indeed, by their own admission, Plaintiffs had sufficient information to investigate their discrimination claims at the time the alleged discriminatory acts occurred. Plaintiffs' reference to historical allegations against McDonald's by others proves the point. (AC ¶¶ 125–136.) These include letters from the NBMOA expressing concern about racial inequality as early as November

2002 and as recently as March 2019—time periods overlapping with Plaintiffs' ownership of their restaurants. (*Id.* ¶¶ 140, 147.) Plaintiffs also rest their claims on the 1996 letter from McDonald's executive to the NBMOA committing to help Black franchisees achieve success (which Plaintiffs mischaracterize as an admission). (*Id.* ¶¶ 137–138.) These letters contradict Plaintiffs' claim that they were oblivious and lulled into inaction by McDonald's commitment to parity. (*See, e.g.*, *id.* ¶¶ 21, 23–26.) Indeed, the very existence of the NBMOA—a 47-year-old organization dedicated to ensuring that Black franchisees are protected and represented within McDonald's—belies Plaintiffs' claim that they had no way to communicate with one another. Moreover, James Byrd acknowledges that he was elected Chair of the Nashville Regional Leadership Council by the owner-operators in the Region. (AC ¶ 44.) His active leadership position in the Region further contradicts his claim that he was "isolat[ed]" and "had no way to discover" the evidence he relies on to plead that McDonald's intentionally limited his opportunity because of his race. (*See* AC ¶¶ 25, 47.)

Equally unavailing is Plaintiffs' attempt to invoke the "continuing violation" doctrine by alleging "an ongoing pattern and practice" of discrimination. (*See, e.g.*, AC ¶¶ 12, 18, 145, 151.) This doctrine does not apply where, as here, the conduct at issue—such as placing Plaintiffs in "poor-performing and dangerous locations," requiring them to undertake unnecessary "rebuilds," and giving them unwarranted bad grades after restaurant inspections (AC ¶ 236)—comprises a series of discrete acts such that each act is separately actionable. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (holding that the continuing violation does not apply to "discrete discriminatory acts" such as termination, failure to promote, denial of transfer, or refusal to hire" because they are "easy to identify" and "separately actionable"); *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 700–01, 709 (7th Cir. 2002) (holding that transfer to a predominately

African-American area, a conflict with a White office administrator, allegedly discriminatory application of the company's dress code, denial of vacation, and termination were all discrete acts, not a continuing violation). Even if a "pattern and practice" theory were available, such a theory must be established through individualized allegations; Plaintiffs' general and vague assertions of a practice do not suffice. *Daniels v. Fed. Reserve Bank of Chi.*, No. 98 C 1186, 2004 WL 419796, at \*6 (N.D. Ill. Mar. 4, 2004). Thus, dismissal of Plaintiffs' time-barred claims is appropriate at the pleading stage. *See Payne v. Abbott Labs*., 999 F. Supp. 1145, 1150 (N.D. Ill. 1998).

## CONCLUSION

For the foregoing reasons, McDonald's requests that the Court dismiss Plaintiffs' Amended Class Action Complaint with prejudice.

Dated: February 8, 2021
Patricia Brown Holmes
Sondra A. Hemeryck
Amy C. Andrews
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700
pholmes@rshc-law.com
shemeryck@rshc-law.com
aandrews@rshc-law.com

Ariel Schepers Wilson
RILEY SAFER HOLMES & CANCILA LLP
121 W. Washington Street, Suite 402
Ann Arbor, Michigan 48104
(734) 773-4900
awilson@rshc-law.com

Andrew Jason Wu (*pro hac vice*)
RILEY SAFER HOLMES & CANCILA LLP
456 Montgomery Street, 16th Floor
San Francisco, California 94104
(415) 275-8550
awu@rshc-law.com

   */s/ Patricia Brown Holmes*
Loretta E. Lynch (*pro hac vice*)
Susanna M. Buergel (*pro hac vice*)
Karen R. King (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(202) 373-3000
lelynch@paulweiss.com
sbuergel@paulweiss.com
kking@paulweiss.com

*Counsel for McDonald's USA, LLC and McDonald's Corporation*

24