Exhibit 1-A

## EXHIBIT B

## FRANCHISE AGREEMENT (TRADITIONAL)

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** ("Franchise") made this _____ day of _____, for the operation of a McDonald's restaurant located at _____ (the "Restaurant") by and between:

### McDONALD'S USA, LLC,

a Delaware limited liability company,

("McDonald's")

and

_____

_____

(collectively "Franchisee")

for the purpose of granting the Franchisee the rights necessary to operate the Restaurant.

In consideration of the mutual rights and obligations contained herein McDonald's and Franchisee agree as follows:

1.    ***Nature and Scope of Franchise.***

(a)    McDonald's operates a restaurant system ("McDonald's System"). The McDonald's System is a comprehensive system for the ongoing development, operation, and maintenance of McDonald's restaurant locations which have been selected and developed for the retailing of a limited menu of uniform and quality food products, emphasizing prompt and courteous service in a clean, wholesome atmosphere which is intended to be attractive to children and families and includes proprietary rights in certain valuable trade names, service marks, and trademarks, including the trade names "McDonald's" and "McDonald's Hamburgers," designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies. The McDonald's System is operated and is advertised widely within the United States of America and in certain foreign countries.

(b)     McDonald's holds the right to authorize the adoption and use of the McDonald's System at the Restaurant.  The rights granted to the Franchisee to operate the Restaurant are set forth in this Franchise, including the Operator's Lease ("Lease") which is attached hereto as Exhibit A, incorporated in this Franchise.

(c)     The foundation of the McDonald's System and the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation.  Compliance by Franchisee with the foregoing standards and policies in conjunction with the McDonald's trademarks and service marks provides the basis for the valuable goodwill and wide family acceptance of the McDonald's System.  Moreover, the establishment and maintenance of a close personal working relationship with McDonald's in the conduct of Franchisee's McDonald's restaurant business, Franchisee's accountability for performance of the obligations contained in this Franchise, and Franchisee's adherence to the tenets of the McDonald's System constitute the essence of this Franchise.

(d)     The provisions of this Franchise shall be interpreted to give effect to the intent of the parties stated in this paragraph 1 so that the Restaurant shall be operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified.

(e)     Franchisee acknowledges Franchisee's understanding of McDonald's basic business policy that McDonald's will grant franchises only to those individuals who live in the locality of their McDonald's restaurant, actually own the entire equity interest in the business of the Restaurant and its profits, and who will work full time at their McDonald's restaurant business.  Franchisee represents, warrants, and agrees that Franchisee actually owns the complete equity interest in this Franchise and the profits from the operation of the Restaurant, and that Franchisee shall maintain such interest during the term of this Franchise except only as otherwise permitted pursuant to the terms and conditions of this Franchise.  Franchisee agrees to furnish McDonald's with such evidence as McDonald's may request, from time to time, for the purpose of assuring McDonald's that Franchisee's interest remains as represented herein.

(f)     Franchisee agrees to pay to McDonald's all required payments under this Franchise, including, without limitation, the payments set forth in paragraphs 8 and 9 herein and paragraph 3.01 of the Lease. All payments hereby required constitute a single financial arrangement between Franchisee and McDonald's which, taken as a whole and without regard to any designation or descriptions, reflect the value of the authorization being made available to the Franchisee by McDonald's in this Franchise and the services rendered by McDonald's during the term hereof.

2.     ***Franchise Grant and Term***.

(a)     McDonald's grants to Franchisee for the following stated term the right, license, and privilege:

(i)      to adopt and use the McDonald's System at the Restaurant;

(ii)     to advertise to the public that Franchisee is a franchisee of McDonald's;

(iii)    to adopt and use, but only in connection with the sale of those food and beverage products which have been designated by McDonald's at the Restaurant, the trade names, trademarks, and service marks which McDonald's shall designate, from time to time, to be part of the McDonald's System; and

(iv)    to occupy the Restaurant as provided herein.

The rights granted under this Franchise are limited to the Restaurant's location only.

(b)      The term of this Franchise shall begin on _____ and end on _____, unless terminated prior thereto pursuant to the provisions hereof.

3.     ***General Services of McDonald's***.  McDonald's shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant and also, upon Franchisee's request, at other reasonable times.  McDonald's shall communicate to Franchisee know-how, new developments, techniques, and improvements in areas of restaurant management, food preparation, and service which are pertinent to the operation of a restaurant using the McDonald's System.  The communications shall be accomplished by visits by operations consultants, printed and filmed reports, seminars, and newsletter mailings.  McDonald's shall also make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants.

4.     ***Manuals***.  McDonald's shall provide Franchisee with the business manuals prepared for use by franchisees of McDonald's restaurants similar to the Restaurant.  The business manuals contain detailed information including:  (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies.  Franchisee agrees to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals, now and as they may be modified from time to time.  Franchisee acknowledges that McDonald's or its affiliates own all proprietary rights in and to the McDonald's System and that the information revealed in the business manuals, in their entirety, constitute confidential trade secrets.  Without the prior written consent of McDonald's, Franchisee shall not disclose the contents of the business manuals to any person, except employees of Franchisee for purposes related solely to the operation of the Restaurant, nor shall Franchisee reprint or reproduce the manuals in whole or in part for any purpose except in connection with instruction of employees in the operation of the Restaurant.  Such manuals, as modified from time to time, and the policies contained therein, are incorporated in this Franchise by reference.

5.     ***Advertising***.  McDonald's employs both public relations and advertising specialists who formulate and carry out national and local advertising programs for the McDonald's System.

Franchisee shall use only advertising and promotional materials and programs provided by McDonald's or approved in advance, in writing, by McDonald's.  Neither the approval by McDonald's of

Franchisee's advertising and promotional material nor the providing of such material by McDonald's to Franchisee shall, directly or indirectly, require McDonald's to pay for such advertising or promotion.

Franchisee shall expend during each calendar year for advertising and promotion of the Restaurant to the general public an amount which is not less than four percent (4%) of Gross Sales (as that term is defined in paragraph 7) for such year. Expenditures by Franchisee to national and regional cooperative advertising and promotion of the McDonald's System, or to a group of McDonald's restaurants which includes the Restaurant, shall be a credit against the required minimum expenditures for advertising and promotion to the general public.

6. ***Training***. McDonald's shall make available to Franchisee the services of Hamburger University, the international training center for the McDonald's System. Franchisee acknowledges the importance of quality of business operation among all restaurants in the McDonald's System and agrees to enroll Franchisee and Franchisee's managers, present and future, at Hamburger University or at such other training center as may be designated by McDonald's from time to time. McDonald's shall bear the cost of maintaining Hamburger University and any other training centers, including the overhead costs of training, staff salaries, materials, and all technical training tools, and agrees to provide to Franchisee both basic and advanced instruction for the operation of a McDonald's System restaurant. Franchisee shall pay all traveling, living, compensation, or other expenses incurred by Franchisee and Franchisee's employees in connection with attendance at Hamburger University or such other training centers.

7. ***Gross Sales***. For the purposes of this Franchise, the term "Gross Sales" shall mean all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, whether such sales be evidenced by check, cash, credit, charge account, exchange, or otherwise, and shall include, but not be limited to, the amounts received from the sale of goods, wares, and merchandise, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant, whether such orders be filled from the Restaurant or elsewhere. Gross Sales shall not include sales of merchandise for which cash has been refunded, provided that such sales shall have previously been included in Gross Sales. There shall be deducted from Gross Sales the price of merchandise returned by customers for exchange, provided that such returned merchandise shall have been previously included in Gross Sales, and provided that the sales price of merchandise delivered to the customer in exchange shall be included in Gross Sales. Gross Sales shall not include the amount of any sales tax imposed by any federal, state, municipal, or other governmental authority directly on sales and collected from customers, provided that the amount thereof is added to the selling price or absorbed therein and actually paid by the Franchisee to such governmental authority. Each charge or sale upon credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when the Franchisee shall receive payment (whether full or partial) therefor.

8. (a) ***Service Fee***. Franchisee shall pay a monthly service fee on or before the tenth (10th) day of the following month in an amount equal to four percent (4.0%) of the Gross Sales of the Restaurant for the preceding month immediately ended.

4

(b)     *Method of Payment*.  Franchisee shall at all times participate in the McDonald's automatic debit/credit transfer program as specified by McDonald's from time to time for the payment of all amounts due McDonald's pursuant to this Franchise.  Franchisee shall execute and deliver to McDonald's such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(c)     *Interest on Delinquencies*.  In the event that the Franchisee is past due on the payment of any amount due McDonald's under this Franchise, including accrued interest, the Franchisee shall be required, to the extent permitted by law, to pay interest on the past due amount to McDonald's for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%).  Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

9.     *Initial Fee*.  Franchisee acknowledges that:  (a) the initial grant of this Franchise constitutes the sole consideration for the payment of an Initial Fee of Forty-Five Thousand Dollars ($45,000.00) paid by Franchisee to McDonald's; and (b) the fee has been earned by McDonald's (except where the construction of the Restaurant has not been completed within one (1) year from the date of the execution and delivery of this Franchise).  If the Restaurant has not been constructed or is not ready for occupancy at the time of the execution of this Franchise, McDonald's shall use its best efforts to expedite the construction and lease of the Restaurant to Franchisee. However, McDonald's shall not be liable to Franchisee in any manner for any delays in or lack of completion of such construction for any reason.  McDonald's shall be under no obligation to enforce performance or to seek other remedies for non-performance of any lease, clause, or contract necessary for the construction of the Restaurant and reserves the right, in case construction of the Restaurant should be abandoned, the lease assigned, or other interest in the premises be relinquished, to terminate this Franchise upon reimbursement to Franchisee of the Initial Fee.  At such time as the Restaurant is completed and ready for occupancy, the Initial Fee shall be deemed to be earned.  If the Restaurant is not ready for occupancy within one (1) year from the date of this Franchise, Franchisee shall have the right to terminate this Franchise and obtain an immediate refund of the Initial Fee upon written request to McDonald's.

10.     *Reports*.  On or before 11:00 a.m. Central Standard Time on the first business day of each month, Franchisee shall render, in a manner specified by McDonald's, a statement, in such form as McDonald's shall reasonably require from time to time, of all receipts from the operation of the Restaurant for the preceding month immediately ended.  On or before the twenty-fifth (25th) day of each month Franchisee shall submit to McDonald's an operating statement and a statistical report for the previous month in form satisfactory to McDonald's. Franchisee shall keep and preserve full and complete records of Gross Sales for at least three (3) years in a manner and form satisfactory to McDonald's and shall also deliver such additional financial and operating reports and other information as McDonald's may reasonably request on the forms and in the manner prescribed by McDonald's. Franchisee further agrees to submit within ninety (90) days following the close of each fiscal year of the Restaurant's operation, a profit and loss statement covering operations during such fiscal year and a balance sheet taken as of the close of such fiscal year, all prepared in accordance with generally accepted accounting principles.  The profit and

loss statement and the balance sheet shall, if McDonald's shall request certification, be certified by a certified public accountant. Franchisee shall at Franchisee's expense cause Franchisee's public accountant and certified public accountant, if any, to consult with McDonald's concerning such statement and balance sheet. The original of each such report required by this paragraph 10 shall be mailed to McDonald's at the address indicated in paragraph 22 herein.

McDonald's shall have the right to inspect and/or audit Franchisee's accounts, books, records, and tax returns at all reasonable times to ensure that Franchisee is complying with the terms of this Franchise. If such inspection discloses that Gross Sales actually exceeded the amount reported by Franchisee as Gross Sales by an amount equal to two percent (2%) or more of Gross Sales originally reported to McDonald's, Franchisee shall bear the cost of such inspection and audit.

11. ***Restrictions***. Franchisee agrees and covenants as follows:

(a) During the term of this Franchise, Franchisee shall not, without the prior written consent of McDonald's, directly or indirectly, engage in, acquire any financial or beneficial interest (including interests in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord for any restaurant business, which is similar to the Restaurant.

(b) Franchisee shall not, for a period of eighteen (18) months after termination of this Franchise for any reason or the sale of the Restaurant, directly or indirectly, engage in or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord of any restaurant business which is similar to the Restaurant within a ten-mile radius of the Restaurant.

(c) Franchisee shall not appropriate, use, or duplicate the McDonald's System, or any portion thereof, for use at any other self-service, carry-out, or other similar restaurant business.

(d) Franchisee shall not disclose or reveal any portion of the McDonald's System to a non-franchisee other than to Franchisee's Restaurant employees as an incident of their training.

(e) Franchisee shall acquire no right to use, or to license the use of, any name, mark, or other intellectual property right granted or to be granted herein, except in connection with the operation of the Restaurant.

The restrictions contained in paragraphs 11(a) and 11(b) herein shall not apply to ownership of less than two percent (2%) of the shares of a company whose shares are listed and traded on a national or regional securities exchange.

12. ***Compliance With Entire System***. Franchisee acknowledges that every component of the McDonald's System is important to McDonald's and to the operation of the Restaurant as a McDonald's restaurant, including a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality, and appearance; and uniformity of facilities and service.

McDonald's shall have the right to inspect the Restaurant at all reasonable times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following:

(a)     Operate the Restaurant in a clean, wholesome manner in compliance with prescribed standards of Quality, Service, and Cleanliness; comply with all business policies, practices, and procedures imposed by McDonald's; serve at the Restaurant only those food and beverage products now or hereafter designated by McDonald's; and maintain the building, fixtures, equipment, signage, seating and decor, and parking area in a good, clean, wholesome condition and repair, and well lighted and in compliance with designated standards as may be prescribed from time to time by McDonald's;

(b)     Purchase kitchen fixtures, lighting, seating, signs, and other equipment in accordance with the equipment specifications and layout initially designated by McDonald's and, promptly after notice from McDonald's that the Restaurant premises are ready for occupancy, cause the installation thereof;

(c)     Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be reasonably changed from time to time by McDonald's;

(d)     Franchisee shall not, without the prior written consent of McDonald's:  (i) make any building design conversion or (ii) make any alterations, conversions, or additions to the building, equipment, or parking area;

(e)     Make repairs or replacements required:  (i) because of damage or wear and tear or (ii) in order to maintain the Restaurant building and parking area in good condition and in conformity to blueprints and plans;

(f)     Where parking is provided, maintain the parking area for the exclusive use of Restaurant customers;

(g)     Operate the Restaurant seven (7) days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by McDonald's (except when the Restaurant is untenantable as a result of fire or other casualty), maintain sufficient supplies of food and paper products, and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency;

(h)     Cause all employees of Franchisee, while working in the Restaurant, to:  (i) wear uniforms of such color, design, and other specifications as McDonald's may designate from time to time; (ii) present a neat and clean appearance; and (iii) render competent and courteous service to Restaurant customers;

(i)     In the dispensing and sale of food products:  (i) use only containers, cartons, bags, napkins, other paper goods, and packaging bearing the approved trademarks and which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; (ii) use only those flavorings, garnishments, and food and beverage ingredients which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; and (iii) employ only those methods of food handling and preparation which McDonald's may designate from time to time;

7

(j)     To make prompt payment in accordance with the terms of invoices rendered to Franchisee on Franchisee's purchase of fixtures, signs, equipment, and food and paper supplies; and

(k)     At Franchisee's own expense, comply with all federal, state, and local laws, ordinances, and regulations affecting the operation of the Restaurant.

13.     ***Best Efforts***.  Franchisee shall diligently and fully exploit the rights granted in this Franchise by personally devoting full time and best efforts and, in case more than one individual has executed this Franchise as the Franchisee, then _____ shall personally devote full time and best efforts to the operation of the Restaurant.  Franchisee shall keep free from conflicting enterprises or any other activities which would be detrimental to or interfere with the business of the Restaurant.

14.     ***INTENTIONALLY DELETED***.

15.     ***Assignment***.  Without the prior written consent of McDonald's, Franchisee's interest in this Franchise shall not be assigned or otherwise transferred in whole or in part (whether voluntarily or by operation of law) directly, indirectly, or contingently, and then only in accordance with the terms of this paragraph 15.

(a)     Death or Permanent Incapacity of Franchisee.  Upon the death or permanent incapacity of Franchisee, the interest of Franchisee in this Franchise may be assigned either pursuant to the terms of paragraph 15(d) herein or to one or more of the following persons:  Franchisee's spouse, heirs, or nearest relatives by blood or marriage, subject to the following conditions:  (i) if, in the sole discretion of McDonald's, such person shall be capable of conducting the Restaurant business in accordance with the terms and conditions of this Franchise and (ii) if such person shall also execute an agreement by which the person personally assumes full and unconditional liability for and agrees to perform all the terms and conditions of this Franchise to the same extent as the original Franchisee.  If, in McDonald's sole discretion, such person cannot devote full time and best efforts to the operation of the Restaurant or lacks the capacity to operate the Restaurant in accordance with this Franchise, McDonald's shall have an option to operate and/or manage the Restaurant for the account of Franchisee or of Franchisee's estate until the deceased or incapacitated Franchisee's interest is transferred to another party acceptable to McDonald's in accordance with the terms and conditions of this Franchise.  However, in no event shall such McDonald's operation and management of the Restaurant continue for a period in excess of twelve (12) full calendar months without the consent of Franchisee or Franchisee's estate.  In the event that McDonald's so operates and/or manages the Restaurant, McDonald's shall make a complete account to and return the net income from such operation to the Franchisee or to Franchisee's estate, less a reasonable management fee and expenses.  If the disposition of the Restaurant to a party acceptable to McDonald's has not taken place within twelve (12) months from the date that McDonald's has commenced the operation or management of the Restaurant on behalf of the deceased or incapacitated Franchisee, then, in that event, McDonald's shall have the option to purchase the Restaurant at fair market value for cash or its common stock at its option.

(b)     Assignment to Franchisee's Corporation.  Upon Franchisee's compliance with such requirements as may from time to time be prescribed by McDonald's, including a Stockholders Agreement in the form prescribed by McDonald's, McDonald's shall consent to an assignment to a corporation whose shares are

8

wholly owned and controlled by Franchisee. The corporate name of the corporation shall not include any of the names or trademarks granted by this Franchise. Any subsequent assignment or transfer, either voluntarily or by operation of law, of all or any part of said shares shall be made in compliance with the terms and conditions set forth in paragraphs 15(a) and 15(d) herein.

(c)  First Option to Purchase. Franchisee or Franchisee's representative shall, at least twenty (20) days prior to the proposed effective date, give McDonald's written notice of intent to sell or otherwise transfer this Franchise pursuant to paragraph 15(d). The notice shall set forth the name and address of the proposed purchaser and all the terms and conditions of any offer. McDonald's shall have the first option to purchase the Restaurant by giving written notice to Franchisee of its intention to purchase on the same terms as the offer within ten (10) days following McDonald's receipt of such notice. However, if McDonald's fails to exercise its option and the Restaurant is not subsequently sold to the proposed purchaser for any reason, McDonald's shall continue to have, upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any subsequent offer.

(d)  Other Assignment. In addition to any assignments or contingent assignments contemplated by the terms of paragraphs 15(a) and 15(b), Franchisee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent. Such consent shall not be arbitrarily withheld.

In determining whether to grant or to withhold such consent, McDonald's shall consider of each prospective transferee, by way of illustration, the following: (i) work experience and aptitude, (ii) financial background, (iii) character, (iv) ability to personally devote full time and best efforts to managing the Restaurant, (v) residence in the locality of the Restaurant, (vi) equity interest in the Restaurant, (vii) conflicting interests, and (viii) such other criteria and conditions as McDonald's shall then apply in the case of an application for a new franchise to operate a McDonald's restaurant. McDonald's consent shall also be conditioned each upon such transferee's execution of an agreement by which transferee personally assumes full and unconditional liability for and agrees to perform from the date of such transfer all obligations, covenants, and agreements contained in this Franchise to the same extent as if transferee had been an original party to this Franchise. Franchisee and each transferor shall continue to remain personally liable for all affirmative obligations, covenants, and agreements contained herein for the full term of this Franchise or for such shorter period as McDonald's may, in its sole discretion, determine. Upon each assignment or other transfer of this Franchise to any person or persons under the terms and conditions of this paragraph 15(d), the percentage service fee charge owing to McDonald's after the date of such assignment or transfer shall be automatically adjusted to the then prevailing percentage service fee charge required under new Franchises issued by McDonald's for similar McDonald's restaurants at the time of such assignment or transfer.

16.  *Franchisee Not an Agent of McDonald's*. Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose. Franchisee is, and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Restaurant and its business, including any personal property, equipment, fixtures, or real property connected therewith, and for all

claims or demands based on damage or destruction of property or based on injury, illness, or death of any person or persons, directly or indirectly, resulting from the operation of the Restaurant. Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances.

17. **_Insurance_**. Franchisee shall, upon taking possession of the Restaurant, acquire and maintain in effect such insurance with such coverages as may be required by the terms of any lease of the Restaurant premises to McDonald's, and in any event, Franchisee shall acquire and maintain in effect not less than the following coverages in the following minimum amounts:

(a) Worker's Compensation insurance prescribed by law in the state in which the Restaurant is located and Employer's Liability Insurance with $100,000/$500,000/$100,000 minimum limit. If the state in which the Restaurant is located allows the option of not carrying Worker's Compensation Insurance, and Franchisee chooses to exercise that option, Franchisee shall nonetheless carry and maintain other insurance with coverage and limits as approved by McDonald's.

(b) Commercial general liability insurance in a form approved by McDonald's with a limit of $5,000,000 per occurrence/$5,000,000 aggregate.

(c) All such insurance as may be required under the Lease.

All insurance policies required to be carried hereunder shall name McDonald's and any party designated by McDonald's as additional insureds, as their interests may appear in this Franchise. All policies shall be effective on or prior to the date Franchisee is given possession of the Restaurant premises for the purpose of installing equipment or opening the Restaurant, whichever occurs first, and evidence of payment of premiums and duplicate copies of policies of the insurance required herein shall be delivered to McDonald's at least thirty (30) days prior to the date that Franchisee opens for business and/or thirty (30) days prior to the expiration date of an existing policy of insurance. All policies of insurance shall include a provision prohibiting cancellations or material changes to the policy thereof until thirty (30) days prior written notice has been given to McDonald's.

In the event Franchisee shall fail to obtain the insurance required herein, McDonald's may, but is not obligated to, purchase said insurance, adding the premiums paid to Franchisee's monthly rent. (Franchisee may authorize McDonald's to purchase and to administer the required minimum insurance on Franchisee's behalf. However, McDonald's, by placement of the required minimum insurance, assumes no responsibility for premium expense nor guarantees payment for any losses sustained by Franchisee.) McDonald's may relieve itself of all obligations with respect to the purchase and administration of such required insurance coverage by giving ten (10) days written notice to Franchisee.

All insurance shall be placed with a reputable insurance company licensed to do business in the state in which the Restaurant is located and having a Financial Size Category equal to or greater than IX and Policyholders Rating of "A+" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by McDonald's.

18.  ***Material Breach***.  The parties agree that the happening of any of the following events shall constitute a material breach of this Franchise and violate the essence of Franchisee's obligations and, without prejudice to any of its other rights or remedies at law or in equity, McDonald's, at its election, may terminate this Franchise upon the happening of any of the following events:

(a)  Franchisee shall fail to maintain and operate the Restaurant in a good, clean, wholesome manner and in compliance with the standards prescribed by the McDonald's System;

(b)  Franchisee shall be adjudicated a bankrupt, become insolvent, or a receiver, whether permanent or temporary, for all or substantially all of Franchisee's property, shall be appointed by any court, or Franchisee shall make a general assignment for the benefit of creditors, or a voluntary or involuntary petition under any bankruptcy law shall be filed with respect to Franchisee and shall not be dismissed within thirty (30) days thereafter;

(c)  Any payment owing to McDonald's is not paid within thirty (30) days after the date such payment is due;

(d)  Any judgment or judgments aggregating in excess of $5,000.00 against Franchisee or any lien in excess of $5,000.00 against Franchisee's property shall remain unsatisfied or unbonded of record in excess of thirty (30) days;

(e)  Franchisee shall cause, suffer, or permit (voluntarily or involuntarily) Franchisee's right of possession as lessee or sublessee of the premises on which the Restaurant is located to be terminated prematurely for any cause whatever;

(f)  Franchisee shall acquire any interest in a business in violation of paragraph 11(a);

(g)  Franchisee shall duplicate the McDonald's System in violation of paragraph 11(c);

(h)  Franchisee shall make or cause a disclosure of any portion of the McDonald's System in violation of paragraph 11(d) or shall make or cause a disclosure of part of the McDonald's System business manuals;

(i)  Franchisee shall violate paragraph 11(e) by use of any name, trademark, service mark, or other intellectual property right exceeding the restrictions of said paragraph 11;

(j)  Franchisee shall knowingly sell food or beverage products other than those designated by McDonald's or which fail to conform to McDonald's System specifications for those products, or which are not prepared in accordance with the methods prescribed by McDonald's, or fail to sell products designated by McDonald's;

(k)  Any assignment or other transfer of any interest of the Franchisee in this Franchise shall occur in violation of paragraph 15(d) herein;

(l)  Franchisee shall deny McDonald's the right to inspect the Restaurant at reasonable times;

(m)  Franchisee shall fail to make or make repeated delays in the prompt payment of undisputed invoices from suppliers or in the remittance of payments as required by this Franchise;

(n)  Franchisee makes any misrepresentations to McDonald's relating to the acquisition and/or ownership of this Franchise;

(o)     Franchisee engages in public conduct which reflects materially and unfavorably upon the operation of the Restaurant, the reputation of the McDonald's System, or the goodwill associated with the McDonald's trademarks; provided that engaging in legitimate political activity (including testifying, lobbying, or otherwise attempting to influence legislation) shall not be grounds for termination;

(p)     Franchisee is convicted of, pleads guilty or no contest to a felony, or any other crime that is reasonably likely to adversely affect the McDonald's System, the Restaurant, or the goodwill associated with the McDonald's trademarks; or

(q)     Franchisee intentionally understates Gross Sales reported to McDonald's.

19.    ***Other Breaches***.  If Franchisee fails in the performance of any of the terms and conditions of this Franchise (other than performance of the terms and conditions listed in paragraph 18), Franchisee shall be guilty of a breach of this Franchise which shall not (except in the case of repeated breaches of the same or of different terms and conditions of this Franchise) constitute grounds for termination of this Franchise.  McDonald's shall have the right to seek judicial enforcement of its rights and remedies, including, but not limited to, injunctive relief, damages, or specific performance.  Notwithstanding any of the provisions of this paragraph 19, any uncured breach of the terms of this Franchise (whether of paragraph 18 or 19) shall be sufficient reason for McDonald's to withhold approval of its consent to any assignment or transfer of Franchisee's interest in this Franchise provided for herein.

20.    ***Effect of Termination***.

(a)     In the event of any material breach of this Franchise, McDonald's shall have an immediate right to enter and take possession of the Restaurant in order to maintain continuous operation of the Restaurant, to provide for orderly change of management and disposition of personal property, and to otherwise protect McDonald's interest.

(b)     Upon termination of this Franchise due to any breach or breaches, Franchisee shall not, without the prior written consent of McDonald's, remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements from the premises either prior to or for a period of thirty (30) days following such termination.  McDonald's shall have the option for thirty (30) days following any such termination to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(c)     Upon termination of this Franchise due to the expiration of its term or as a result of any eminent domain proceedings affecting the premises upon which the Restaurant is situated, Franchisee shall not remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements within sixty (60) days prior to the date specified for termination or the date specified for takeover by any public authority.  McDonald's shall, upon written notice of its intention to purchase said property at least thirty (30) days prior to such date of termination, have the option to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(d)      Upon termination or expiration of this Franchise, Franchisee shall:  (i) forthwith return to McDonald's the business manuals furnished to Franchisee, together with all other material containing trade secrets, operating instructions, or business practices; (ii) discontinue the use of the McDonald's System and its associated trade names, service marks, and trademarks or the use of any and all signs and printed goods bearing such names and marks, or any reference to them; (iii) not disclose, reveal, or publish all or any portion of the McDonald's System; and (iv) not thereafter use any trade name, service mark, or trademark similar to or likely to be confused with any trade name, service mark, or trademark used at any time in the McDonald's System.

21.      **Effect of Waivers**.  No waiver by McDonald's or any breach or a series of breaches of this Franchise shall constitute a waiver of any subsequent breach or waiver of the terms of this Franchise.

22.      **Notices**.  Any notice hereunder shall be in writing and shall be delivered by personal service or by United States certified or registered mail, with postage prepaid, addressed to Franchisee at the Restaurant or to McDonald's at **110 N. CARPENTER STREET, CHICAGO, ILLINOIS 60607**.  Either party, by a similar written notice, may change the address to which notices shall be sent.

23.      **Cost of Enforcement**.  If McDonald's institutes any action at law or in equity against Franchisee to secure or protect McDonald's rights under or to enforce the terms of this Franchise, in addition to any judgment entered in its favor, McDonald's shall be entitled to recover such reasonable attorneys' fees as may be allowed by the court together with court costs and expenses of litigation.

24.      **Indemnification**.  If McDonald's shall be subject to any claim, demand, or penalty or become a party to any suit or other judicial or administrative proceeding by reason of any claimed act or omission by Franchisee or Franchisee's employees or agents, or by reason of any act occurring on the Restaurant premises, or by reason of an omission with respect to the business or operation of the Restaurant, Franchisee shall indemnify and hold McDonald's harmless against all judgments, settlements, penalties, and expenses, including attorneys' fees, court costs, and other expenses of litigation or administrative proceeding, incurred by or imposed on McDonald's in connection with the investigation or defense relating to such claim, litigation, or administrative proceeding and, at the election of McDonald's, Franchisee shall also defend McDonald's.

25.      **Construction and Severability**.  All references in this Franchise to the singular shall include the plural where applicable.  If any part of this Franchise for any reason shall be declared invalid, such decision shall not affect the validity of any remaining portion, which shall remain in full force and effect.  In the event that any material provision of this Franchise shall be stricken or declared invalid, McDonald's reserves the right to terminate this Franchise.

26.      **Scope and Modification of Franchise**.  This Franchise (including Exhibit A and any riders hereto) constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties.  Nothing in this Franchise or in any related agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee.  No interpretation, change, termination, or waiver of any of the provisions hereof shall be binding upon McDonald's unless in writing signed by an officer or franchising director of McDonald's, and which is specifically identified as

an amendment hereto. No modification, waiver, termination, rescission, discharge, or cancellation of this Franchise shall affect the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, rescission, discharge, or cancellation.

27. ***Governing Laws***. The terms and provisions of this Franchise shall be interpreted in accordance with and governed by the laws of the state of Illinois.

28. ***Acknowledgment***. Franchisee acknowledges that:

(a) The term of this Franchise is set forth in paragraph 2(b) hereof with no promise or representation as to the renewal of this Franchise or the grant of a new franchise;

(b) Franchisee hereby represents that Franchisee has received a copy of this Franchise, has read and understands all obligations being undertaken, and has had an opportunity to consult with Franchisee's attorney with respect thereto at least seven (7) calendar days prior to execution;

(c) No representation has been made by McDonald's as to the future profitability of the Restaurant;

(d) Prior to the execution of this Franchise, Franchisee has worked at a McDonald's restaurant and has had ample opportunity to contact existing franchisees of McDonald's and to investigate all representations made by McDonald's relating to the McDonald's System;

(e) This Franchise establishes the Restaurant at the location specified on page 1 hereof only and that no "exclusive," "protected," or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred;

(f) This Franchise supersedes any and all other agreements and representations respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this Franchise; however, nothing in this Franchise or in any related agreement is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee;

(g) McDonald's or its affiliates are the sole owner(s) of the trademarks, trade names, service marks, and goodwill associated therewith, respectively, and Franchisee acquires no right, title, or interest in those names and marks other than the right to use them only in the manner and to the extent prescribed and approved by McDonald's;

(h) No future franchise or offers of franchises for additional McDonald's restaurants, other than this Franchise, have been promised to Franchisee and any other franchise offer shall only be in writing, executed by an officer or franchising director of McDonald's, and identified as a Franchise Agreement or Rewrite (New Term) Offer Letter;

(i) Neither McDonald's nor anyone acting on its behalf has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of this Franchise, which is not embodied herein or set forth in the Franchise Disclosure Document; and

(j) This Franchise is offered to Franchisee personally and to no others, and may not be accepted by any other person, partnership, or corporation, or transferred by assignment, will, or operation of law.

**IN WITNESS WHEREOF**, the parties hereto set their hands and seals, in duplicate, the day and year in this instrument first above written.

**McDONALD'S USA, LLC**                    **Franchisee**


By: _____        _____
                                                                                  Date



Prepared By: _____          _____
                                                                                  Date

**The following changes are made to the Franchise Agreement in the following states:**

**Minnesota**   Paragraph 27 continues with, "Nothing in this Franchise or the Franchise Disclosure Document shall in any way abrogate or reduce any rights of the Franchisee as provided for in Minnesota Statutes, Chapter 80C, or Franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction."

A new Paragraph 28(h) is inserted (and remaining sub-paragraphs are renamed (i) through (k)) as follows: "McDonald's considers the trademarks, trade names, logo types, service marks, and commercial symbols to be valuable property rights and continually protects against infringement of these assets. It protects franchisees against claims of infringement or unfair competition to which the franchisees might become subjected because of their authorized use of the trademarks, service marks, logo types, or other commercial symbols in the United States."

Paragraph 28(l) is added as follows: "With respect to franchises governed by Minnesota law, McDonald's will comply with Minnesota Statutes Section 80C.14, Subdivisions 3, 4, and 5 which require, except in certain specified cases, that the Franchisee be given ninety (90) days notice of termination (with sixty (60) days to cure) and 180 days notice for non-renewal of this Franchise; and that consent to the transfer of this Franchise will not be unreasonably withheld."

**North Dakota**   Paragraph 11(b) continues with, "Covenants not to compete such as those mentioned above are generally considered unenforceable in the State of North Dakota. However, Franchisee and McDonald's agree to enforce these provisions to the extent allowed under law."

Paragraph 27 continues with, ", except that North Dakota law will govern with respect to claims arising under the North Dakota Franchise Investment Law."

**Washington**   Paragraph 28(k) is added as follows: "In recognition of the requirements of the Washington Franchise Investment Protection Act (the "Act") and the rules and regulations promulgated thereunder, this Franchise shall be modified as follows:

The State of Washington has a statute, RCW 19.100.180, which might supersede this Franchise in Franchisee's relationship with McDonald's, including the areas of termination and renewal of this Franchise. There also might be court decisions which supersede this Franchise in Franchisee's relationship with McDonald's, including the areas of termination and renewal of this Franchise.

In the event of a conflict of laws, to the extent required by the Act, the provisions of the Act, Chapter 19.100 RCW, shall prevail.

To the extent required by the Act, a release or waiver of rights executed by a franchisee shall not include rights under the Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act, such as a right to a jury trial, might not be enforceable; however, McDonald's and Franchisee agree to enforce them to the maximum extent the law allows."

**EXHIBIT G**

**OPERATOR'S LEASE**

[CITY, STATE]
[Address]
L/C: _____
File: _____

**EXHIBIT A TO FRANCHISE AGREEMENT**

**OPERATOR'S LEASE**

**TABLE OF CONTENTS**

Article 1    **SUMMARY OF FUNDAMENTAL LEASE PROVISIONS**
Sec.         1.01   Term                                                                 1
             1.02   Rent                                                                 1
             1.03   Legal Description                                                    1
             1.04   Liability Insurance Limits                                           1
             1.05   Attachments, Exhibits and Addenda                                    1


Article 2    **PREMISES AND TERM**
Sec.         2.01   Premises                                                             1
             2.02   Term                                                                 2
             2.03   Quiet Enjoyment                                                      2
             2.04   Use of Premises                                                      2
             2.05   Rule Against Perpetuities                                            2
             2.06   Construction and Delivery of Building and Other Improvements         2
             2.07   Acceptance of Premises                                               2
             2.08   Tenant's Compliance With Various Requirements                        3


Article 3    **RENT, TAXES, RECORDS AND REPORTS**
Sec.         3.01   Rent                                                                 3
             3.01   (A) Basic Rent and Pass Thru Rent                                    3
             3.01   (B) Percentage Rent                                                  3
             3.01   (C) Definition of "Gross Sales"                                      3
             3.01   (D) Taxes and Assessments                                           4
             3.01   (E) Other Charges and Expenses                                       5
             3.01   (F) Method and Proof of Payment                                      5
             3.02   Records                                                              5
             3.03   Reports                                                              5
             3.03   (A) Default in Reporting                                             6
             3.03   (B) Inspection of Records by Landlord                                6
             3.04   No Abatement of Rent                                                 6
             3.05   Interest on Delinquencies                                            6
             3.06   Lien for Rent                                                        6

i

**TABLE OF CONTENTS (Continued)**

Article 4    **OBLIGATIONS OF TENANT**
Sec.

| | | |
|---|---|---|
| 4.01 | Utilities | 6 |
| 4.02 | Maintenance and Repair | 6 |
| 4.03 | Alterations | 7 |
| 4.04 | Surety | 7 |
| 4.05 | Liens Against Property | 7 |
| 4.06 | Assignment by Tenant | 7 |
| 4.07 | Franchise Agreement | 8 |

Article 5    **FIXTURES AND EQUIPMENT**
Sec.

| | | |
|---|---|---|
| 5.01 | Fixtures | 8 |
| 5.02 | Removal of Tenant's Property | 8 |

Article 6    **INSURANCE AND DAMAGE TO PROPERTY**
Sec.

| | | |
|---|---|---|
| 6.01 | Liability Insurance | 8 |
| 6.02 | Rental Insurance | 8 |
| 6.03 | Property Insurance | 8 |
| 6.04 | Placement and Policies of Insurance | 9 |
| 6.05 | Repair and Replacement of Buildings | 9 |

Article 7    **RIGHTS OF LANDLORD**
Sec.

| | | |
|---|---|---|
| 7.01 | Inspection by Landlord | 10 |
| 7.02 | Indemnity for Litigation | 10 |
| 7.03 | Waiver of Claims | 10 |
| 7.04 | Re-entry Upon Default | 10 |
| 7.05 | Holding Over | 11 |
| 7.06 | Remedies Cumulative | 12 |
| 7.07 | Waiver | 12 |
| 7.08 | Accord and Satisfaction | 12 |
| 7.09 | Right to Perform for Tenant | 12 |
| 7.10 | Condemnation | 12 |
| 7.11 | Subordination and Non-Disturbance | 13 |

Article 8    **MISCELLANEOUS**
Sec.

| | | |
|---|---|---|
| 8.01 | No Agency Created | 14 |
| 8.02 | Recording of Lease | 14 |
| 8.03 | Force Majeure | 14 |
| 8.04 | Paragraph Headings | 14 |
| 8.05 | Invalidity of a Provision | 14 |
| 8.06 | Law Governing | 14 |
| 8.07 | Entire Agreement | 14 |
| 8.08 | Parties Bound | 14 |
| 8.09 | Notices or Demands | 15 |

## OPERATOR'S LEASE

**THIS LEASE** shall be considered effective the same date as the Franchise Agreement to which it is attached (the "Franchise Agreement"). The term "Landlord," when used in this Lease, shall refer to McDonald's USA, LLC, a Delaware limited liability company, and the term "Tenant," when used in this Lease, shall refer to the undersigned Tenant.

In consideration of the mutual promises contained in this Lease, the parties agree as follows:

## ARTICLE 1  SUMMARY OF FUNDAMENTAL LEASE PROVISIONS

1.01 **Term:** (See Article 2.02) The term of this Lease will begin on _____ and end on _____.

1.02 **Rent:** See Article 3.01 and Schedule B, attached.

1.03 **Legal Description:** See Schedule A and Article 2.01.

1.04 **Liability Insurance Limits:** $5,000,000 per occurrence/$5,000,000 aggregate.

1.05 **Attachments, Exhibits and Addenda:** This Lease includes the following Attachments, Schedules and Addenda which will take precedence over conflicting provisions (if any) of this Lease, and they are made an integral part of this Lease and are fully incorporated into it by this reference.

> (i) Schedule A – Legal Description
>
> (ii) Schedule B – Rent
>
> (iii) Schedule C – Landlord's Interest Addendum
>
> (iv) Schedule D – Head Lease dated _____ with amendments dated _____.
>
> (v) Schedule E – _____

References in this Article to the other Articles in this Lease are for convenience and to designate some of the other Articles where references to particular Fundamental Lease Provisions will be made. If there is any conflict between a Fundamental Lease Provision and the balance of the Lease, the former will control.

## ARTICLE 2  PREMISES AND TERM

2.01 **Premises:** Landlord leases to Tenant the real estate described in Schedule A, attached, together with all easements and appurtenances and all buildings and improvements located on the real estate (all of which are collectively referred to in this Lease as "the Premises"). The Premises are subject to any easements, conditions, encumbrances, restrictions, and party wall agreements, if any, of record and roads and highways and zoning and building code restrictions existing on the date of this Lease.

2.02  **Term:**  The term of this Lease will be as indicated in Article 1.01, subject, however, to any rights set forth in this Lease for the earlier termination of the Lease term.  At the request of either party, a supplement establishing the beginning and ending dates of this Lease shall be executed.  Landlord may establish the beginning date by notifying the Tenant in writing of the date it recognizes as the beginning date of the term.

2.03  **Quiet Enjoyment:**  Landlord promises that Tenant, upon paying the rent and all other charges provided for in this Lease, and upon observing and keeping all Tenant's obligations, will lawfully and quietly hold, occupy and enjoy the Premises during the term of this Lease, without hindrance or interference by anyone claiming by, through or under Landlord, subject to the terms of this Lease and any mortgage or encumbrance now or hereafter placed on the Premises by Landlord.

2.04  **Use of Premises:**  Tenant will use and occupy the Premises solely for a McDonald's Restaurant selling only such products and operating in a manner that may be designated by McDonald's USA, LLC.  Tenant agrees to continuously occupy the Premises during the term of this Lease and agrees not to vacate them.  A breach of this provision will be deemed to be substantial.  If Tenant vacates the Premises during the term of this Lease, Landlord will have the right, in addition to its other rights and remedies, to enter the Premises for the purpose of continuing the operation of the McDonald's Restaurant; and, if Landlord so elects, Landlord shall be entitled to all profits, if any, from the operation of the restaurant.  Tenant further agrees to conduct its restaurant business in a manner that will maximize Gross Sales.  Tenant agrees to purchase, install and maintain, all at its own expense, signs and trade fixtures and equipment in accordance with the plans, specifications and layouts of McDonald's USA, LLC, or any of its subsidiaries, unless these items have been furnished by Landlord.

2.05  **Rule Against Perpetuities:**  If the term of this Lease or the accrual of rent have not commenced within one (1) year from date of execution of this Lease, this Lease will become null and void and of no further force and effect.  The sole remedy of Tenant in such case is the return of any monies paid to Landlord in anticipation of this Lease.

2.06  **Construction and Delivery of Building and Other Improvements:**  Landlord will construct or have others construct or remodel or otherwise prepare the Premises for a McDonald's Restaurant in accordance with the then current plans and specifications of McDonald's USA, LLC. The Premises will be delivered to Tenant when they are sufficiently completed to allow Tenant to install, at Tenant's sole cost and expense, the signs, trade fixtures, equipment and other personal property and improvements necessary to complete the Premises for the operation of a McDonald's Restaurant, unless otherwise provided in Article 1.03.  Tenant will promptly and diligently perform its work in accordance with the plans and specifications previously submitted by or to Tenant and approved by Landlord and in compliance with all applicable federal, state and local statutes, codes and regulations.  Tenant will do all that is reasonably necessary to promptly open the restaurant as soon as possible after delivery of the Premises to the Tenant.

2.07  **Acceptance of Premises:**  By taking possession of the Premises, Tenant acknowledges that Tenant has inspected the Premises and the improvements thereon and found them to be in a safe, satisfactory, and completed condition, ready for occupancy and the installation of trade fixtures, equipment and signage.  All warranties as to the condition of the Premises or its fitness for use, either expressed or implied, are expressly waived by Tenant. Tenant may, however, receive certain warranties and guarantees, by separate agreement, from McDonald's USA, LLC or one of its subsidiaries; but those warranties will be personal covenants, only, and will not be binding upon the successors and assigns of Landlord.

2.08 **Tenant's Compliance With Various Requirements:** Tenant may not use or permit any person to use the Premises or any part of it for any use in violation of federal, state or local laws, including, but not limited to, present and future ordinances or other regulations of any municipality in which the Premises are situated. Tenant will not use or permit any person to use the Premises or any building thereon for the manufacture or sale of intoxicating liquor of any kind whatsoever. Except as provided below, Tenant may not operate any coin or token operated vending or similar device for the sale of any goods, wares, merchandise, food, beverages or services, including but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices, and machines for the sale of beverages, foods, candy, cigarettes or other commodities. One coin operated newspaper vending machine, Playplace games and one pay telephone may be installed, if they are in compliance with Landlord's current written policy on the installation and maintenance of these items. During the term of this Lease, Tenant will keep the Premises and all buildings in a clean and wholesome condition and repair and will maintain the Premises so that they fully comply with all lawful health and police regulations. Tenant will conduct the McDonald's Restaurant on the Premises strictly in accordance with the terms and provisions of the Franchise Agreement. Tenant will minimize all cooking odors and smoke, maintain the highest degree of sanitation and comply with all ordinances, orders, directives, rules and regulations of all governmental bodies, bureaus and offices having jurisdiction over Tenant and over the Premises. Landlord makes no warranties or representations as to the state of such ordinances, rules, orders and directives, regulations, and Tenant acknowledges that Tenant has independently investigated them and will comply with them. Landlord makes no warranties or representations that the Premises, when accepted by Tenant, conform with the Federal, State or Industrial Safety Codes. Tenant will obtain, keep in full force and effect, and strictly comply with, all governmental licenses and permits which may be required for Tenant's use and occupancy of the Premises and the operation of the McDonald's Restaurant.

## ARTICLE 3  RENT, TAXES, RECORDS AND REPORTS

3.01 **Rent:** Tenant promises to pay rent to Landlord, without offset or deduction, as follows:

A. **Basic Rent and Pass Thru Rent:** Tenant will pay monthly to Landlord the Basic Rent and any Pass Thru Rent, if applicable, as indicated in Schedule B, attached. The first payment of Basic Rent and Pass Thru Rent, if applicable, will be due and payable on the commencement date of the term, and the subsequent monthly rental payments, including any Pass Thru Rent, will be due thereafter, in advance, on or before the first day of every succeeding calendar month. If the date of commencement of rent occurs on a day other than the first day of the month, the first rental payment (of Basic Rent, Pass Thru Rent, if any, and Percentage Rent, if any) will be adjusted for the proportionate fraction of the whole month so that all rental payments, other than the first, will be made and become due and payable on the first day of each month.

B. **Percentage Rent:** In addition to the Basic Rent and Pass Thru Rent, if applicable, Tenant promises to pay Percentage Rent to Landlord in the amount and during the periods set forth in Schedule B, attached, on all Gross Sales from the Premises in excess of the Monthly Base Sales set forth in Schedule B, attached. See Article 3.03 for the manner of payment of Percentage Rent.

C. **Definition of "Gross Sales":** For the purposes of this Lease, the term "Gross Sales" will mean all receipts (cash, cash equivalent, credit or redeemed gift certificates) or revenue from sales by Tenant, and of all others, from all business conducted upon or from the Premises, whether such sales be evidenced by check, cash, credit, charge account, exchange or otherwise,

and will include, but not be limited to, the amount received from the sale of goods, wares and merchandise, including sales of food, beverages and tangible property of every kind and nature, promotional or otherwise, and for services performed at the Premises, together with the amount of all orders taken or received at the Premises, all as may be prescribed or approved by the Franchise Agreement. Gross Sales will not include sales of merchandise for which cash has been refunded, or allowances made on merchandise claimed to be defective or unsatisfactory, provided that such returned or exchanged merchandise will have been previously included in Gross Sales. Gross Sales will not include the amount of any sales tax imposed by any federal, state or other governmental authority directly on sales and collected from customers, provided that the amount of the tax is added to the selling price and actually paid by Tenant to such governmental authority. Each charge or sale upon installment or credit will be treated as a sale for the full price in the month during which such charge or sale is made irrespective of the time when Tenant receives payment (whether full or partial). In addition, Landlord may, from time to time, permit or allow certain other items to be excluded from Gross Sales. However, any such permission or allowance may be revoked or withdrawn at the discretion of Landlord and will not stop Landlord from requiring strict compliance with the terms of this Lease.

D. **Taxes and Assessments:** In addition to the Basic Rent, the Pass Thru Rent, if applicable, and the Percentage Rent, Tenant will pay directly to the taxing authority, when due, all real estate taxes and special and general assessments that are levied or assessed against the Premises during the term or any extension of this Lease. Tenant agrees to provide to Landlord, if requested, copies of paid invoices and such other documentation evidencing payment of taxes as may be reasonably requested by Landlord. If Tenant shall default in the payment of any obligation herein required to be paid by Tenant, then Landlord may pay the same together with any penalty or interest levied on the tax bill, and Tenant will be obligated to repay Landlord on demand for such payment, together with interest on all past due obligations, including interest on the penalty and interest levied under this provision.

(a) **First and Last Year**: All real estate taxes and general and special assessment payments of every nature paid during the first and last year of the term of this Lease will be prorated. This tax proration will be based upon the fiscal year of the taxing authority levying the tax, using the percentage of the taxes payable during the first or last tax fiscal year that Tenant actually occupies, or had the right to occupy, the demised Premises. The party paying such taxes shall be entitled to reimbursement from the other party for its pro rata share upon demand and the presentation of an itemized statement with copies of all appropriate documentation evidencing payment.

(b) **Rent Taxes:** Tenant will also pay promptly, when due, any tax which is levied or assessed against the rental, real or tangible personal property, whether or not called a rental tax, excise tax, sales tax, gross receipts tax, tax on services or otherwise; and Tenant will promptly reimburse Landlord for any similar tax which Landlord is required to pay or, in fact, does pay. Such payment or reimbursement will not be deducted from Gross Sales.

(c) **Personal Property Taxes:** Tenant agrees to pay all personal property taxes levied upon the fixtures, equipment and other improvements located on the Premises whether installed and paid for by Tenant or Landlord. The personal property taxes for the first and last year of the term of this Lease will be prorated in the same manner as the real estate taxes and assessments.

(d)  **Appeal:**  Subject to Landlord's rights, Tenant, at Tenant's sole expense, is authorized and hereby permitted to contest and appeal property tax assessments on the demised Premises, and Landlord will cooperate with and assist Tenant in any reasonable manner.

E.  **Other Charges and Expenses:**  Any other charge or expense of any nature which Landlord may be required to pay by virtue of Landlord's interest in the Premises (including, but not limited to, common area maintenance charges, merchant's association's dues, utility charges, fees and taxes and security service fees – collectively referred to as "other charges") will be promptly paid by Tenant to the party to whom they are due as additional charges.  Landlord will provide Tenant with information necessary for Tenant to pay the other charges prior to, or as soon as possible after, the commencement of the term of this Lease.  Until Tenant receives this information, Tenant will not be responsible for the other charges.

F.  **Method and Proof of Payment:**

(a)  Tenant shall, at all times, participate in Landlord's automatic debit/credit transfer program as specified by Landlord from time to time for the payment of all amounts due Landlord pursuant to this Lease.  Tenant shall execute and deliver to Landlord such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(b)  With respect to Articles 3.01(D) and (E), above, or any other provision in this Lease which requires or contemplates Tenant first paying other charges or expenses, Landlord may, at its exclusive option, elect to make such payments directly to the taxing authority, Head Landlord (if applicable), utility company or other party due a payment for which Tenant is liable under this Lease.  If Landlord wishes to exercise this option, Landlord will notify Tenant in writing of its election.  From that time on, Landlord shall make such payments directly, and all penalties and expenses thereafter accruing shall be the responsibility of Landlord. If Landlord elects to make any payment directly, Tenant shall, nonetheless, be responsible for making payment to Landlord for any payment Landlord will make, or makes, within ten (10) days of Tenant's receipt of a billing advice from Landlord.

3.02  **Records:**  Tenant will keep and preserve upon the Premises complete written records of all Gross Sales conducted in any calendar or business year for a period of three (3) years, in a manner and form satisfactory to Landlord.  Tenant will permit Landlord or Landlord's representatives to examine or audit the records at any and all reasonable times, and will, upon Landlord's request, explain the method of keeping records.  The books and records will include cash register tapes, properly identified, over-ring slips, sales journals, general ledger, profit and loss statements, balance sheets, purchase invoices, bank statements with canceled checks and deposit advices, corporate books and records, management company books, including, but not limited to, minute books and stock certificate books, state sales tax returns, federal income tax returns, retailer's occupation tax returns or similar returns required to be filed by the state in which the Premises are located.

3.03  **Reports:**  By 11:00 a.m. Central Standard Time of the first business day of each month, Tenant will deliver to Landlord, in the manner specified by Landlord from time to time, a statement by Tenant or Tenant's authorized representative, reflecting Gross Sales during the preceding month.  Tenant will pay to Landlord on or before ten (10) days after the end of each calendar month during this Lease all sums due based upon Gross Sales as shown in the statement for the period covered by the statement.  Within thirty (30) days following the expiration of each calendar year of the term of this Lease, Tenant will deliver to Landlord at the place last fixed for the payment

of rent, a statement of Gross Sales for the preceding calendar year (certified, at Tenant's expense, if requested by Landlord, by a Certified Public Accountant of good standing and reputation in the state in which the Premises are located) which will show Gross Sales separately for each monthly period during the preceding year.

A. **Default in Reporting:** Upon failure of Tenant to prepare and deliver promptly any monthly or annual statement required by this Lease or to make any required payment, Landlord may elect to treat Tenant's failure as a substantial breach of this Lease entitling Landlord to terminate this Lease and Tenant's right to possession of the Premises.

B. **Inspection of Records by Landlord:** If Landlord is dissatisfied with statements furnished by Tenant, Landlord may notify Tenant, and Landlord, at its option, may then examine Tenant's books or have a Certified Public Accountant selected by Landlord examine Tenant's books. If such examination discloses any underpayment of Percentage Rent, Tenant will promptly pay the deficient amount. If Tenant contests such deficiency, Landlord will then appoint an independent auditor to examine Tenant's books and records. If the independent audit confirms that there has been an underpayment exceeding two percent (2%) of the Percentage Rent, as represented by Tenant, Tenant will, in addition to the above, reimburse Landlord for the cost of the auditor's examination.

3.04 **No Abatement of Rent:** Except as provided in this Lease, damage to or destruction of any portion or all of the buildings, structures and fixtures upon the Premises, by fire, the elements or any other cause, whether with or without fault on the part of Tenant, will not terminate this Lease or entitle Tenant to surrender the Premises or entitle Tenant to any abatement of or reduction in the rent payable, or otherwise affect the respective obligations of the parties, any present or future law to the contrary notwithstanding, subject to Article 6.05 in this Lease.

3.05 **Interest on Delinquencies:** If the Tenant is past due on the payment of any amount due Landlord, under this Lease, including accrued interest, the Tenant shall be required, to the extent permitted by law, to pay interest on the past due amount to the Landlord for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%). Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

3.06 **Lien for Rent:** Tenant grants to Landlord a lien upon all Tenant's property located on the Premises, from time to time, for all rent and other sums due from Tenant to Landlord under the provisions of this Lease.

## ARTICLE 4  OBLIGATIONS OF TENANT

4.01 **Utilities:** Tenant will pay directly all charges for gas, electricity, or other utilities, sewer charges, taxes and driveway fees, if applicable, and for all water used on the Premises as such charges become due. Tenant's obligation to pay the foregoing charges will commence five (5) days after Tenant's equipment is delivered to the Premises.

4.02 **Maintenance and Repair:** Tenant will, at its expense, (a) keep the entire Premises, all improvements, utility lines and Tenant's or Landlord's fixtures and equipment at all times in good repair, order or condition; (b) replace all broken, damaged or missing personal property, fixtures or equipment; and (c) at the expiration of the term of this Lease, whether by lapse of time or otherwise, surrender the Premises in good repair, order and condition, ordinary wear and tear

excepted, and loss by fire and other casualty excepted to the extent that provision for such exception may elsewhere be made in this Lease. Upon request of Landlord, Tenant will remove all signs and other identifying features from the Premises. Tenant's obligation to make repairs to the Premises will include all repairs, whether ordinary or extraordinary, including structural repairs to the foundation, floors, walls and roof.

4.03 **Alterations:** Tenant shall not make any change in, alteration of, or addition to any part of the Premises, or remove any of the buildings or building fixtures without, in each instance, obtaining the prior written consent of Landlord and complying with all governmental rules, ordinances and regulations.

4.04 **Surety:** Before commencement of any construction or installation of any structure, fixture, equipment or other improvement on the Premises, or of any repairs, alterations, additions, replacement or restoration in, on or about the Premises, Tenant will give Landlord written notice specifying the nature and location of the intended work and the expected date of commencement. Tenant will deposit with Landlord, if requested by Landlord, a certificate or other evidence satisfactory to Landlord that Tenant has obtained a bond or that Tenant's building contractor, if any, has furnished a bond in favor of Landlord, with a surety approved by Landlord, guaranteeing the performance and completion of all work free and clear of all liens arising from such work. Landlord reserves the right to withhold its approval of any proposed construction, improvement, repair, alteration or replacement and, without limiting the generality of the foregoing, may require as a condition of its approval that it be permitted to review and approve any contract entered into by Tenant regarding such notices as may be necessary to protect Landlord against liability for liens and claims.

4.05 **Liens Against Property:** Nothing in this Lease will authorize Tenant to do any act which will in any way encumber the title of Landlord to the Premises. The interest or estate of Landlord or the fee owner in the Premises, if Landlord is not the fee owner, will not in any way be subject to any claim by lien or encumbrance, whether by operation of law or by virtue of any express or implied contract by Tenant. Tenant will not permit the Premises to become subject to any mechanics', laborers' or materialsmen's lien for labor or material furnished to Tenant in connection with work of any character performed or claimed to have been performed on the Premises by or at the direction of, or sufferance of, Tenant.

If any lien is filed against the Premises or Tenant's interest in this Lease, at Landlord's option, Tenant will either pay the amount of the lien in full or will, upon demand of Landlord, provide and pay for a non-cancelable bond, placed with a reputable company, approved by Landlord, in an amount deemed sufficient by Landlord, insuring the interest of Landlord and any mortgagee from any loss by reason of the filing of such lien. Tenant will immediately pursue in good faith its legal remedies to remove a lien on the Premises.

4.06 **Assignment by Tenant:** Tenant will not allow or permit any transfer of this Lease or any interest in this Lease by operation of law, or assign, convey, mortgage, pledge or encumber this Lease or any interest in this Lease, or permit the use or occupancy of the Premises or any part thereof without, in each case, obtaining Landlord's prior written consent. No assignment (with or without Landlord's consent) will release Tenant from any of its obligations in this Lease. Notwithstanding the foregoing, Landlord shall consent to an assignment by Tenant of his rights and interest in this Lease if the Tenant complies with the terms and conditions of the Franchise Agreement pertaining to the assignment of the Franchise Agreement.

4.07 **Franchise Agreement:** Tenant will comply with and perform all covenants contained in the Franchise Agreement. Tenant's breach of any of the terms and covenants of the Franchise Agreement will also constitute a breach of this Lease. Termination, expiration, default or revocation of the Franchise Agreement for any reason, either in whole or in part, will also terminate this Lease, without further notice being required.

## ARTICLE 5  FIXTURES AND EQUIPMENT

5.01 **Fixtures:** All buildings and improvements and all plumbing, heating, lighting, electrical and air conditioning fixtures and equipment and all other articles of property which, at the date Tenant takes possession of the Premises, are the property of Landlord or of the fee owner of the Premises are and will remain a part of the real estate and be considered to be leased in this Lease. Any additions, alterations or remodeling of improvements made to the Premises will immediately become the property of Landlord and will not be removed by Tenant at the termination of this Lease by lapse of time or otherwise.

5.02 **Removal of Tenant's Property:** At or prior to the termination of this Lease, whether by lapse of time or otherwise, Tenant will, subject to any rights of Landlord under the Franchise Agreement, remove all of its personal property and trade fixtures from the Premises and will repair any damage to the Premises which may have been caused by such removal.

## ARTICLE 6  INSURANCE AND DAMAGE TO PROPERTY

6.01 **Liability Insurance:** Tenant will pay for and maintain during the entire term of this Lease the following insurance:

A.     Worker's Compensation Insurance prescribed by law in the state in which the Premises are located and Employer's Liability Insurance with $100,000/$500,000/$100,000 minimum limit. If the state in which the Premises are located allows the option of carrying no Worker's Compensation, and Tenant chooses to exercise that option, Tenant shall nonetheless carry and maintain other insurance with coverage and limits as approved by the Landlord.

B.     Commercial General Liability Insurance in a form approved by Landlord, on an occurrence basis, with limits as described in Article 1.04.

C.     Fire Legal Liability Insurance with minimum limits of $500,000 per occurrence.

6.02 **Rental Insurance:** Tenant will maintain and keep in force rental insurance in an amount equal to not less than the total of one (1) year's Basic Rent and Pass Thru Rent, if applicable, as specified in Article 1.02 of this Lease.

6.03 **Property Insurance:** Tenant will maintain and keep in force, all risk insurance, including flood, earthquake and earth movement coverage, upon the Premises, fixtures, operational equipment, signs, furnishings, decor, plate glass and supplies, in a full replacement cost form obligating the insurer to pay the full cost of repair or replacement. It is intended that neither Landlord nor Tenant will be a co-insurer, and to that end, if the insurance proceeds are not adequate to rebuild the building or other improvements located on the Premises, Tenant will be obligated for the difference between the proceeds obtained and the actual cost of the restoration of the Premises, fixtures, operational equipment, signs, furnishings, decor, plate glass and supplies.

6.04 **Placement and Policies of Insurance:**  All insurance policies required to be carried in this Lease will name Landlord and any party designated by Landlord as additional insured.  All policies will be effective on or prior to the date Tenant is given possession of the Premises for the purpose of installing equipment, and evidence of payment of Premiums and duplicate copies of policies of the insurance required in this Lease will be delivered to Landlord at least thirty (30) days prior to the date that Tenant opens for business or thirty (30) days prior to the expiration dates of an existing policy of insurance.  All policies of insurance will include as an additional insured any mortgagee, as its interest may appear, and will include provisions prohibiting cancellations or material changes to the policy until thirty (30) days prior written notice has been given to Landlord.

If Tenant should fail to obtain the required insurance, Landlord may, but is not obligated to, purchase the insurance, adding the premiums paid to Tenant's monthly rent.  Tenant may authorize Landlord to purchase and to administer the required minimum insurance on Tenant's behalf.  However, Landlord, by placement of the required minimum insurance, assumes no responsibility for premium expense nor guarantees payment for any losses sustained by Tenant. Landlord may relieve itself of all obligations with respect to the purchase and administration of the required insurance coverage by giving ten (10) days written notice to Tenant.

All insurance will be placed with a reputable insurance company licensed to do business in the state in which the Premises are located and having a financial size category equal to or greater than IX and a policyholders rating of "A +" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by Landlord.  Tenant further agrees to increase the various insurance coverages specified above from time to time upon the written request of Landlord to meet changing economic conditions and requirements imposed upon Landlord under the Landlord's Head Lease (if applicable) and loan agreements, if any.

6.05 **Repair and Replacement of Buildings:**  If the building on the Premises is damaged by fire or any other casualty, Landlord will, within a reasonable time from the date of the damage or destruction, repair or replace the building so that Tenant may continue in occupancy.  Landlord's obligation to rebuild or restore the Premises will, however, be only to the extent of insurance proceeds recovered.  Basic Rent and any Pass Thru Rent required to be paid in this Lease will not abate during the period of untenantability.  If the building cannot be replaced or repaired within a reasonable time due to the inability of Landlord to obtain materials and labor, or because of strikes, acts of God or governmental restrictions that would prohibit, limit or delay the construction, then the time for completion of the repair or replacement will be extended accordingly.  However, in any event, if the repair or replacement of the building has not been commenced within a period of one (1) year from the date of the damage or destruction, Tenant or Landlord may, at their option, terminate this Lease.  If any damage or destruction occurs during the last five (5) years of the term of this Lease to the extent of fifty percent (50%) or more of the insurable value of the building, Landlord may, by notice to Tenant within forty (40) days after the occurrence of the damage or destruction, in lieu of repairing or replacing the building, elect to terminate this Lease as of the date of the damage or destruction.  Tenant hereby expressly waives and releases any and all claims against Landlord for damages in case of Landlord's failure to rebuild or restore the building in accordance with the provisions of this Article.  Tenant's sole remedy for any such failure will be to elect to terminate this Lease as of the date of occurrence of the damage or destruction. If the building and other improvements are not repaired, restored or replaced, for any reason, all proceeds of the all risk coverage insurance applicable to the building and other permanent improvements will be paid and given to Landlord.  Tenant agrees to execute and deliver any release or other document Landlord may request to obtain the release or control of the proceeds.

If Landlord repairs and restores the Premises, as required above, Tenant agrees to promptly repair, replace, restore or rebuild Tenant's leasehold improvements, equipment and furnishings ("Tenant's Improvements") in accordance with the current standards and specifications for McDonald's Restaurants upon notice from Landlord that the Premises are ready for Tenant's Improvements. Tenant agrees to submit for Landlord's approval, all plans and specifications for Tenant's Improvements to Landlord within thirty (30) days after Landlord delivers its plans and specifications for the restored Premises to Tenant.

## ARTICLE 7  RIGHTS OF LANDLORD

7.01  **Inspection by Landlord:**  Landlord or any authorized representative of Landlord may enter the Premises at all times during reasonable business hours for the purpose of inspecting the Premises.

7.02  **Indemnity for Litigation:**  If Landlord becomes subject to any claim, demand or penalty or becomes a party to any suit or other judicial or administrative proceeding by reason of any act occurring on the Premises, or by reason of an omission with respect to the business or operation of the McDonald's Restaurant, Tenant will indemnify and hold Landlord harmless against all judgments, settlements, penalties, and expenses, including reasonable attorney's fees, court costs and other expenses of litigation or administrative proceeding incurred by or imposed on Landlord in connection with the investigation or defense relating to such claim or litigation or administrative proceeding.  At the election of Landlord, Tenant will also defend Landlord.

Tenant will pay all costs and expenses, including reasonable attorney's fees, which may be incurred by Landlord in enforcing any of the covenants and agreements of this Lease.  All such costs, expenses and attorney's fees will, if paid by Landlord, together with interest, be additional rent due on the next rent date after such payment or payments.

7.03  **Waiver of Claims:**  Landlord and Landlord's agents and employees will not be liable for, and Tenant waives claims for, damage to persons or property sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises or the building of which they are a part, including, but not limited to, claims for damage resulting from: (a) equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep the building or the Premises in repair; (c) injury done or occasioned by wind, water or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water and steam pipes, stairs, porches, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about such building or Premises; (h) the escape of steam or hot water (it being agreed that all the foregoing are under the control of Tenant); (i) water being upon or coming through the roof, skylight, trapdoor, stairs, walks or any other place upon or near such building of the Premises or otherwise; (j) the falling of any fixture, plaster or stucco; (k) interruption of service of any utility.

7.04  **Re-entry Upon Default:**  If (a) Tenant defaults in the payment of any installment of Basic Rent, Pass Thru Rent or Percentage Rent or any additional sum due in this Lease; (b) Tenant defaults in any of the covenants, agreements, conditions or undertakings to be performed by Tenant other than the payment of rent (Basic Rent, Pass Thru Rent, Percentage Rent or additional charges) and such default continues for ten (10) days after notice in writing to Tenant; (c) Tenant defaults in any of the terms of the Franchise Agreement or if the Franchise Agreement should terminate, whether by lapse of time or otherwise; (d) proceedings in bankruptcy or for liquidation, reorganization or rearrangement of Tenant's affairs are instituted by or against Tenant; (e) a

receiver or trustee is appointed for all or substantially all of Tenant's business or assets on the grounds of Tenant's insolvency; (f) a trustee is appointed for Tenant after a petition has been filed for Tenant's reorganization under the Bankruptcy Act of the United States; (g) Tenant makes an assignment for the benefit of its creditors; or (h) Tenant vacates or abandons the Premises, then in any of the above events, Landlord, at its election, may declare the term of this Lease ended and, either with or without process of law, re-enter, expel, remove and put out Tenant and all persons occupying the Premises under Tenant, using such force as may be necessary in so doing, and repossess and enjoy the Premises. Such re-entry and repossession will not work a forfeiture of the rents to be paid or terminate the covenants to be performed by Tenant during the full term of this Lease.

Upon the expiration of the term of this Lease by reason of any of the events described above, or in the event of the termination of this Lease or right to possession by summary dispossession proceedings or under any provision of law now or at any time in force, whether with or without legal proceedings, Landlord may, at its option, relet the Premises or any part for the account of Tenant and collect the rents therefor, applying them first to the payment of expenses Landlord may have in recovering possession of the Premises, including legal expenses and attorney's fees, and for putting the Premises into good order or condition or preparing or altering the same for re-rental, expenses, commissions and charges paid, assumed or incurred by Landlord in reletting the Premises, and then to the fulfillment of the covenants of Tenant in this Lease. Any such reletting may be for the remainder of the term of this Lease or for a longer or shorter period. In any case and whether or not the Premises or any part thereof is relet, Tenant will pay to Landlord the Basic Rent, Pass Thru Rent, if applicable, Percentage Rent, any additional charges, and all other charges required to be paid by Tenant up to the time of termination of this Lease, or of recovery of possession of the Premises by Landlord, as the case may be. Thereafter, Tenant covenants and agrees, if required by Landlord, to pay to Landlord, until the end of the term of this Lease, the equivalent of the amount of all the Basic Rent and Pass Thru Rent, if applicable, reserved in this Lease, Percentage Rent, and all other charges required to be paid by Tenant, less the net income of reletting, if any. These payments will be due and payable by Tenant to Landlord on the rent days above specified. In any of the circumstances described above, Landlord will have the election to recover against Tenant, as damages for loss of the bargain and not as a penalty, an aggregate sum which, at the time of such termination of this Lease, or of such recovery of possession of the Premises by Landlord, represents the then present worth of the excess, if any, of the aggregate of the Basic Rent, Pass Thru Rent, if applicable, Percentage Rent, and all other charges payable by Tenant in this Lease that would have accrued for the balance of the term over the aggregate rental value of the Premises for the balance of the term. Percentage Rent for purposes of this Article shall be deemed to mean the Percentage Rent which Landlord can show could be generated from the Premises but in no event less than the greatest amount of Percentage Rent paid by Tenant during any year. Nothing in this Lease contained will limit or prejudice Landlord's right to prove and obtain as liquidated damages arising out of such breach or termination the maximum amount allowed by any statute or rule of law which may govern the proceeding in which such damages are to be proved.

7.05 **Holding Over:** Tenant will not hold over beyond the expiration or sooner termination of the term of this Lease. If Tenant does hold over, it will give rise to a tenancy at the sufferance of Landlord upon the same conditions as are provided for in this Lease with a monthly rental for the period of such holding over which is double the Basic Rent, Pass Thru Rent, if applicable, and Percentage Rent last paid by Tenant during the term of this Lease, and interest thereon, as liquidated damages, and not as a penalty. Landlord's acceptance of any rent after holding over begins does not renew this Lease. This provision does not waive Landlord's rights of re-entry or

any other right in this Lease resulting from Tenant's breach of the covenant not to hold over or any other breach in this Lease.

7.06 **Remedies Cumulative:** The remedies in this Lease granted to Landlord will not be exclusive or mutually exclusive, and Landlord will have such other remedies against Tenant as may be permitted in law or in equity at any time. Any exercise of a right of termination by Landlord will not be construed to eliminate any right of Landlord to damages on account of any default of Tenant.

7.07 **Waiver:** No delay or omission of Landlord to exercise any right or power arising from any default will impair any such right or power or will be construed to be a waiver of any such default or an acquiescence under this Lease. No waiver of any breach of any of the covenants of this Lease will be held to be a waiver of any other breach or waiver, acquiescence in or consent to any further or subsequent breach of the same covenant. The rights in this Lease given to receive, collect or sue for any rent, monies or payments or to enforce the terms, provisions and conditions of this Lease, or to prevent the breach or non-observance thereof, or to exercise any right or remedy in this Lease, will not in any way affect the right or power of Landlord to declare the term ended and to terminate this Lease because of any default in or breach of any of the covenants, provisions or conditions of this Lease.

7.08 **Accord and Satisfaction:** No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent in this Lease stipulated will be deemed to be other than on account of the earliest stipulated rent, nor will any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided for in this Lease.

7.09 **Right to Perform for Tenant:** If Tenant should fail to perform any of its obligations under the provisions of this Lease, Landlord, at its option, may (but will not be required to) do the same or cause the same to be done. In addition to any and all other rights and remedies of Landlord, the cost incurred by Landlord in connection with such performance by Landlord will be an additional charge due from Tenant to Landlord, together with interest thereon at the maximum rate permitted by law in the state in which the Premises are located on the next rent date after such expenditure or, if there is no maximum rate permitted by law, at fifteen percent (15%) per annum.

7.10 **Condemnation:** If the entire Premises are condemned under eminent domain, or acquired in lieu of condemnation, for any public or quasi-public use or purpose, all rentals and taxes or other charges will be paid to that date, and Tenant will have the right to make a claim for the value of its leasehold estate. Tenant will, also, have the right to claim and recover such compensation as may be separately awarded for any and all damage to Tenant's business by reason of the condemnation and for any cost or loss to which Tenant might be put in removing Tenant's merchandise, furniture, equipment and other personal property. Tenant specifically waives and releases any claim it may have, however, for the value of the building, fixtures and other improvements on the Premises whether or not installed or paid for by Tenant. Tenant further agrees to subordinate any claim it may have to Landlord's claim for the value of the improvements.

If only a part of the Premises is taken or condemned and Landlord determines that the operation of a McDonald's Restaurant on the Premises is no longer economically feasible or desirable, Landlord may at any time, either prior to or within a period of sixty (60) days after the date when possession of the Premises will be required by the condemning authority, elect to

terminate this Lease. If Landlord fails to exercise its option to terminate this Lease or will not have any such option, Landlord will (1) with reasonable promptness, make necessary repairs to and alterations of the improvements on the Premises for the purpose of restoring it to substantially the same use as that which was in effect immediately prior to such taking, to the extent that may be necessary by the condemnation; and (2) be entitled to the entire award for such partial taking. If Landlord does not elect to terminate this Lease, Tenant's Basic Rent and Pass Thru Rent, if applicable, will be reduced by a fraction, the numerator of which will be the total condemnation award or settlement and the denominator of which will be the fair market value of the Premises, prior to the taking, as determined by an independent appraiser selected by the Landlord.

7.11 **Subordination and Non-Disturbance:** This Lease and all of Tenant's rights, title and interest under the Lease will be subject, subordinated and inferior to the lien of any and all mortgages and to the rights of all parties under any sale and leaseback of the Premises and to any and all terms, conditions, provisions, extensions, renewals or modifications of any such mortgage or mortgages or sale and leaseback which Landlord or any grantee of Landlord (collectively hereafter called "Fee Owner") has or may place upon the Premises and the improvements thereon, in the same manner and to the same extent as if this Lease had been executed subsequent to the execution, delivery and recording of such mortgage or of the deed and lease under the sale and leaseback. This provision is intended to include the right of any grantee or Landlord under a sale and leaseback to further encumber the property with one or more mortgages, all of which are declared to be superior to the interest of Tenant in this Lease.

If a mortgagee or any other person acquires title to the Premises pursuant to the exercise of any remedy provided for in such mortgage, or in the event of the default under the Lease related to a sale and leaseback of the Premises, Tenant's right of possession will not be disturbed provided (a) Tenant is not then in default under this Lease and (b) Tenant attorns to such title holder. Tenant agrees that upon a mortgage foreclosure it will attorn to any mortgagee or assignee or any purchaser at the foreclosure sale (collectively called "Purchaser") as its Landlord and in the case of a default under the terms of the lease used in a sale and leaseback, it will attorn to the Fee Owner of the Premises as its new Landlord and, in either event, this Lease will continue in full force and effect as a direct Lease between Tenant and such party under all of the terms of this Lease. If there is a foreclosure of a mortgage placed on the property by a grantee under a sale and leaseback, such attornment will be required only if, at the time of such foreclosure, the Lease used in the sale and leaseback is also in default.

The subordination of this Lease to any mortgagee of Fee Owner provided for in this Lease or to any Lease under a sale and leaseback arrangement will be automatic and self-operative, and no special instrument of subordination will be necessary. Without limiting such automatic and self-operative subordinations, however, Tenant will, on demand, at any time or times, execute, acknowledge and deliver to Fee Owner, without expense to Fee Owner, any and all instruments that may be necessary or proper to evidence the subordination of this Lease and all rights in this Lease to the lien of any such mortgage, or to any such lease under a sale and leaseback arrangement. If Tenant fails, at any time, to execute, acknowledge and deliver any such subordination instrument within five (5) days after receipt of the notice, in addition to any other remedies available, Landlord may execute, acknowledge and deliver the same as the attorney-in-fact on Tenant's behalf; and Tenant hereby irrevocably makes, constitutes and appoints Landlord, its successors and assigns, such attorney-in-fact for that purpose.

**ARTICLE 8  MISCELLANEOUS**

8.01  **No Agency Created:**  Tenant will have no authority, express or implied, to act as agent of Landlord or any of its affiliates for any purpose.  Tenant is, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Premises, including any personal property, equipment, fixtures or real property connected with them and for all claims or demands based on damage or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of the McDonald's Restaurant located on the Premises.

8.02  **Recording of Lease:**  Tenant will not record this Lease without the written consent of Landlord.  However, upon the request of either party, the other party will join the execution of a memorandum or a so-called "short-form" of this Lease for the purpose of recordation.  The memorandum or short form of this Lease will describe the parties, the Premises and the term of this Lease and will incorporate this Lease by reference.  The party requesting execution of the memorandum will bear all costs for recording it.

8.03  **Force Majeure:**  Whenever a period of time is provided in this Lease for either party to do or perform any act or thing, except the payment of monies, neither party will be liable for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control or other causes beyond the reasonable control of the parties, and in any event the time period for the performance of an obligation in this Lease will be extended for the amount of time of the delay. This Article will not apply to, or result in, an extension of the term of this Lease.

8.04  **Paragraph Headings:**  Headings in this Lease are for convenience only and are not to be construed as part of this Lease and will not be construed as defining or limiting in any way the scope or intent of the provisions of this Lease.

8.05  **Invalidity of a Provision:**  If any term or provision of this Lease will to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease will not be affected, but each term and provision of this Lease will be valid and be enforced to the fullest extent permitted by law.  If any material term of this Lease is stricken or declared invalid, Landlord reserves the right to terminate this Lease at its sole option.

8.06  **Law Governing:**  The terms and provisions of this Lease will be governed by the laws of the State of Illinois.

8.07  **Entire Agreement:**  This Lease and the Franchise Agreement will be deemed to include the entire agreement between the parties, and it is agreed that neither Landlord nor anyone acting in its behalf has made any statement, promise or agreement or taken upon itself any engagement whatever, verbally or in writing, in conflict with the terms of this Lease, or that in any way modifies, varies, alters, enlarges, or invalidates any of its provisions, or extends the term of this Lease, and that no obligations of Landlord will be implied in addition to the obligations expressed in this Lease. This agreement cannot be changed orally but only by an agreement in writing signed by Landlord and Tenant.  Nothing in this Lease or in any related agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Tenant.

8.08  **Parties Bound:**  The terms of this Lease will extend to and be binding upon the administrators, executors, heirs, assigns and successors of the parties, subject to the terms of Article 4.06.

8.09 **Notices or Demands:** All notices to or demands upon Landlord or Tenant given under any of the provisions of this Lease will be in writing. Any notices or demands from Landlord to Tenant will be deemed to have been duly and sufficiently given if a copy has been delivered personally or mailed by United States registered or certified mail in an envelope properly stamped and addressed to Tenant at the address of the Premises. Any notices or demands from Tenant to Landlord will be deemed to have been duly and sufficiently given if mailed by registered or certified mail in an envelope properly stamped and addressed to Landlord at 110 N. Carpenter Street, Chicago, Illinois 60607, Attention: Director, U.S. Legal Department. Mailed notices shall be deemed received three (3) business days after being deposited in the U.S. Mail. Either party, by notice, may change the address to which notice will be sent, but all notices mailed to Tenant at the address of the restaurant on the Premises will be deemed sufficient.

**To indicate their consent** to this Operator's Lease the parties, or their authorized representatives or officers, have signed this document.

**TENANT:**                                          **LANDLORD: McDONALD'S USA, LLC**

_____            By: _____

                                                     Date Signed: _____

                                                     Location Code: _____

                                                     Prepared by: _____

**Addition to Schedule A if there is excess property:**

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## EXCESS PROPERTY ADDENDUM

1. Landlord and Tenant acknowledge that the Premises includes excess property which will not be used in the operation of the McDonald's Restaurant developed on the Premises. The excess property is included in the legal description described on Schedule A of this Lease.

2. If the Landlord, in its sole discretion, is able to sell or lease the excess property during the term of this Lease, Tenant agrees to amend this Lease to accomplish the following:

   A. The Premises shall be amended to delete the excess property so that it will no longer be leased to Tenant.

   B. The Premises will be made subject and subordinate to easements that may be needed for access, utilities, drainage, signs or any other necessary use to properly or conveniently develop the excess property. Landlord agrees that no such easements or reservations shall unreasonably interfere with the continuing operation of the McDonald's Restaurant, and all costs, expenses and liabilities associated with the easements or any other use of the Premises shall be assumed by the Landlord.

3. Notwithstanding the deletion of the excess property from the Premises, the Tenant's rent shall remain as stated in this Lease and shall not be reduced. However, Tenant shall be reimbursed by Landlord for an amount equal to approximately all of Tenant's costs for real estate taxes, insurance and maintenance of the excess property up to an amount not to exceed the Landlord's gain on any sale or disposition of the excess property. The gain or loss on the disposition of the excess property shall be determined by subtracting the net book value of the excess property from the net proceeds of the Landlord's sale or other disposition of the excess property. If the excess property is leased by Landlord, the gain or loss shall be determined by subtracting the net present value of the rental payments to be received by Landlord from the net present value of all of Landlord's rental payments or Landlord's net book value associated with the excess property.

4. If the excess property is developed in such a manner as to provide for common access, parking, utilities or other easements that benefit both the Premises and the excess property, Tenant agrees to pay a pro rata share of the cost of maintaining and repairing such common access, parking, utilities or other easements as set forth in the written agreements.

5. The effective date of the above described amendment shall be the date of closing of the sale of the excess property, if sold, or the date the rent commences, if it is leased.

## SCHEDULE A

```
        STORE:                                SITE   :
                                              FILE   :
                                              SEQ    :
                                              REGION :


        RE:   INITIAL        PROJECTED

                                  RENT TERMS
                               ----------------------
```

| COMMENCEMENT DATE EXPIRATION DATE | MONTHLY BASIC RENT | PERCENT RENT | MONTHLY BASE SALES | PASS THRU RENT # | ADDL PROP RENT # | REACQUISITION/ RENEGOTIATION RENT # |
|---|---|---|---|---|---|---|
| COMMENCEMENT OF TERM REMAINDER OF TERM | | | | | | |

\# If rental amounts are shown in these columns, these amounts are to be paid monthly.

SCHEDULE B

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## LANDLORD'S INTEREST ADDENDUM
(McDonald's USA, LLC Leased Property)

1. **LANDLORD'S INTEREST IN PREMISES:**  Landlord holds a leasehold interest in the Premises or a portion of the Premises under the Head Lease described in Article 1.05.

2. **COMPLIANCE WITH HEAD LEASE:**  Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it.  If there are any inconsistencies between this Lease and the Head Lease, the more restrictive obligations of the Head Lease will prevail.  Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord.  Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including, but not limited to, payment of all charges, costs and expenses as set forth in Article 3.01 of this Lease.  Such payments shall not, however, include payment of Landlord's basic monthly rental obligations under the Head Lease.

3. **TENANT'S STATEMENTS AND CERTIFICATES:**  Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Head Landlord under the terms of the Head Lease.  All certificates or policies of insurance so required will also name the Head Landlord as co-insured or additional insured, as the case may be.

4. **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:**  It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease.  If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce its rights under the Head Lease.  With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of the Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and Landlord will not be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

5. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a sublease between Landlord and Tenant and not to make an assignment of the Head Lease.  The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

**SCHEDULE C**

[CITY, STATE]
[Address]
L/C: _____
File #: _____

# LANDLORD'S INTEREST ADDENDUM
## (McDonald's Corporation Leased Property)

1. **LANDLORD'S INTEREST IN PREMISES:** Landlord holds a leasehold interest in the Premises or a portion of the Premises through an internal lease(s) with McDonald's Corporation and/or its affiliated companies (McDonald's Corporation and/or its affiliated companies are hereafter referred to as "McDonald's") ("McDonald's Internal Lease Documentation") as may be amended from time to time. The McDonald's Internal Lease Documentation does not increase Tenant's obligations under this Lease. The McDonald's Internal Lease Documentation requires Landlord to meet all of the obligations of the tenant under the Head Lease described in Article 1.05.

2. **COMPLIANCE WITH HEAD LEASE:** Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it. If there are any inconsistencies between this Lease, McDonald's Internal Lease Documentation and the Head Lease, the more restrictive obligations of the Head Lease will prevail. Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord and/or McDonald's. Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including, but not limited to, payment of all charges, costs and expenses as set forth in Article 3.01 of this Lease. Such payments shall not, however, include payment of the basic monthly rental obligations under the Head Lease.

3. **TENANT'S STATEMENTS AND CERTIFICATES:** Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord, insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Landlord or the Head Landlord under the terms of the Head Lease. All certificates or policies of insurance so required will, in addition to Landlord, also name the Head Landlord and McDonald's as co-insureds or additional insureds, as the case may be.

4. **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:** It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease. If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce the rights of tenant under the Head Lease. With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of the Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and neither Landlord nor McDonald's will be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

5. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a subleasing agreement between Landlord and Tenant and not to make an assignment of the Head Lease or McDonald's Internal Lease Documentation.  The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

**SCHEDULE C**

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## LANDLORD'S INTEREST ADDENDUM
(McDonald's Corporation or McRec Fee Owned Property)

1. **LANDLORD'S INTEREST IN PREMISES:** Landlord holds a leasehold interest in the Premises or a portion of the Premises through an internal lease(s) with McDonald's Corporation and/or its affiliated companies (McDonald's Corporation and/or its affiliated companies are hereafter referred to as "McDonald's") ("McDonald's Internal Lease Documentation") as may be amended from time to time. The McDonald's Internal Lease Documentation between McDonald's and Landlord does not increase Tenant's obligations under this Lease. Tenant acknowledges and agrees that under the terms of this Lease, Tenant will perform, comply with and discharge any and all obligations related to the Premises and its use, including, but not limited to, the payment of all charges, costs and expenses as set forth in Article 3.01 of this Lease.

2. **TENANT'S INSURANCE POLICIES AND CERTIFICATES:** All certificates and policies of insurance so required under this Lease will, in addition to Landlord, name McDonald's as an additional insured.

3. **INTENT OF THE PARTIES:** It is the intent of the parties to enter into a subleasing agreement between Landlord and Tenant and not to make an assignment of the McDonald's Internal Lease Documentation. The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease. In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

**SCHEDULE C**

[CITY, STATE]
[Address]
L/C: _____
File #: _____

**LANDLORD'S INTEREST ADDENDUM – OIL**
(Oil Partner as Head Landlord and McDonald's USA, LLC is tenant
under a Ground Lease and Operating Agreement with an oil partner)

1. **LANDLORD'S INTEREST IN PREMISES:**  Landlord holds a leasehold interest in the Premises or a portion of the Premises under the Head Lease described in Article 1.05.  The Head Lease provides for the joint operation of a fuel facility, McDonald's Restaurant and convenience store, and if provided for in the Head Lease, the operation of a car wash, at the property as defined in the Head Lease.

2. **COMPLIANCE WITH HEAD LEASE:**  Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it.  If there are any inconsistencies between this Lease and the Head Lease, the more restrictive obligations of the Head Lease will prevail.  Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord.  Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including but not limited to, payment of all charges, costs and expenses set forth in Article 3.01 of this Lease.  Such payments shall not, however, include payment of Landlord's monthly basic rental obligations under the Head Lease.

3. **TENANT'S STATEMENTS AND CERTIFICATES:**  Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Head Landlord under the terms of the Head Lease.  All certificates or policies of insurance so required will also name the Head Landlord as co-insured or additional insured, as the case may be.

4. **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:**  It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease.  If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce its rights under the Head Lease.  With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of the Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and Landlord will not be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

5.  **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a subleasing agreement between Landlord and Tenant and not to make an assignment of the Head Lease.  The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## LANDLORD'S INTEREST ADDENDUM – OIL

(Oil Partner as Head Landlord and McDonald's Corporation is tenant
under a Ground Lease and Operating Agreement with an oil partner)

1. **LANDLORD'S INTEREST IN PREMISES:** Landlord holds a leasehold interest in the Premises or a portion of the Premises through an internal lease(s) with McDonald's Corporation and/or its affiliated companies (McDonald's Corporation and/or its affiliated companies are hereafter referred to as "McDonald's") ("McDonald's Internal Lease Documentation") as may be amended from time to time. The McDonald's Internal Lease Documentation does not increase Tenant's obligations under this Lease. The McDonald's Internal Lease Documentation requires Landlord to meet all of the obligations of the tenant under the Head Lease described in Article 1.05. The Head Lease provides for the joint operation of a fuel facility, McDonald's Restaurant and convenience store, and if provided for in the Head Lease, the operation of a car wash, at the property as defined in the Head Lease.

2. **COMPLIANCE WITH HEAD LEASE:** Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it. If there are any inconsistencies between this Lease, McDonald's Internal Lease Documentation and the Head Lease, the more restrictive obligations of the Head Lease will prevail. Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord and/or McDonald's. Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including but not limited to, payment of all charges, costs and expenses set forth in Article 3.01 of this Lease. Such payments shall not, however, include payment of Landlord's monthly basic rental obligations under the Head Lease.

3. **TENANT'S STATEMENTS AND CERTIFICATES:** Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Landlord or the Head Landlord under the terms of the Head Lease. All certificates or policies of insurance so required will, in addition to Landlord, also name the Head Landlord and McDonald's as co-insureds or additional insureds, as the case may be.

4. **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:** It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease. If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce its rights under the Head Lease. With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of the Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and

1

neither Landlord nor McDonald's will be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

5. **INTENT OF THE PARTIES:** It is the intent of the parties to enter into a subleasing agreement between Landlord and Tenant and not to make an assignment of the Head Lease or McDonald's Internal Lease Documentation. The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease. In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## CO-BRANDED DEVELOPMENT ADDENDUM
(McDonald's entity is landlord under a Ground Lease and Operating Agreement with an oil partner)

1. **GROUND LEASE AND OPERATING AGREEMENT:**  Tenant acknowledges that Landlord or McDonald's Corporation or an affiliated company of McDonald's Corporation has entered into a Ground Lease and Operating Agreement ("Agreement") with that oil partner set forth in the Agreement.  The Agreement provides for the joint operation of a fuel facility, McDonald's Restaurant and convenience store, and if provided for in the Agreement, the operation of a car wash, at the property as defined in the Agreement.

2. **COMPLIANCE WITH THE AGREEMENT:**  Tenant acknowledges receipt of a copy of the Agreement, will abide by its terms and agrees that Tenant is obligated to perform any and all obligations of Landlord set forth in the Agreement.  Tenant further agrees that these obligations are in addition to any obligations that Tenant may have under the terms of this Lease or Franchise Agreement with Landlord.  If there are any inconsistencies between the Agreement and this Lease or Franchise Agreement, the more restrictive obligations of the Agreement will prevail.  If there are any inconsistencies between the Agreement and the Head Lease, if any, as described in Article 1.05, the more restrictive obligations of the Head Lease will prevail.

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## McDONALD'S INTEREST ADDENDUM

(McDonald's USA, LLC holds interest in Master Agreement – interest is not a leasehold)

**THIS McDONALD'S INTEREST ADDENDUM** is attached to and made a part of the Operator's Lease ("Agreement") between **McDONALD'S USA, LLC,** a Delaware limited liability company ("McDonald's") and _____ (hereafter, for purposes of this Addendum, called "Grantee").

1. **McDONALD'S INTEREST IN PREMISES:** McDonald's has obtained the right to use the Premises pursuant to the _____ described in Article 1.05 ("Master Agreement").

2. **COMPLIANCE WITH THE MASTER AGREEMENT:** Grantee acknowledges and agrees that the terms and conditions of this Agreement are subject and subordinate to the terms and conditions of the Master Agreement and any subsequent amendments to it. If there are any inconsistencies between this Agreement and the Master Agreement, the more restrictive obligations of the Master Agreement will prevail. Grantee will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the grantor of McDonald's interest under the Master Agreement ("Master Grantor") to terminate the Master Agreement or to prejudice or limit any rights of McDonald's under the Master Agreement. Grantee will perform, comply with and discharge all obligations which McDonald's is required to perform, comply with and discharge pursuant to the Master Agreement including, but not limited to, the payment of all charges, costs and expenses as set forth in Article 3.01 of this Agreement. Such payments shall not, however, include payment of McDonald's basic monthly fee obligation for its interest under the Master Agreement.

3. **GRANTEE'S STATEMENTS AND CERTIFICATES:** Without limiting the generality of the foregoing, Grantee agrees to promptly provide the insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required from time to time by McDonald's under the terms of the Master Agreement. All certificates or policies of insurance so required will name the Master Grantor as co-insured or additional insured, as the case may be.

4. **ENFORCEMENT OF McDONALD'S RIGHTS UNDER MASTER AGREEMENT:** It is acknowledged that the Master Grantor may have certain obligations under the Master Agreement to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Master Agreement. If these obligations exist, McDonald's agrees to make a good faith effort to obtain the timely and faithful performance of the Master Grantor's obligations, but McDonald's will not be in default or breach of any of its covenants and duties under this Agreement or be liable for any resulting loss or claim of Grantee if McDonald's is not able to enforce its rights under the Master Agreement. With respect to McDonald's obligation, if any, to repair and restore the Premises in the event of damage or destruction by fire or any other cause, McDonald's obligations are conditioned upon McDonald's obtaining the cooperation and approval of the Master Grantor, as it may be required, and the compliance of the Master Grantor with all of the Master Grantor's duties under the Master Agreement; and McDonald's will not be liable to Grantee for any damage, claim or injury resulting from McDonald's inability to repair or restore the Premises due to a default or breach of the Master Agreement by the Master Grantor.

5. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a sub-agreement between McDonald's and Grantee and not to make an assignment of the Master Agreement.  The parties further acknowledge that it is their intent that there be no merger of either McDonald's or Grantee's interest in this Agreement and the fee interest if either party acquires the fee interest in the Premises at any time after the execution of this Agreement.  In such event, this Agreement will remain in full force and effect and will determine the rights, duties, and obligations of the parties.  In addition, notwithstanding anything contained in this Agreement to the contrary, if McDonald's does not hold a leasehold interest in the Premises, this Agreement shall not be deemed a sublease but a sub-conveyance allowed by McDonald's rights under the Master Agreement.  It is further agreed that the designation of this document as an "Operator's Lease" is merely for convenience and does not purport to transfer greater rights to Grantee than those held by McDonald's pursuant to the Master Agreement.

[CITY, STATE]
[Address]
L/C: _____
File #: _____

# McDONALD'S INTEREST ADDENDUM
(McDonald's Corporation holds interest in Master Agreement – interest is not a leasehold)

**THIS McDONALD'S INTEREST ADDENDUM** is attached to and made a part of the Operator's Lease ("Agreement") between **McDONALD'S USA, LLC,** a Delaware limited liability company ("McDonald's USA") and _____ (hereafter, for purposes of this Addendum, called "Grantee").

1. **McDONALD'S USA'S INTEREST IN PREMISES:** McDonald's USA has obtained the right to use the Premises through an internal agreement(s) with McDonald's Corporation and/or its affiliated companies (McDonald's Corporation and/or its affiliated companies are hereafter referred to as "McDonald's") ("McDonald's Internal Agreement Documentation") as may be amended from time to time. The McDonald's Internal Agreement Documentation does not increase Grantee's obligations under this Agreement. The McDonald's Internal Agreement Documentation requires McDonald's USA to meet all of the obligations of McDonald's under the Master Agreement described in Article 1.05.

2. **COMPLIANCE WITH THE MASTER AGREEMENT:** Grantee acknowledges and agrees that the terms and conditions of this Agreement are subject and subordinate to the terms and conditions of the Master Agreement and any subsequent amendments to it. If there are any inconsistencies between this Agreement, McDonald's Internal Agreement Documentation and the Master Agreement, the more restrictive obligations of the Master Agreement will prevail. Grantee will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the grantor of McDonald's interest under the Master Agreement ("Master Grantor") to terminate the Master Agreement or to prejudice or limit any rights of McDonald's under the Master Agreement. Grantee will perform, comply with and discharge all obligations which McDonald's is required to perform, comply with and discharge pursuant to the Master Agreement including, but not limited to, the payment of all charges, costs and expenses as set forth in Article 3.01 of this Agreement. Such payments shall not, however, include payment of McDonald's basic monthly fee obligation for its interest under the Master Agreement.

3. **GRANTEE'S STATEMENTS AND CERTIFICATES:** Without limiting the generality of the foregoing, Grantee agrees to promptly provide the insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required from time to time by McDonald's USA, McDonald's or the Master Grantor under the terms of the Master Agreement. All certificates or policies of insurance so required will, in addition to McDonald's USA, also name the Master Grantor and McDonald's as co-insureds or additional insureds, as the case may be.

4. **ENFORCEMENT OF McDONALD'S RIGHTS UNDER MASTER AGREEMENT:** It is acknowledged that the Master Grantor may have certain obligations under the Master Agreement to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Master Agreement. If these obligations exist, McDonald's USA agrees to make a good faith effort to obtain the timely and faithful performance of the Master Grantor's obligations, but McDonald's USA will not be in default or breach of any of its covenants and duties under this Agreement or be liable for any resulting loss or claim of Grantee if McDonald's USA is not able to enforce its rights under the Master Agreement. With respect to McDonald's

1

USA's obligation, if any, to repair and restore the Premises in the event of damage or destruction by fire or any other cause, McDonald's USA's obligations are conditioned upon McDonald's USA's obtaining the cooperation and approval of the Master Grantor, as it may be required, and the compliance of the Master Grantor with all of the Master Grantor's duties under the Master Agreement; and neither McDonald's USA nor McDonald's will be liable to Grantee for any damage, claim or injury resulting from McDonald's USA's inability to repair or restore the Premises due to a default or breach of the Master Agreement by the Master Grantor.

5.  **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a sub-agreement between McDonald's USA and Grantee and not to make an assignment of the Master Agreement.  The parties further acknowledge that it is their intent that there be no merger of either McDonald's USA's or Grantee's interest in this Agreement and the fee interest if either party acquires the fee interest in the Premises at any time after the execution of this Agreement.  In such event, this Agreement will remain in full force and effect and will determine the rights, duties, and obligations of the parties.  In addition, notwithstanding anything contained in this Agreement to the contrary, if McDonald's USA does not hold a leasehold interest in the Premises, this Agreement shall not be deemed a sublease but a sub-conveyance allowed by McDonald's rights under the Master Agreement.  It is further agreed that the designation of this document as an "Operator's Lease" is merely for convenience and does not purport to transfer greater rights to Grantee than those held by McDonald's pursuant to the Master Agreement.

## OPERATOR EXTENSION OF TERM LANGUAGE

If Landlord extends its leasehold interest or acquires the fee interest in the Premises so that the Landlord's tenure extends beyond _____, the term of this Lease shall be automatically modified for a term consistent with the Landlord's real estate interest in the Premises, but in no event beyond _____. This Lease shall also be amended to reflect any new terms and conditions in the new or extended Lease or in the acquisition documents executed by Landlord and its landlord or seller. The Basic Rent and Percentage Rent may be increased to reflect Landlord's total real estate acquisition and development costs for the Premises by applying Landlord's then current rental formula using the Percentage Rent then in effect for similar McDonald's Restaurants.

## EARLY TERMINATION DUE TO NO ADDITIONAL REAL ESTATE TENURE

Tenant acknowledges that Landlord is in negotiations with the party that controls the real estate interest in the Premises ("Head Landlord") to obtain additional real estate tenure for the Premises (as defined below). As of the date of this Lease, Landlord does not have real estate tenure at the Premises, but the Head Landlord has agreed to allow Landlord to occupy the Premises while negotiations continue. The Head Landlord may revoke its agreement at any time; therefore, Landlord and Tenant agree that, notwithstanding the term in this Article, Landlord may terminate this Lease upon the following: (i) negotiations with the Head Landlord cease or (ii) the Head Landlord requires Landlord to vacate the Premises. In either case, this Lease will terminate when McDonald's right to occupy the Premises terminates.