IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES BYRD, JR. and DARRELL BYRD, for themselves and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 20 C 6447 |
| MCDONALD'S USA, LLC, a Delaware limited liability company; and MCDONALD'S CORPORATION, a Delaware corporation, | Judge Harry D. Leinenweber |
| Defendants. | |

## AMENDED MEMORANDUM OPINION AND ORDER

Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 36) is granted. The Court dismisses the steering allegations with prejudice. The remainder of Count I is denied without prejudice. Plaintiffs may file a Second Amended Complaint within thirty (30) days. If no Second Amended Complaint is filed, the dismissal without prejudice will convert to one with prejudice. Having dismissed the Amended Complaint, Defendants' Motion to Strike Class Allegations (Dkt. No. 39) is denied as moot.

## I. BACKGROUND

The Plaintiffs are African-American brothers who have been McDonald's franchisees for several decades. They bring this

putative class action on behalf of themselves and a class of African-American franchisees alleging McDonald's violated 42 U.S.C § 1981. The major complaint alleged is that "McDonald's growth strategy has been predatory in nature, targeting Black consumers, markets, and territories by steering Black franchisees to Black neighborhoods with high overhead costs—including higher security, insurance, and employee turnover—where White franchisees refused to own and operate restaurants." (Am. Compl. ¶ 7, Dkt. No. 32.) This discriminatory conduct, it is alleged, has led to the decline of Black franchisees by half and an increasing disparity in cash flow and revenue between Black and White franchisees. (*Id.* ¶¶ 12–13.)

McDonald's is a highly successful fast-food restaurant organization that began in the United States but is now worldwide. It has approximately 39,000 restaurants in over 100 countries. (*Id.* ¶ 90.) Its stores are, for the most part, independently operated by franchisees. (*Id.* ¶ 83.) McDonald's, however, owns approximately 55% of the land and 80% of the buildings that comprise McDonald's franchise operations. (*Id.* ¶ 84.) McDonald's earns revenues from rents, royalties, and initial fees. (*Id.* ¶ 86.) By all accounts the McDonald's story has been a success. It has built up a brand value of $146.1 billion and has total assets of $47.5 billion. (*Id.* ¶ 87.)

Most franchisees enter into a standard franchise agreement with McDonald's. (*Id.* ¶ 91.) Each franchise agreement is specific to a particular restaurant and is for a limited period of time. (*Id.*) The franchisor is McDonald's USA, LLC, a wholly owned subsidiary of McDonald's Corporation (collectively, "McDonald's"). (*Id.* ¶ 75.) Under the agreement, the franchise is limited, typically for a period of twenty (20) years, with no right to renew or extend. (*Id.* ¶¶ 89, 90.) The grant of one franchise does not guarantee the right to acquire additional franchises. (Franchise Agreement ¶ 28(h), Mem., Ex. 1-A, Dkt. No. 29-3.) Franchisees are not required to accept a franchise that is offered to them. (Preliminary Agreement ¶ 13, Franchise Disclosure Document, Ex. J, Mem., Ex. 1-B, Dkt. No. 29-4.)

Franchisees must operate in compliance with the entire McDonald's system, which includes renovating and remodeling. (*See* Franchise Disclosure Document at 23, Mem. Ex. 1-B, Dkt. No. 29-4.) The franchisee must also pay fees to McDonald's for the right to operate the franchise which include monthly base and percentage rent, which can vary among franchisees. (Am. Compl. ¶ 108.) McDonald's does not guarantee financial success nor make any representation about the performance of an individual restaurant. (Franchise Disclosure Document at 37.) A franchisee may not transfer a franchise without McDonald's approval and McDonald's

has the right of first refusal to acquire a franchisee's restaurant. (*Id.* at 34–35.) A franchisee pays all occupancy costs, including fire, casualty, and liability insurance, property taxes and site maintenance as well as the cost of improvements. (Am. Compl. ¶ 94.) At the end of the franchise term, McDonald's maintains control of the underlying building and real estate and can either enter into a new franchise agreement with the existing franchisee, enter into a franchise agreement with a different franchisee, or close the restaurant. (*Id.* ¶ 95.)

Anyone who wishes to acquire a McDonald's restaurant must complete a training program for new franchisees. (*Id.* ¶ 102.) McDonald's then makes available a list of restaurant opportunities and individuals are required to negotiate the terms of purchase directly with the current owner. (Prospective Franchisee Brochure at 23, Mot., Ex. C, Dkt. No. 37-5.) The purchase price for restaurants varies greatly depending on location, past performance, and physical condition. (*Id.*) The franchisee must pay a minimum of 25% of the purchase price for a down payment and may finance the balance for a period of no more than seven years. (Am. Compl. ¶ 106.)

At the end of 2019 the median annual sales for the 12,000 domestic restaurants was $2,910,000 with the highest annual sales at $12,653,000 and the lowest at $654,000. (*Id.* ¶ 97.) According

to Plaintiffs, McDonald's dictates uniformity of operational structures and revenue expectations of all franchised restaurants even though it is aware that Black-owned and operated restaurants generate significant lower revenue and are subject to higher operational costs than the national average. (*Id.* ¶ 99.) The Amended Complaint contends that "[t]hese differences are statistically significant and are the result of historic racial bias and barriers built into the McDonald's franchise system." (*Id.* ¶ 100.) The Amended Complaint further alleges that this discriminatory treatment has led to an exodus of black franchises from 377 out of 15,086 total franchisees in 1998 to 186 out of 38,999 in 2020. (*Id.* ¶ 17, Figs. 1, 2.)

The Byrds are African-American brothers and have been McDonald's franchisees for a number of years: since 1989 for James and 1998 for Darrell. (*Id.* ¶ 2.) Both men currently operate restaurants in the Nashville and Memphis regions of Tennessee. (*Id.* ¶ 39.) James, at one time, owned ten restaurants. (*Id.* ¶ 43.) Today James operates two locations: the Houston Levee location and the Macon location. (*Id.* ¶ 42.) He acquired the Houston Levee store in 2003 and Macon in 2008. (*Id.* ¶ 48.)

Darrell started his career with McDonald's within his brother's organization. (*Id.* ¶ 63.) Today he operates two restaurants, one in Arlington, Tennessee, and the other in

Somerville, Tennessee. (*Id.* ¶ 62.) The start date of the former resaurant was 2009 and of the latter 2012. (2019 Business Review Rpt. at 45, Mem., Ex. K, Dkt. No. 37-13.) Darrell alleges he has been plagued with operational and financial difficulties, even though his Arlington restaurant has had sales revenues consistently above the national average. (Am. Compl. ¶ 65.)

According to the Amended Complaint, McDonald's has denied Darrell growth and rewrite assistance. (*Id.* ¶ 69.) Darrell alleges that he received a "plus five" (out of ten) on his 2019 Business Review. (*Id.* ¶ 69.) He further alleges that a White franchisee, Michael Retzer, received a score as high as "five" and as low as "two" and was granted growth and rewrite assistance. (*Id.* ¶ 70.) McDonald's, however, in support of its Motion, attached a copy of Darrell's 2019 Business Review as an exhibit which shows that Darrell actually received a "negative five" rating, rather than a "plus five". (2019 Business Review Rpt. at 11.)

Plaintiffs filed this action on October 29, 2020. (Dkt. No. 1.) Defendants moved to dismiss the original Complaint on January 4, 2021. (Dkt. No. 28.) In response, Plaintiffs filed their Amended Complaint on January 25, 2021. (Dkt. No. 32.) Defendants moved to dismiss the Amended Complaint on February 8, 2021. (Dkt. No. 36.)

## II. **LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. At this stage, the Court accepts as true all the facts alleged in the Amended Complaint, views them in the light most favorable to the Plaintiffs, and draws all possible inferences in Plaintiffs' favor. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). On a 12(b)(6) motion the Court may also consider documents attached to Defendants' Motion to Dismiss that are "referred to in the [Plaintiffs'] complaint and central to [their] claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012.)

To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of "plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016) (quotation and citation omitted). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### III. <u>DISCUSSION</u>

Section 1981 provides a cause of action for discrimination on the basis of race in making and enforcing contracts. "Making and enforcing contracts" is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). To state a claim under Section 1981 a plaintiff must allege: (1) membership in a racial minority; (2) an intent by the defendant to discriminate on the basis of race; (3) the discrimination concerns one or more of the activities enumerated in Section 1981(b); and (4) but for race, the plaintiff would not have suffered the loss of a legally protected right. *Comcast Corp. v. National Association of African American owned Media*, 140 S. Ct. 1009, 1014 (2020). Defendants have moved to dismiss contending that Plaintiffs have failed to allege intentional discrimination and "but for" causation, and the matters complained of are all time barred. The Court addresses these arguments below.

### A. Particularity

Defendants first argue that the Amended Complaint failed to alleged facts supporting a plausible inference that McDonald's

- 8 -

systemically discriminated against Black-franchise owners. Specifically, Defendants argue that the Amended Complaint fails to allege any specific facts that could support a plausible inference that McDonald's intended to discriminate against its Black-franchise owners. Instead, Plaintiffs rely on vague and conclusory allegations which fail to meet the pleading standards demanded under the Federal Rules of Civil Procedure.

In response, Plaintiffs argue that race discrimination cases are not subject to the heightened pleading standard articulated in *Iqbal* and *Twombly*. To support this argument, Plaintiffs rely on *Swanson v Citibank*, 614 F.3d 400 (7th Cir 2010). *Swanson* involved an African-American loan applicant who allegedly was denied a home-equity loan because of her race. *Id.* at 402. Her complaint included the names of those involved in the loan denial and the date the loan was denied. *Id.* at 402–03. The Seventh Circuit held that these bare allegations were sufficient to satisfy Rule 8 of the Federal Rules of Civil Procedure. *Id.* at 405–06.

The *Swanson* case was followed the next year by *McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011). *McCauley* involved a Section 1983 *Monell* claim against the City of Chicago. *Id.* at 614. The Seventh Circuit concluded that the case had been properly dismissed because the complaint violated the plausibility standard of *Twombly* and *Iqbal*. *Id.* at 616–19. The Seventh Circuit said that

- 9 -

under this standard a court should accept the well-pleaded facts in the complaint as true but deny the presumption of truth to legal conclusions and conclusory allegations that merely recite the elements of the claim. *Id.* at 616. In deciding a 12(b)(6) motion, courts are to excise these legal conclusions and conclusory allegations from the complaint and then decide whether the remaining allegations plausibly suggest an entitlement to relief. *Id.* The Seventh Circuit explained that it interpreted *Twombly* and *Iqbal* to require the plaintiff to provide some specific facts to support the legal claim in the complaint. *Id.* The Seventh Circuit further stated that "the degree of specificity required is not easily quantified but the plaintiff must give enough details about the subject matter of the case to present a story that holds together" *Id.* And "the required level of specificity rises with the complexity of the claim." *Id.* at 616–17. A more complex case will require more detail. *Id.* at 617.

To put it mildly, the Plaintiffs have alleged a massive, complex case of discrimination commencing decades ago, extending across the nation, that has personally impacted hundreds of African-American McDonald's franchisees. However, regardless of whether this case is classified as a complex case or a simple one, as *Swanson* says, the minimum allegations necessary to satisfy Rule 8 for a discrimination case are the three W's: (1) the type of

discrimination (what); (2) who did it (whom); (2) and the date it occurred (when). *Swanson*, 614 F.3d at 405. The Amended Complaint fails to meet this standard.

To start, there are no allegations regarding who perpetrated any alleged discrimination. The Amended Complaint describes conduct or statements by various McDonald's managers and executives, such as Thomas H. Prentice, a former Executive Vice President of McDonald's, who, in 1998 wrote an apologetic letter to the Chairman of the National Black McDonald's Operators Association ("NBMOA"), in which he admitted that Black franchisees had not attained the same level of success as their peers and promising to improve. (Am. Compl. ¶¶ 137–38; 4/18/1996 Ltr., Am. Compl. Ex. A, Dkt. No. 32-1.) The Amended Complaint also mentions Nashville Field Operations Manager, Jim Schugars (Am. Compl. ¶¶ 59, 69–70) and Franchise Business Partner, Clyde Neville, who gave Michael Retzer an "override", apparently in 2019 (*Id.* ¶ 70.) As another example, the Amended Complaint mentions CEO Steve Easterbrook, who in 2015, Plaintiffs allege instituted a host of discriminatory policies, including limiting or rejecting advertising budgets to target Black consumers, denying opportunities for growth, confining Black franchisees to inner city or urban areas with higher costs, denying Black franchisee's requests for rent relief, and implementing an initiative that

- 11 -

"negatively and disproportionately impacted Black franchisees."
(*Id.* ¶¶ 142–43.) The Amended Complaint further describes the 1976
Senate testimony of Donald R. Conley, who headed NBMOA at the time,
about excluding Black Franchisees from white areas; a *New York
Times* article describing the complaints of a Black franchisee; and
the descriptions of the complaints alleged in several lawsuits
brought by Black franchisees against McDonald's. (*Id.* ¶¶ 128–29.)
The Amended Complaint does nothing, however, to connect any conduct
by these McDonald's managers and executives to discrimination
experienced by Plaintiffs or any purported class member. The
Amended Complaint does not even allege that Plaintiffs or any
purported class members were subjected to any of these "policies."

When stripped of McDonald's discriminatory history, the vague
allegations are that at some unspecified time, Plaintiffs and other
African-American franchisees were steered to economically
unattractive locations. The closest Plaintiffs come to alleging
discrimination is the McDonald's denial of financial relief for
Darrell. These more specific allegations, however, suffer from two
fatal flaws. The first is that the Amended Complaint misstates
Darrell's 2019 score. Plaintiffs argue that the Court should not
consider the 2019 Business Review score because it is not attached
to their Amended Complaint and is not "central" to the Amended
Complaint. The performance evaluations, however, are central to

job discrimination cases and can be relied upon by the court. *Titus v. Illinois Department of Transportation*, 828 F. Supp.2d 957, 969 (N.D. Ill. 2011). Moreover, the Court notes that, while Plaintiffs argue the Court shouldn't consider the actual 2019 Business Review, Plaintiffs have not disputed the accuracy of Darrell's rating as set forth in that 2019 Business Review. The second concern is that the Amended Complaint fails to lay out sufficient details regarding Michael Retzer, or any other comparator franchisee. Even drawing every inference in favor of Plaintiffs, the Amended Complaint lacks details evidencing Darrell was treated differently that his non-Black peers when seeking financial relief.

The Court does not mean to imply that McDonald's operations over the years have not been tainted by the brush of racism. The fact that the first African-American franchisees didn't appear until 15 years after the franchise system was established in 1955 provides the opposite inference. However, historical discrimination cannot be the base for a Section 1981 discrimination suit filed in 2020. For these reasons, Plaintiffs have failed to satisfy either the *Twombly/Iqbal* or the *Swanson* Rule 8 standard of specificity. Accordingly, Plaintiffs' claim is dismissed.

### B. Statute of Limitations

Even if Plaintiffs had stated a claim under Rule 12(b)(6), the statute of limitation applicable to a Section 1981 claim

depends upon whether the complained of conduct occurred prior to or after the formation of that at-issue contract. For pre-contractual conduct, the applicable statute of limitations is Illinois's two year limitation on personal injury lawsuits. *See Porter v. Pipefitters Ass'n Local Union 597, U.A.*, 2013 WL 5162206, at *4 (N.D. Ill. Sept. 12, 2013). For post-contractual conduct, 28 U.S.C. § 1658's four-year statute of limitations applies. *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 269 (7th Cir. 2004).

The Amended Complaint alleges that McDonald's steers Black franchisees to economically undesirable locations. This allegation is clearly pre-contractual conduct and subject to the two-year statute of limitations. Here, neither Plaintiff specifically alleges that McDonald's steered him toward their current franchises. Even if they had made such allegations, the last acquisition by either Plaintiff was 2012. As a result, no such steering could have occurred after 2012, well beyond the two year statute of limitations.

Plaintiffs contend that their Amended Complaint sets forth a pattern and practice by McDonalds that has occurred throughout their franchise terms. Accordingly, they allege it is saved from dismissal by the "continuing violation" exception to the statute of limitations defense. Their argument fails because the Supreme Court has held that "discrete acts such as termination, failure to

promote, denial of transfer, or refusal to hire are easy to identify" and do not constitute continuing violations but are claims that can and should be brought on a timely basis. *National Railway Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Moreover, while Plaintiffs argue that they couldn't have known that they were steered, their Amended Complaint fails to support that allegation. Indeed, the Amended Complaint is devoid of any facts regarding Plaintiffs' franchise acquisitions, let alone facts that would lead to the inference that McDonald's mislead the Plaintiffs during the acquisition process.

For these reasons Plaintiffs' steering allegations are time barred and therefore dismissed with prejudice.

## IV. <u>CONCLUSION</u>

For the reasons state herein, Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 36) is granted. The Court dismisses the steering allegations with prejudice. The remainder of Count I is denied without prejudice. Plaintiffs may file a Second Amended Complaint within thirty (30) days. If no Second Amended Complaint is filed, the dismissal without prejudice will convert to one with prejudice. Having dismissed the Amended Complaint, Defendants' Motion to Strike Class Allegations (Dkt. No. 39) is denied as moot.

**IT IS SO ORDERED.**

_____

Harry D. Leinenweber, Judge
United States District Court

Dated: 6/9/2021