**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES BYRD, JR. and DARRELL BYRD, for themselves and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No.: 1:20-cv-06447 |
| v. | Hon. Harry D. Leinenweber |
| MCDONALD'S USA, LLC, a Delaware limited liability company, and MCDONALD'S CORPORATION, a Delaware corporation, | |
| Defendants. | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

THE PARTIES ................................................................................................................... 16

JURISDICTION AND VENUE ........................................................................................ 19

FACTUAL ALLEGATIONS ............................................................................................ 20

    A.    McDonald's Franchise Model: Unequal Bargaining, Captive Tenants, Discriminatory Franchise Agreements, and Misleading Financial Disclosures .... 20

        (i)    The Franchise Agreement ............................................................ 21

        (ii)    Entry into the McDonald's Franchise System ............................... 24

        (iii)    The Cost to Own and Operate a McDonald's Franchise .............. 25

        (iv)    The Cost to Own and Operate a Black McDonald's Franchise: A Financial Suicide Mission ........................................................ 27

    B.    McDonald's History of Discrimination Against Black Franchisees .................... 28

        (i)    Boycott in Cleveland 1969 ........................................................... 29

        (ii)    McDonald's Uses the NBMOA to Fraudulently Conceal from Plaintiffs and Similarly-Situated Black Franchisees ..................... 29

        (iii)    McDonald's Makes False Promises of Parity ............................... 33

        (iv)    2009 to 2015: McDonald's Concealment Vis-à-Vis the NBMOA ...................................................................................... 35

        (v)    2016 to Present: McDonald's Uses the NBMOA to Misrepresent the Disparity in Cash Flow Gaps Between Black Franchisees and White Franchisees ................................................................................. 41

        (vi)    Bigger Bolder Vision 2020 (BBV2020) Initiative Disproportionately Impacts Black Franchisees ........................... 44

i

       (vii)  2020: McDonald's Own Corporate Executives File a Lawsuit, Highlighting the Discriminatory Treatment of Black Franchisees ...................................................................................47

C.     "Big Mac Attack" on Black Franchisees: McDonald's Pattern and Practice of Intentional and Covert Racial Discrimination .........................................................48

       (i)    Take it or Leave it: Steering and Redlining to High-Cost and Low-Volume Locations ........................................................48

       (ii)   McDonald's Requires Black Franchisees to Make Renovations to Locations it Knows Will Not Generate a Return on Their Investment ...................................................................................51

       (iii)  McDonald's Arbitrarily Denies Black Franchisees Opportunities for Growth to Profitable Locations within the Franchise System..53

       (iv)  McDonald's False Promise of "Rent Relief" and Misleading Financial Assistance.......................................................................55

       (v)   Targeted and Unreasonable Inspections and Grading ..................57

       (vi)  No Choice But to Sell or Operate at a Loss: McDonald's Forced Exit Scheme ...................................................................................58

D.     McDonald's Discrimination against James Byrd, Jr. ...........................................59

       (i)    McDonald's Applies Its Inspection and Review Process Unequally, Denying Mr. Byrd Opportunities for Growth, While Helping White Franchisees Prosper .....................................................................61

       (ii)   McDonald's Confines Mr. Byrd to Low-Volume Stores..............63

       (iii)  McDonald's Forces Mr. Byrd to Participate in its Modernization Initiative, Acquire Debt and Remodel, Misrepresenting the Return on Investment...................................................................................64

       (iv)  McDonald's Denies Mr. Byrd's Request for Rent Relief and Forces him to Wait Long Periods for any Other Financial Assistance ...................................................................................66

E.    McDonald's Discrimination against Darrell Byrd ................................................. 70

        (i)    McDonald's Denies Darrell Byrd's Request for Rent Relief and Deems him "Ineligible for Growth," Blocking his Daughter from the Next Gen Program ................................................. 72

**CLASS ALLEGATIONS** ................................................................................................ 73

A.    Class Definition ................................................................................................. 73

B.    Numerosity and Ascertainability ....................................................................... 74

C.    Predominance of Common Issues ...................................................................... 74

D.    Typicality ........................................................................................................... 76

E.    Adequacy of Representation .............................................................................. 76

F.    Superiority ......................................................................................................... 77

**Equitable Tolling, the Discovery Rule, and Fraudulent Concealment of Discrimination Claim** ................................................................................................................... 78

**COUNT I – Violation of 42 U.S.C. § 1981** ................................................................. 80

**COUNT II – Fraudulent Concealment** ....................................................................... 85

**PRAYER FOR RELIEF** ............................................................................................... 89

**DEMAND FOR JURY TRIAL** ..................................................................................... 91

iii

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, James Byrd, Jr. and Darrell Byrd ("Plaintiffs"), individually and on behalf of all other similarly situated Black McDonald's franchisees (collectively, "Class Members" or the "Class"), by and through undersigned counsel, hereby file this Second Amended Class Action Complaint against Defendants, McDonald's Corporation, the franchisor of the McDonald's franchise system, and its wholly-owned subsidiary, McDonald's USA LLC, (collectively, "McDonald's" or "Defendants"), for violations of 42 U.S.C. § 1981 and Illinois state law, and demand a trial by jury. Plaintiffs make the following allegations based on personal knowledge as to the facts pertaining to themselves and upon information and belief, including the investigation of counsel, as to all other matters.

## INTRODUCTION

1.     Plaintiffs bring this lawsuit on behalf of themselves and one-hundred and eighty-six (186) similarly-situated Black McDonald's franchisees, who currently own and operate McDonald's restaurants in the United States, seeking racial justice and economic equality by holding McDonald's accountable for violations of their civil rights in denying Black franchisees equal franchise opportunities and for abusing its relationship of trust with the National Black McDonald's Operators Association ("NBMOA"), by using it to fraudulently conceal evidence confirming McDonald's continued pattern and practice of discrimination.

2.     Plaintiffs are brothers who own and operate four (4) McDonald's restaurants in Tennessee. James Byrd has been a McDonald's franchisee for thirty-one years, with an organization that has dwindled down from ten (10) to two (2) underperforming McDonald's restaurants. His brother, Darrell, has been a McDonald's franchisee for twenty-two years, with an organization that has been cut down from four (4) to two (2) McDonald's restaurants.

3. The Byrd brothers operate restaurants in the Nashville "region" of McDonald's, an area that includes Nashville and Memphis, Tennessee, which is the region with the **highest** cash flow (and presumably net income)[1] disparity between White and Black McDonald's franchisees nationwide. For decades, the Byrd brothers comprised half of only four (4) total Black McDonald's franchisees in their local advertising co-operative (known as a "co-op"). James Byrd is now the **only** remaining Black McDonald's franchisee in Memphis.

4. Although the Byrds risk retaliation (and potentially any chance at saving their only remaining restaurants) in bringing forth this action, they cannot allow other Black McDonald's franchisees to be misled and injured by the same pipeline of discrimination that has plagued Black franchisees for decades.

5. Beginning in the 1960's, with an unprecedented, opportunistic expansion of real estate ownership into Black communities on the heels of the American civil rights movement through crudely-termed "zebra" partnerships with silent, White investors, continuing with targeted marketing campaigns aimed at Black consumers, from "*Do Your Dinnertimin' at McDonald's*" advertisements in the late 1970s, to "Calvin Got a Job" commercials in the 1990s,[2] to its recruitment of Black icon Michael Jordan in 1992, as recently revived through a collaboration with Black rap artist Travis Scott, McDonald's has perpetuated a decades-long fraud by selling itself as a friend of Black America, yielding billions in profits to the company, at the expense of its own Black franchisees.

---

[1] As alleged more specifically herein, McDonald's controls financial documents for its franchisees and intentionally concealed documents showing net income to downplay the disparity between White and Black franchisees.

[2] McDonald's "Calvin Got a Job" commercials featured a young Black, baggy-clothes wearing teenage character named Calvin from the ghetto, who is depicted as learning responsibility and staying out of trouble by getting a job at McDonald's. *See* https://youtu.be/1p_Fkiwhljs (last visited on July 19, 2021).

6.      McDonald's led aspiring Black entrepreneurs, including, but not limited to, the Byrd brothers, to believe franchise ownership was a "Golden Opportunity," their ticket to the American dream. The reality was the opposite. McDonald's persuaded Black franchisees to sign up for financial suicide missions.

7.      As alleged herein, McDonald's growth strategy has been predatory in nature, targeting Black consumers, markets, and territories by shackling Black franchisees to operate stores in low income, predominantly Black neighborhoods with high overhead costs—including higher security, insurance, and employee turnover—where White franchisees refused to own and operate restaurants.

8.      By placing Black franchisees in predominantly Black neighborhoods, McDonald's is able to both increase its capital through the acquisition of real estate in areas with lower market prices, and increase sales to Black consumers, resulting in higher company profits, which, unlike those of its franchisees, are based only on gross sales and do not account for the higher operational costs associated with these locations. McDonald's shifts the entire risk of loss to Black franchisees through high rents and ongoing fees that pay for McDonald's acquisition and development of real estate and generate consistent company profits. Black franchisees are entirely responsible for all related occupancy costs, as well as renovations and/or rebuilds, despite these locations historically underperforming. When Black franchisees are inevitably unable to pay McDonald's rent and fees, and McDonald's wants them out, McDonald's holds all of the power, and retains all of the benefits by keeping the real estate with all improvements paid for by Black franchisees.

9.      McDonald's primary weapon is fear—fear of termination, fear of being denied expansion, fear of having McDonald's open a restaurant across the street or down the block, and fear of non-renewal. Putative Class Members who wish to join this action are also afraid.

10.     Plaintiffs and putative Class Members remain in the McDonald's franchise system as captive tenants, subject to, and in fear of, McDonald's unfettered discretion to determine their eligibility status for growth and renewal of their franchises, enabling McDonald's to continue to restrict Black franchisees to Black neighborhoods and to deny them equal opportunities to more profitable locations, the key to success in the McDonald's franchise system.

11.     McDonald's pattern and practice of denying Plaintiffs and the Class equal opportunities to more profitable locations to offset the low performing locations to which McDonald's steers them, while occasionally offering misleading forms of temporary "relief," pushes Black franchisees further into debt, leading Plaintiffs and Black franchisees to believe that they are to blame for their inability to profit individually, and giving McDonald's a pretextual "out" at the end of Plaintiffs' 20-year franchise terms to deem Plaintiffs and the Class ineligible for growth and/or renewal. At the same time, McDonald's offers its White franchisees "packaged deals" of newer, safer, and more profitable locations to offset any poor-performing locations, permanent rent and other financial relief, and makes exceptions for White franchisees in the franchise renewal (or "rewrite") process that it does not make for similar Black franchisees.

12.     Through this vicious cycle, Black franchisees go in and out of locations with consistent individual profit shortfalls, not disclosed in any of the financials shared with existing or prospective franchisees, on land and buildings owned by McDonald's, operated by Black franchisees to better target Black consumers, with improvements paid for by Black franchisees, maximizing McDonald's profits at the individual expense of Plaintiffs and the Class. The only way to break this cycle is to force McDonald's to stop treating Plaintiffs and other current Black franchisees differently than its White franchisees.

13.     In an effort to counter that discrimination, in 1972, twelve Black McDonald's franchisees created the NBMOA as a mechanism for promoting the growth of Black franchisees in the industry and to advocate for equality.

14.     Faced with mounting public pressure, on April 18, 1996, McDonald's, through its Executive Vice President, Thomas S. Dentice, finally admitted to its history of systemic racism in a letter to NBMOA Chairman, Reggie Webb, attached as **Exhibit "A"** hereto, and promised to work directly with the NBMOA to overcome the effects of its discrimination against them, fully integrate its Black franchisees into the McDonald's system, and achieve parity between its Black and White franchisees.

15.     In doing so, McDonald's assumed a special relationship with its Black franchisees, through the NBMOA, and specifically undertook the duties of: (1) helping Black franchisees overcome the effects of McDonald's past racist treatment; (2) achieving "parity" between its Black franchisees and White franchisees; and (3) fully disclosing pertinent system-wide information to Black franchisees to allow them to compare the performance of their stores with those of White franchisees and otherwise monitor McDonald's promised progress toward parity.

16.     However, rather than use the NBMOA to achieve parity among its franchisees, McDonald's instead used it as a mechanism to placate its Black franchisees while fraudulently concealing its continued discrimination against them.

17.     In its special relationship with the NBMOA, McDonald's controlled the narrative and all of the data that it released and shared with the NBMOA to disguise the gross inequality in profitability between White and Black franchisees that did not disappear but instead continued from the late 1990s through today. This behavior was continuous and systematic throughout the last two decades.

5

18.     McDonald's did not fully disclose to the NBMOA system-wide information that would allow Plaintiffs and similarly-situated Black franchisees to accurately compare the performance of their stores with those of White franchisees.

19.     McDonald's provided the NBMOA with misleading and incomplete information regarding a *de minimis* "cash flow" gap between the stores owned by Black and White franchisees, which was in most cases merely tens of thousands of dollars annually, in order to create a false perception regarding McDonald's supposed progress toward parity, while concealing the much more significant gap in their net income, which was over $400,000 per year. According to the data McDonald's disclosed to the NBMOA, this cash flow gap ranged from between a total of $19,107 in December 2010 to a high of $68,069 in December 2017, to $56,522 as of March 31, 2020.

20.     McDonald's focused on "cash flow," to the exclusion of other metrics, because it is easily susceptible to manipulation. A company's "cash flow" is defined as cash provided by operations less capital expenditures. It does not account for unpaid debt, which McDonald's knew disproportionately plagued Black franchisees because of their higher operating costs. By using cash flow alone, McDonald's can easily distort a financial picture to mislead Black franchisees into believing that they are performing similarly to White franchisees, as illustrated below"

|  | **Black Franchisee** | **Black Franchisee** | **White Franchisee** |
|---|---|---|---|
| **Average Annual Revenue** | $2,000,000 | $2,000,000 | $2,500,000 |
| **Average expenses** | $1,500,000 | $1,500,000 | $1,500,000 |
| **Debt** | $500,000 *PAID DEBT)* | $500,000 (*UNPAID DEBT*) | $500,000 *PAID DEBT* |
| **Cash flow** | $0 | **500,000** | **500,000** |

21.     Of course, franchisees do not join the McDonald's franchise system, or invest significant sums of money into their stores, to generate favorable "cash flow" statements; they do so to earn a profit, or "net income," which is the true measure of success in the McDonald's system.

22.     In its meetings with the NBMOA, however, McDonald's never revealed information regarding how the net income of Black franchisees compared to the net income of White franchisees. The reason why is now obvious: unbeknownst to Plaintiffs and similarly situated Black McDonald's franchisees, due to McDonald's continued discrimination against its Black franchisees, the divide between the net income earned by Black franchisees and White franchisees was over $400,000 per year.

23.     Plaintiffs' respective average annual net incomes are substantially less than $100,000 per year and in many cases less than $50,000 or operating at losses. For example, in 2019, despite investing substantially more than a million dollars for the initial purchase, and hundreds of thousands of dollars more over the years in improvements to his Houston Levee store, it generated Jim Byrd a net income of just $38,941.

24.     Upon information and belief with respect to the average net income of White franchisees, Plaintiffs' and the remaining Black franchisees' average annual net incomes are at least $400,000 less than that of McDonald's White franchisees.

25.     McDonald's also made it appear to Black franchisees that owning multiple franchise locations was an attainable goal for them, but did not roll the curtains back far enough to show that most of those Black franchisees were awarded low-volume locations, with higher costs, or outdated former corporate-owned stores that McDonald's did not want, and were continually restricted from growing to more profitable locations.

7

26.     McDonald's cut their own losses by promoting those stores to NBMOA leadership as opportunities for Black franchisees to grow, without disclosing the stores' low profits for the individual Black franchisees.

27.     As a result of McDonald's continued racial discrimination, as concealed from Plaintiffs and the Class, Plaintiffs' and Class Members' annual sales, on average, fell $700,000 below McDonald's national average sales of $2.7 million between 2011 and 2016, and $2.9 million in 2019. Plaintiffs' sales are insufficient to cover the expenses associated with their substandard locations, resulting in consistent profit shortfalls and accumulating debt.

28.     The historic high of approximately 400 Black McDonald's franchisees in 1998 has been **more than cut in half**.  Today, there are fewer than 200 Black McDonald's franchisees.  *See* Figure 1 below, based on McDonald's data.

29.     At the same time, from 1998 to date, the total number of McDonald's franchised restaurants **more than doubled**.  *See* Figure 2 below, based on data from McDonald's Corporation.

30.     These statistics are not isolated examples; they are demonstrative of the systematic failure of McDonald's to comply with the mandates of Section 1981 and are the result of racial bias and barriers within the McDonald's franchise system, effectuated by McDonald's through systematic and covert racial discrimination targeted against Black franchisees, the evidence of which McDonald's fraudulently concealed.

8

**Exodus of Black Franchisees 1998 – 2020**

| END OF YEAR | BLACK FRANCHISEES |
|---|---|
| 1998 | 377 |
| 1999 | 368 |
| 2000 | 350 |
| 2001 | 347 |
| 2002 | 333 |
| 2003 | 319 |
| 2004 | 320 |
| 2005 | 313 |
| 2006 | 305 |
| 2007 | 304 |
| 2008 | 304 |
| 2009 | 294 |
| 2010 | 285 |
| 2011 | 283 |
| 2012 | 276 |
| 2013 | 270 |
| 2014 | 261 |
| 2015 | 255 |
| 2016 | 236 |
| 2017 | 222 |
| 2018 | 207 |
| 2019 | 194 |
| 2020 | 186 |

**Figure 1: Number of Black McDonald's Franchisees**

**Total Number of Franchised McDonald's Restaurants 1998 – 2020**

| YEAR | TOTAL FRANCHISES |
|---|---|
| 1998 | 15,086 |
| 1999 | 15,949 |
| 2000 | 16,795 |
| 2001 | 17,395 |
| 2002 | 17,864 |
| 2003 | 18,132 |
| 2004 | 18,248 |
| 2005 | 18,334 |
| 2006 | 22,880 |
| 2007 | 24,471 |
| 2008 | 25,465 |
| 2009 | 26,216 |
| 2010 | 26,338 |
| 2011 | 27,075 |
| 2012 | 27,882 |
| 2013 | 28,691 |
| 2014 | 29,544 |
| 2015 | 30,081 |
| 2016 | 31,230 |
| 2017 | 34,108 |
| 2018 | 35,085 |
| 2019 | 36,059 |
| 2020 | 38,999 |

**Figure 2: Number of McDonald's Franchised Restaurants**

9

31.     McDonald's knowingly and covertly discriminates against Plaintiffs, current Black McDonald's franchisees, and similarly-situated Black McDonald's franchisees, a protected class under federal law (42 U.S.C. § 1981), through an ongoing pattern and practice of denying Black franchisees equal franchise opportunities by, *inter alia*:

  a.    restricting Plaintiffs and similarly-situated Black franchisees' growth beyond predominantly Black, inner city, and/or rural neighborhoods, with higher expenses and lower sales, because of their race;

  b.    excluding Plaintiffs and similarly-situated Black franchisees from the purchase of restaurants in the open market because of their race;

  c.    providing Plaintiffs and similarly-situated Black franchisees with misleading financial information to induce them to purchase McDonald's least desirable franchises;

  d.    requiring Plaintiffs and similarly-situated Black franchisees to invest in rebuilds and/or renovations in locations they know will not generate a return on investment;

  e.    excluding Plaintiffs and similarly-situated Black franchisees from the same growth opportunities to higher-volume, lower-cost restaurants offered to White franchisees;

  f.    failing to provide any legitimate business reasons for repeated denials of franchise opportunities to Plaintiffs and similarly-situated Black franchisees;

  g.    denying Plaintiffs and similarly-situated Black franchisees meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

  h.    depriving Plaintiffs and similarly-situated Black franchisees of the same legacy opportunities offered to White franchisees through McDonald's Next Generation ("Next Gen") program;

  i.    retaliating against Plaintiffs and similarly-situated Black franchisees for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through targeted, increased, and unreasonable inspections;

10

j.     disparate treatment with respect to inspections, grading, and business reviews of Plaintiffs and similarly-situated Black franchisees' restaurants as pretext for forcing them out of the McDonald's franchise system; and/or

k.     placing Plaintiffs and similarly-situated Black franchisees in untenable positions of economic duress, denying them eligibility for growth and/or renewal of their agreements, so that Black franchisees have no choice but to continue to operate substandard locations or sell on McDonald's terms, at a loss.

32.    Through this consistent and ongoing practice of discrimination against Plaintiffs and similarly-situated Black franchisees, McDonald's deprived Plaintiffs and putative Class Members of the same rights enjoyed by White franchisees to the creation, performance, modification, and termination of their agreements and the enjoyment of all benefits, privileges, terms, and conditions of their franchise relationships with McDonald's.

33.    But for their race and McDonald's unjustifiable refusal to provide equal franchise opportunities to Plaintiffs and similarly-situated Black franchisees, Plaintiffs and putative Class Members would not have incurred excessive operational expenses and insufficient sales volume, resulting in lost profits, lost business opportunities, emotional distress, humiliation, and damage to their professional reputations.

34.    McDonald's has fraudulently concealed its renewed pattern and practice of discrimination following its false promise of "parity" for Black franchisees in the late 1990's, through a campaign of misinformation, *vis-à-vis* the NBMOA, and by isolating Plaintiffs and a putative Class of similarly-situated Black franchisees, as it continues to propagate a false narrative of diversity and racial equality.

35.    It is no coincidence that McDonald's is currently defending four (4) race discrimination lawsuits in less than one (1) year at all levels of its operations: employees, workers, and now franchisees, former and current.

11

36.     Plaintiffs and putative Class Members did not know that that they were denied equal franchise opportunities because they are Black.  At all times material to Plaintiffs' and putative Class Members' claims, McDonald's led them to believe—and some continue to believe—that they have equal access to locations, terms, benefits, privileges, and conditions of the McDonald's franchise relationship as White franchisees.

37.     Indeed, it was not until the January 7, 2020, filing of a racial discrimination lawsuit by Black McDonald's senior executives, Victoria Guster-Hines and Domineca Neal, that Plaintiffs and the putative Class learned of inside corporate information ***for the first time*** that revealed, at an executive level, that McDonald's deliberately divests opportunities from Black franchisees, implements business plans with a discriminatory impact on Black franchisees, grades Black Consumer Market restaurants "differently, in a negative way," and has overall abandoned its purported commitment to racial equality on a company-wide basis. *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1], ¶¶ 65, 75 (N.D. Ill. Jan. 1, 2020).[3]

38.     The discriminatory character of McDonald's conduct has not been apparent to Plaintiffs or to putative Class Members when committed on an individual basis because McDonald's practice is to systematically isolate Plaintiffs and similarly-situated Black franchisees, leading them to believe that their financial losses are caused by individual deficiencies as "bad operators," or operational deficiencies within their organizations, rather than discrimination.

39.     Plaintiffs and putative Class Members are not bad businesspeople, as McDonald's has attempted to lead them to believe; they are victims of McDonald's targeted discrimination

---

[3] A copy of the *Guster-Hines* Complaint is attached as **Exhibit "B"** hereto. *See also* Memorandum Opinion and Order, [D.E. 90] (N.D. Ill. June 25, 2020) (denying motion to dismiss).

against Plaintiffs and similarly-situated Black franchisees, which McDonald's covered up during years of parity deals and false promises.

40.     McDonald's has maintained that it is committed to racial equality, through the company's Standards of Business Conduct, advertisements, and promises of parity.

41.     McDonald's Chief Executive Officer, Christopher Kempczinski, appeared on CNBC's "Mad Money with Jim Cramer" this year, and stated that, "*McDonald's has created more millionaires within the Black community than probably any other corporation on the planet*."

42.     Likewise, in response to the murder of George Floyd and the Black Lives Matter movement, McDonald's proclaimed, "*We do not tolerate inequity, injustice, or racism*." McDonald's advertisements read, "They were all one of us. We see them in our customers. We see them in our crew members. *We see them in our franchisees*. And this is why the entire McDonald's family grieves. It's why we stand for them and any other victims of systematic oppression and violence."

43.     Even in McDonald's Corporation's Verified Complaint against its former CEO, Stephen J. Easterbrook, it continues to represent to the public that "ethical operation of its business is not just a legal imperative, but also a cherished value." *McDonald's Corporation v. Easterbrook*, Case Id. 2020-0658, Verified Compl. [D.E. 1], at ¶ 11 (Del. Ch. Aug. 10, 2020).

44.     In response to the lawsuit filed by former franchisees on September 1, 2020, McDonald's Black Board of Director's member, John Rogers, publicly espoused that "there is no finer example of an equitable business model in America than the one McDonald's has."[4]

---

[4] John W. Rogers, Jr., *Why McDonald's sets the standard for equitable business models*, Fortune, (Sept. 16, 2000) https://fortune.com/2020/09/16/mcdonalds-black-franchisees-lawsuit-diversity/ (last visited Sept. 25, 2020) .

45. McDonald's business model is only "equitable" to the extent its general franchise model is equally onerous on franchisees, individually, because the fees and charges McDonald's imposes on franchisees are based on gross revenue as opposed to net profit (e.g., percentage rent is based on gross revenue, 4% management fee based on gross revenue, and 2% advertising fee based on gross revenue).

46. By drawing off of the gross revenue, as opposed to net profit, McDonald's makes money off of each and every dollar a franchised restaurant makes, regardless of the underlying profitability (or loss) of its individual franchisees.

47. This onerous business model is particularly unfair and overly risky for Black franchisees, including Plaintiffs, who were systematically and unequally placed into low revenue and high-cost locations.

48. Revenue for McDonald's franchises is driven by one thing and one thing only: "location, location, location." After all, its product is homogenous and literally the same whether a "Big Mac" is purchased in Brooklyn or Memphis. Revenue has very little or anything to do with who is the franchisee. **It is almost exclusively driven by location**.

49. McDonald's continues to mislead Plaintiffs and similarly-situated Black franchisees through a narrative that is patently **false**. McDonald's publicly proclaims that it "is only as successful as its franchisees: it wants every franchisee in its system to thrive, and it provides extensive support to its franchisees to help them succeed." In reality, McDonald's definition of success is one-sided: McDonald's business model is that of a real estate company that profits on sales and the fees and rent it charges to franchisees, without any consideration for higher expenses and substantially lower gross revenue associated with the substandard locations it offers to Black franchisees, and their resulting profit loss and accumulating debt.

14

50.     Behind the scenes, after the filing of a discrimination lawsuit by former Black McDonald's franchisees and this class action, McDonald's for the first time began offering similarly-situated, current Black franchisees opportunities that it never offered to Plaintiffs and similarly-situated former Black franchisees, including permanent rent relief, expansion into high-volume restaurants, and assistance with debt relief, demonstrating it had the control to apply these measures in accordance with its policies and chose not to.  Not surprisingly, these offers come coupled with take-it-or-leave it releases of liability to any Black franchisee who accepts assistance.

51.     By fraudulently concealing the evidence of its continued racial discrimination, McDonald's was able to avoid providing the foregoing concessions and relief for decades.

52.     After outright and structural racism in the administration of the franchise system, Plaintiffs and putative Class Members operate in fear of McDonald's power to take away franchises to which many of them have dedicated their lives. Today, Plaintiffs can no longer sit silently, and lend their voice to current Black McDonald's franchisees through this lawsuit.

53.     If left unremedied, McDonald's systematic pattern and practice of discriminatory acts will continue to result in a mass exodus of Black franchisees from the McDonald's franchise system and an increasing net income disparity between Black and White McDonald's franchisees.

54.     To remedy McDonald's systemic failure to comply with federal law, this action requests that the Court, *inter alia*:

> (a) require McDonald's to provide Plaintiffs and similarly-situated Black franchisees open and equal access to the geographic market of locations that meet or exceed McDonald's disclosed national average sales;

> (b) require McDonald's to conform to the mandates of Section 1981 and implement objective standards for decisions relating to Plaintiffs and similarly-situated

15

Black franchisees, including: (i) decisions on whether to grant franchisees new franchise terms, known as "rewrites"; (ii) terminations; (iii) rent adjustments and other financial assistance, accounting for higher operating costs and lower volume sales in certain locations; and/or (iv) rebuild and renovation requirements;

(c) require McDonald's to ensure that Plaintiffs and similarly-situated Black franchisees are offered growth opportunities to the same extent that such growth opportunities are available to other franchisees in the same geographic area; and/or

(d) require McDonald's to ensure its grading and inspection standards are fairly and uniformly applied.

55.     Plaintiffs seek declaratory and injunctive relief from these practices; compensatory and punitive damages; equitable remedies of restitution and disgorgement; and an award of costs, expenses, expert and attorneys' fees, for themselves individually and on behalf of the Class they seek to represent, to redress McDonald's failure to provide Black McDonald's franchisees with equality in their franchise agreements in violation of 42 U.S.C. § 1981 (Count I) and for fraudulent concealment of the net income gap between Black and White McDonald's franchisees, which prevented Plaintiffs and similarly-situated Black franchisees from discovering McDonald's continued pattern and practice of discrimination (Count II).

## PARTIES

### A.     Individual Plaintiffs and Class Representatives

56.     Plaintiffs are members of a federally-protected class who own and operate McDonald's domestic franchised restaurants.

16

57.     Plaintiff James (aka Jim) Byrd, Jr. and his brother, Darrell Byrd (together, the "Byrds"), are Tennessee citizens, McDonald's franchise owner/operators, i.e., franchisees, over the age of 21, and otherwise *sui juris*.

58.     The Byrds currently own and operate four McDonald's restaurants in the Memphis and Nashville area, which are part of McDonald's Nashville Regional Office.

59.     For decades, the Byrds made up half of only four total Black franchisees in the Memphis area and are now the sole remaining Black franchisees in that region. The Nashville Region, where the Byrds operate, is well known to McDonald's as having the highest net income disparity between Black and White franchisees in the nation.

60.     Not surprisingly, the Byrds have lost **more than half** of their organization of restaurants: James Byrd owned and lost eight restaurants, while Darrell Byrd owned and lost two restaurants, due to McDonald's misconduct. The Byrds are now left with only four remaining restaurants and no way out other than to sell to McDonald's at a financial loss or continue to operate at a loss and in fear of retaliation.

### (i)      *James Byrd, Jr.*

61.     Plaintiff James Byrd is a Black McDonald's franchisee who owns and operates two McDonald's franchises in predominantly rural or Black neighborhoods located at 3675 S. Houston Levee Road, Collierville, TN, NSN 22859, L/C 41-0597 ("Houston Levee") and 1206 N. Houston Levee Road, Cordova, TN, NSN 31693, L/C 41-1029 ("Macon").

62.     McDonald's sold Mr. Byrd his Houston Levee and Macon franchised restaurants based on projected sales per year of $1.8 million and $1.5 to $1.6 million in 2003 and 2008, respectively.

17

63.     James Byrd began with one (1) McDonald's restaurant in the Memphis, Tennessee area, and had a total of ten (10) McDonald's restaurants at the height of his career.

### (ii)     *Darrell Byrd*

64.     Plaintiff Darrell Byrd is a Black McDonald's franchisee who owns and operates two (2) McDonald's franchises located at 11590 Highway 70, Arlington, TN, NSN 29403, L/C 41-0784 ("Arlington") and 16630 US Hwy. 64, Somerville, TN, 38068, NSN 34976, L/C 41-1097 ("Somerville").

65.     Darrell Byrd entered the McDonald's system as a franchisee when he joined his brother's organization in 1998, and began operating his own stores in 2009.

66.     Darrell Byrd's restaurants, like his brother's, were in predominantly rural or Black neighborhoods, with higher operational costs and revenues that fail to cover expenses over time.

### B.  Defendants

67.     Defendant McDonald's USA, LLC ("McDonald's USA") is a Delaware limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 110 North Carpenter Street, Chicago, Illinois.

68.     McDonald's USA is a wholly-owned subsidiary of McDonald's Corporation and the franchisor of the McDonald's franchise system, which develops, operates, franchises, and services a system of fast-food restaurants in the United States.

69.     Defendant McDonald's Corporation ("McDonald's Corporation") is a publicly traded Delaware corporation with its principal place of business located at One McDonald's Plaza, Oak Brook, Illinois.  McDonald's Corporation is the sole member of McDonald's USA, and is the worldwide franchisor of the McDonald's franchise system.

18

70.     McDonald's Corporation is the franchisor of agreements entered into by Plaintiffs and the putative Class (and not later amended or superseded) prior to approximately 2005, and McDonald's USA is the franchisor of agreements entered into by Plaintiffs and the putative Class since approximately 2005.

## JURISDICTION AND VENUE

71.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based on the federal question arising under Section 1981, 42 U.S.C. §§ 1981 *et seq*.

72.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d) because this is a class action subject to the Class Action Fairness Act ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), with an aggregate amount in controversy in excess of Five Million Dollars ($5,000,000.00) (exclusive of interest and costs), members of the Class in excess of one hundred (100), and with at least one (1) member of the putative Class that is a citizen of a state different from that of one of the Defendants.

73.     This Court has personal jurisdiction over Defendants because their principal place of business is in the State of Illinois and because they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction.

74.     Venue is proper pursuant to 28 U.S.C. § 1391 and 18 U.S.C. §1965, because a substantial part of the events or omissions giving rise to the claim have occurred and are occurring in the Northern District of Illinois, and each Defendant transacted affairs and conducted activity that gave rise to the claim of relief in this District, where their principal place of business is located, and they are headquartered. 28 U.S.C. § 1391(b); 18 U.S.C. §1965(a).

## FACTUAL ALLEGATIONS

A.     **McDonald's Franchise Model:  Unequal Bargaining, Captive Tenants,
       Discriminatory Franchise Agreements, and Misleading Financial Disclosures**

75.     McDonald's business model is highly franchised, allowing it to become one of the largest commercial real estate owners in the world:  93% of McDonald's restaurants are franchised globally, with 95% of all U.S. restaurants franchised to independent franchisees and about 5% are operated by McDonald's wholly-owned subsidiaries ("McOpCo Companies').

76.     McDonald's Corporation owns and controls approximately 55% of the land and 80% of the buildings for restaurants in its consolidated markets.

77.     According to McDonald's Corporation's 2019 Annual Report, net property and equipment under franchise arrangements totaled $19.2 billion (including land of $5.4 billion) *after* depreciation and amortization of $10.9 billion at year-end 2019.

78.     In 2019, consolidated revenues for McDonald's Corporation totaled $21.1 billion, returning approximately $8.6 billion to shareholders through a combination of shares repurchased and dividends paid at year-end 2019.  McDonald's revenues consist of rents, royalties, and initial fees; franchised sales are *not* recorded as revenues of McDonald's Corporation.

79.     McDonald's is the leading quick-service restaurant ("QSR") chain in the United States, with a brand value of $146.1 billion, according to Forbes, and total assets of $47.5 billion, according to McDonald's Corporation's 2019 Annual.

80.     At the same time, capital expenditures decreased $348 million or 13% in 2019, primarily due to lower reinvestment in existing restaurants. McDonald's Corporation's total capital expenditures in the U.S. totaled approximately just $1.4 million in 2019, $1.8 million in 2018, and $861,000 in 2017.

81.     Under this business model, McDonald's USA obtains new capital as well as profits from its franchisees, with little to no investment of its own. By using franchisees' fees and rent to acquire land and build restaurants that McDonald's now owns, McDonald's creates captive tenants out of its franchisees, requiring them to pay extremely high rent over long lease terms, without any right to renew, to develop its own real estate without investment, using the franchisee to lever leaseback financing, thereby allowing McDonald's Corporation to reap tremendous profits.

82.     McDonald's Corporation has grown to become the world's leading global foodservice retailer, with 39,000 restaurants globally in over 100 countries at year-end 2019. *See* "McDonald's Reports Second Quarter 2020 Results," McDonald's Company News, July 28, 2020.

> (i)     *The Franchise Agreement*

83.     Under McDonald's standard franchise agreement, McDonald's owns or secures a long-term Operator's Lease for the land and building of the restaurant location for 20-year terms (the Franchise Agreement, Operator's Lease, Franchise Disclosure Document, and any amendment(s) thereto are collectively referred to as, the "Franchise Agreement").[5]

84.     Under the Franchise Agreement, McDonald's owns or leases the franchised premises, so that the franchisee is always the tenant. Franchisees are granted the right to operate a restaurant using the McDonald's system through a license and, in most cases, the use of a restaurant facility, through the Lease, which is coterminous with the Franchise Agreement. Failure to renew therefore includes possible eviction and loss of the franchisee's business.

85.     Franchisees pay initial fees upon the opening of a new restaurant or grant of a new franchise, as well as continuing rent and royalties to McDonald's based upon a percentage of sales

---

[5] Upon information and belief, Plaintiffs' standard Franchise Agreements contain the same or substantially similar terms as each of the Franchise Agreements entered into with Class Members.

with minimum rent payments. This structure enables McDonald's to generate significant and predictable levels of cash flow.

86. Additionally, franchisees pay for all occupancy costs, including fire and casualty insurance on the real estate, naming McDonald's as the insured, liability insurance protecting McDonald's, equipment and fixtures on the real estate (signs, seating, and décor), property taxes, and site maintenance of the real estate, at the franchisees' **sole cost and expense**, as well as improvements of McDonald's real estate at no cost to McDonald's.

87. At the end of the 20-year term, McDonald's maintains control of the underlying real estate and building and can either enter into a new 20-year franchise agreement with the existing franchisee or a different franchisee, or close the restaurant.

88. Through McDonald's standard Franchise Agreement, McDonald's agrees to make available to Franchisee **all** additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, **to all its franchisees** operating McDonald's restaurants.

89. Through McDonald's Franchise Disclosure Document ("FDD"),[6] McDonald's provides prospective franchisees[7] with "Financial Performance Representations," that include *pro forma* statements with the national average **sales** of domestic traditional McDonald's restaurants opened at least one (1) year prior. For example, the most recent 2020 FDD provides, in pertinent part, as follows:

---

[6] McDonald's has possession of the disclosure documents it provided to Plaintiffs and Class Members.

[7] McDonald's provides disclosure documents not only upon entry, but also throughout the franchise term with respect to any additional purchases of a franchise and/or in connection with a sale of a franchise. A "prospective franchisee" is defined by the Franchise Rule as "any person (including any agent, representative, or employee) who approaches or is approached by a franchise seller to discuss the possible establishment of a franchise relationship." 16 C.F.R. Part 436.

### *All Domestic Traditional Restaurants*

Of the approximately 12,032 domestic traditional McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 79% had annual sales volumes in excess of $2,300,000; approximately 70% had annual sales volumes in excess of $2,500,000; and approximately 60% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was $3,009,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,910,000 during 2019**.

### *Traditional Franchised Restaurants*

Of the approximately 11,435 domestic traditional franchised McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 78% had annual sales volumes in excess of $2,300,000; approximately 68% had annual sales volumes in excess of $2,500,000; and approximately 58% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was $2,970,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was **$2,867,000 during 2019**.

### *Traditional Company Owned Restaurants*

Of the approximately 597 domestic traditional McOpCo restaurants opened at least 1 year as of December 31, 2019, approximately 99% had annual sales volumes in excess of $2,300,000; approximately 98% had annual sales volumes in excess of $2,500,000; and approximately 95% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was $3,758,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McOpCo restaurants was $8,182,000 and $2,047,000, respectively. The median annual sales volume of domestic traditional McOpCo

23

restaurants open at least 1 year as of December 31, 2019, was **$3,629,000 during 2019**.

(Emphases added).

90.     At all times material hereto, and upon information and belief, putative Class Members' average annual sales are hundreds of thousands of dollars less than McDonald's disclosed national sales averages of $2.7 million between 2011 and 2016, and $2.9 million in 2019.

91.     McDonald's dictates uniformity of the operational structure and revenue expectations of all its franchisees' restaurants, even though they are cognizant that Black-owned and operated McDonald's franchises generate significantly lower revenue and assume higher operational costs than the national average due to the substandard locations and the related lower revenue and higher costs.

92.     McDonald's knew that the different revenues and operating costs of Black-operated franchises as compared to White-operated franchises are not random or due to poor management. These differences are the result of the historical racial bias and barriers built into the McDonald's franchise system. Acquisition of a McDonald's franchise under these conditions was nothing short of a financial suicide mission.

### (ii)     *Entry into the McDonald's Franchise System*

93.     Before McDonald's will consider a candidate for any McDonald's franchise opportunity, a candidate must first satisfactorily complete McDonald's Franchise Applicant Training and Evaluation Program, which may exceed a period of two years on a part-time basis, without compensation, or any commitment or promise of a McDonald's franchise.

94.     According to McDonald's website, the decision to offer any franchise opportunity is within McDonald's ***sole*** discretion. *See* https://www.mcdonalds.com/us/en-us/about-us/franchising.html (last visited on Jan. 25, 2021).

95. McDonald's does not offer franchise territories and will ***not*** work with applicants who want a specific geographic location. *See* McDonald's Franchising FAQ ("We do not franchise territories and do not work with applicants who desire a specific restaurant location or limited geographic area."), https://www.mcdonalds.com/us/en-us/about-us/franchising/franchising-faq.html (last visited Jan. 25, 2021).

96. According to "Your Path to Becoming a McDonald's Franchisee," prospective franchisees can only enter the Franchisee Training Program if they meet the following requirements:

      a.     Ability to invest a minimum of $500,000 in non-borrowed personal funds;

      b.     Divestiture of all existing business interests;

      c.     Commitment to an extensive training program that can range from 12-18 months, with a minimum of 20 hours per week;

      d.     Relocation based on availability of restaurants.

*See* McDonald's "*Your Path to becoming a McDonald's franchisee*," at p. 23, https://www.mcdonalds.com/content/dam/usa/nfl/documents/franchising/Your_Path_to_Becoming_a_McDonalds_Franchisee.pdf (last visited on Jan. 25, 2021).

      **(iii)**    ***The Cost to Own and Operate a McDonald's Franchise***

97. To purchase a McDonald's franchise, McDonald's requires an initial down payment of 40% of the total cost for a new restaurant, or 25% of the total cost for an existing restaurant. *See* McDonald's *Buying a Franchise*, https://www.mcdonalds.com/us/en-us/about-us/franchising/acquiring-franchising.html. The balance of the purchase price may be financed for no more than seven years. *Id*.

98.     Pursuant to McDonald's 2020 FDD, McDonald's estimates a franchisee's Estimated Initial Investment to be between $1,314,500 to $2,306,500, which does not include ongoing percentage rate or service fees.

99.     In addition to these initial fees, McDonald's requires franchisees, including Plaintiff and putative Class Members, to pay the following ongoing fees:

   a.  **Service fee**: A monthly service fee based upon the restaurant's sales, which, as of this filing date, is an amount equal to four percent (4.0%) of the Gross Sales[8] of the restaurant for the preceding month immediately ended; and

   b.  **Rent**: Monthly base rent and any pass thru rent, if applicable, plus percentage rent in amounts calculated as a percentage of monthly Gross Sales, and any applicable rent escalations.

100.     Gross sales are not impacted by operational costs and neither is McDonald's service fee and/or monthly rent. Operational costs only impact the franchisee's profit, not McDonald's.

101.     Plaintiffs and putative Class Members are required to lease the restaurant premises from McDonald's, under an Operator's Lease that is incorporated into the Franchise Agreement. Prospective franchisees must agree to use and occupy the leased premises solely for a McDonald's Restaurant selling only such products and operating in a manner that may be designated by McDonald's and in a manner that will maximize gross sales.

102.     Under the Operator's Lease, franchisees are required to pay rent every month of the franchise to McDonald's, along with the related occupancy costs, which include property taxes, insurance, maintenance, and structural repairs.

---

[8] "Gross Sales" is defined in the Franchise Agreement as all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant.

103.    Under this formula, McDonald's derives significant revenue without any significant risk of loss. The base rent gives McDonald's a minimum guarantee of profit, with additional profits obtained through percentage rent.

104.    McDonald's also requires franchisees, including Plaintiffs, to rebuild, renovate, and/or make major remodels to their restaurants at franchisees' **sole** cost and expense. McDonald's therefore owns the real estate, franchisees' money pays for it, and all improvements on the real estate by franchisees benefit McDonald's as the owner.

105.    Franchisees assume **sole** financial responsibility for advertising and promotion through contributions set at a **minimum** of 4% of Gross Sales each calendar year through the U.S. cooperative of McDonald's Owner/Operators known as the Operator's National Advertising ("OPNAD") Fund. While participation is technically "voluntary," franchisees' consistent involvement with OPNAD and local cooperatives is one of several factors McDonald's uses to measure compliance with the Operator Involvement standard, which Plaintiffs and putative Class Members **must** meet to be eligible for growth and rewrite.

**(iv)    *The Cost to Own and Operate a Black McDonald's Franchise:
A Financial Suicide Mission***

106.    Unequal bargaining power characterizes the relationship between franchisees and McDonald's and this bargaining disparity is even more palpable for Black applicants and franchisees like Plaintiff and Class Members.

107.    This unequal bargaining position made it easy for McDonald's to historically award Black franchisees entering the system the oldest restaurants, with the lowest volume of sales, in need of the most reinvestment, in tough and depressed areas, that had been routinely rejected by White franchisees, many of which McDonald's wanted to close, but needed someone to operate until McDonald's could sell its real estate.

27

108.    McDonald's offered Plaintiff and putative Class Members locations with higher operating costs, such as security, insurance, and employee training and turnover, and which are historically underperforming in sales to offset these expenses.

109.    McDonald's discriminatory practices led to disproportionately low net income and cash flow for Black franchisees, forcing them, including Plaintiffs and putative Class Members, into significant debt.

110.    Indeed, Plaintiffs and similarly-situated Black franchisees, under long-term contracts, with mounting debt and no way out, isolated every step of the way by McDonald's business practices, have been all but forced into continuing to operate these substandard locations without any individual profit and certainly not any individual profit comparable to White McDonald's franchisees.

111.    For McDonald's, it was a win-win strategy to collect high rent and fees for substandard restaurants, built upon a history of discrimination it successfully executed for decades.

B.    **McDonald's History of Discrimination Against Black Franchisees**

112.    The McDonald's franchise system was established in 1955, but Black franchisees were denied entry until 1968, following the assassination of Dr. Martin Luther King Jr., at the height of civil unrest.

113.    Through crudely-coined "zebra" and "salt and pepper" partnerships with silent, White investors, McDonald's opportunistically used its Black franchisees to expand its real estate footprint into predominantly Black, inner-city neighborhoods where White franchisees refused to operate, particularly in the face of mounting racial tension in the United States.

114.    On December 21, 1968, Herman Petty opened his first restaurant in the inner-city of Chicago, becoming the first Black Owner/Operator of a McDonald's franchise.

### (i) *Boycott in Cleveland 1969*

115.    A boycott of McDonald's in 1969 made headlines in Ohio and led to the first Black

franchisees in the McDonald's system opening restaurants in depressed areas of Cleveland.

116.    In a January 25, 1970, article regarding the first Black owned and operated

McDonald's franchise, the New York Times reported: "Spokesman for Negro groups, who banded

together to form Operation Black Unity have been demanding black ownership of four existing

McDonald's units … ***All are in predominantly Negro areas***." *Cleveland Negro Wins a Franchise*,

N.Y. Times (Jan. 25, 1970), https://www.nytimes.com/1970/01/25/archives/cleveland-negro-

wins-a-franchise-9month-controversy-over-restaurant.html (emphasis added).

### (ii) *McDonald's uses the NBMOA to Fraudulently Conceal from Plaintiffs and Similarly-Situated Black Franchisees*

117.    In 1972, McDonald's black franchisees created the NBMOA to help promote their

growth in the industry.

118.    Since the creation of the NBMOA, McDonald's has had, and continues to have, an

active role in positioning its communications to Black franchisees. McDonald's has been, and

continues to be, intricately involved with the leadership of the NBMOA organization, routinely

attending meetings at the local and national level to make franchisees believe they were being

treated the same as other franchisees, making it appear that any lack of success was the fault of the

individual.

119.    McDonald's utilized the NBMOA as its vehicle to intentionally and fraudulently

conceal the effects of its continued discriminatory practices from Plaintiffs, putative Class

Members, and similarly-situated Black franchisees by, including, among other things:

　　　　a.    disclosing to them misleading and incomplete information regarding the

　　　　　　 cash flow of stores owned by Black franchisees as compared to stores

owned by White franchisees, in order to create a false perception regarding progress toward parity;

b.      failing to provide Plaintiffs and similarly-situated Black franchisees information requested regarding audits, impact studies of initiatives impacting Black franchisees, accurate numbers for the decrease and increase of franchisees, future growth opportunities, and the number of franchisees deemed ineligible for growth; and

c.      communicating a false narrative through NBMOA leadership that McDonald's was addressing the concerns of Plaintiffs and similarly-situated Black franchisees, such that it always falsely appeared progress was being made.

120.    McDonald's knew Plaintiffs, putative Class Members, and similarly-situated Black franchisees, who had previously been blocked for years from purchasing a McDonald's restaurant, would be fearful to complain and highlight themselves when problems occurred.

121.    Plaintiffs and similarly-situated Black franchisees' only recourse internally was the NBMOA, whose leadership was comprised of some of the very same franchisees that McDonald's used the NBMOA to mislead.

122.    McDonald's used the NBMOA leadership as a shield to curb any outcries of discriminatory or hostile treatment.

123.    The power of NBMOA leaders to advocate and make change had limits. The primary role of the NBMOA from McDonald's position was to pacify its Black franchisees through concealment, misinformation, and half-truths and to add credibility to its arbitrary and subjective mistreatment of Black franchisees.

124. During hearings held on April 7 and 8, 1976, before the United States Senate Committee on Commerce regarding the Fairness in Franchising Act, Donald R. Conley, President of the McDonald's Operator's Association, testified that McDonald's primary tool used to force franchisees to sell prior to expiration of their agreements is their power over renewal of franchise agreements, entirely within McDonald's control and discretion, allowing them to discriminate against franchisees. *See* U.S. Senate, Hearing of the Committee on Commerce, S. 2335 (1996), at pp. 381–397.

125. Mr. Conley testified that McDonald's inhibits franchisees' expansion, while encroaching on their territories, with new McDonald's restaurants that cut sales volume, thereby depressing the resale value of the franchise at franchisee's loss and McDonald's gain. *Id*. He explained that because McDonald's franchise agreements have a restrictive covenant that prevents the franchisee from owning any business other than its McDonald's operation, the franchisee is locked into the McDonald's store as his only business such that cutting the sales volume or profitability of that one business by siphoning off sales to additional units is a process employed by McDonald's to devalue the business interest and drive the franchisee out of business. *Id*.

126. In the same hearing, Vice President of McDonald's Corporation is cited in an excerpt from the company's in-house publication, "Insight," as stating that pursuant to McDonald's renewal policy, being a good operator, having high sales volume, and/or being favorably regarding by customers does not entitle a franchisee to renewal. *Id*. at 382. According to McDonald's, renewal can be denied for other completely subjective evaluations at the whim of management, such as "stamina," "attitude," "cooperation," and the like; "McDonald's reserved the right to discriminate against existing franchisees as to renewal." *Id*. at 387.

127.     By 1980, Black Franchisees began to question the subjective treatment happening in their restaurants as compared to other non-Black operators in the same region.

128.     In 1983, Charles Griffis, a Black McDonald's owner/operator in the Los Angeles market, filed a race discrimination countersuit against McDonald's, alleging, among other things, that McDonald's systematically excluded Black franchisees from buying stores in White neighborhoods.

129.     In a March 12, 1984, New York Times article, Griffis detailed his experience:

> **My stores are in hellholes**, he said.  They get robbed once or twice a month, and I pay $20,000 a month in security services they don't pay in good neighborhoods.  We had a murder in one and we still get the windows smashed and the bathrooms vandalized.  **I've upgraded my stores a lot and I don't see why I shouldn't have a shot at a store in a good neighborhood**.

Tamar Lewin, *McDonald's is Battling with Black Franchisee*, N.Y. Times, March 12, 1984, *available at* https://www.nytimes.com/1984/03/12/business/mcdonald-s-is-battling-with-black-franchisee.html; *see also* excerpt of the article below (emphasis added).



COMPANY NEWS

**McDonald's Franchise Battle**

"Charles Griffis came to California in 1977 when he heard he might be able to buy a McDonald's franchise in Santa Barbara… It turns out, though, that the store was in Los Angeles on Santa Barbara Street, right in the middle of the ghetto… It was an old store in real bad shape."

". . .[Rev. Jesse] Jackson wrote McDonald's on behalf of his Operation PUSH to complain that blacks felt they were 'being subjected to a double standard' in that they were **confined to inner-city areas with high maintenance and security costs, and were usually offered only recycled stores, which are generally more expensive and less profitable than new ones**. . ."

130.    In response to McDonald's racial practices, and Griffis's situation, the New York chapter of the NBMOA also wrote to McDonald's New York Regional Vice President at the time to advise that, "**black McDonald's owner-operators are primarily confined to ghetto areas and not allowed to expand as fast as their white counterparts**." *Id*. (emphasis added).

131.    Although Griffis's challenge was public, his situation within McDonald's was made to appear as an isolated incident.

*(iii)    McDonald's Makes False Promises of "Parity"*

132.    By the late 1990s, McDonald's leadership admitted that McDonald's excluded Black franchisees from franchise opportunities afforded to White franchisees, but they made it appear as if they would reconcile for past wrongs through a parity initiative.

133.    Specifically, through Executive Vice President, Thomas S. Dentice, McDonald's admitted, "*[T]he company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers*." A true and correct copy of the April 18, 1996, Letter to NBMOA Chairman, Reggie Webb, is attached as **Exhibit "A"** hereto, with excerpts above (emphasis added).

134.    Starting with this pronouncement of parity, Black franchisees for over two decades, almost universally believed that McDonald's was in a new era of equality.

135.    Yet, despite the beliefs of Black franchisees, parity was never achieved. McDonald's spent the next decade instituting aspirational and temporary measures and promising Black franchisees, including Plaintiffs and putative Class Members, that it was working to achieve parity between Black and White McDonald's franchisees.

136.    Plaintiffs and putative Class Members relied on these representations and had no reason to believe McDonald's was discriminating against them.

137.    To McDonald's, parity was a marketing tool, not a change in policies and treatment.

138.    On November 14, 2002, NBMOA leadership addressed McDonald's past discriminatory practices in a letter from NBMOA Chairman and CEO, Larry C. Tripplett, to NBMOA Membership, which described its negotiations with McDonald's Leadership "to ensure that Parity is met and maintained." *See* Nov. 14, 2002 Tripplett Letter, **Exhibit "C"** hereto, with excerpts below.

139.    In the letter, Larry Tripplett questioned why financial assistance such as temporary rent assistance was given to White franchisees and unevenly provided to Black franchisees, such as Plaintiffs, with on-average the lowest volume stores and in need of the assistance to offset the lower revenues. The letter also quelled Plaintiffs and similarly-situated Black franchisees from any

legal action by stating that the organization was not involved in any lawsuit nor planned to engage in any.

140.    On or about August 12, 2004, the NBMOA requested an audit by McDonald's to look into the cash flow positions of stores in Chicago, the Great Southern Region, the Midwest, and Ohio, and certain issues regarding sales.

141.    The NBMOA also requested a review of the loss of nineteen (19) Black-owned and operated McDonald's restaurants since the promise of parity ended.

142.    The NBMOA was not provided any data or an audit from McDonald's leadership and Plaintiffs and similarly-situated Black franchisees continued to operate in the dark.

      **(iv)**    <u>***2009 to 2015***</u>*: McDonald's Concealment Vis-à-Vis the NBMOA*

143.    In 2009, during an NBMOA Board meeting at the Ritz Carlton in Buckhead, Georgia, McDonald's corporate executives, including Debbie Stroud, Marty Ranft, Mason Smoot, Karen King, and Rick Colon, presented incomplete financial information Black franchisees, including Plaintiffs, to conceal the information Plaintiffs and similarly-situated Black franchisees would have needed to discover that their losses were not individualized, but rather the result of ongoing and systemic racism.

144.    For example, Karen King, President of McDonald's East Division Office, presented to the NBMOA members that the actual cash flow of Black franchisees was "a little lower than where they wanted it to be." (Ex. D, at 2).

144.    Mr. Colon, Sr. Vice President McOpCo of the East Division, highlighted McDonald's business perspectives for McOpCo companies and stated, "there was a 10 to 1 odds opportunity to get growth from McOpCo's and 1 out of 18 chances for new store opportunity in 2008," all the while knowing that McOpCo franchises had lower volumes and the highest need for

reinvestments and remodels, which would cause the Black franchisees who purchased them to incur more debt without profitable locations to offset them.

145.    During the question-and-answer session with members attending the meeting, Mr. Colon quickly shut down any attempts by Black operators to gain more information about purchasing a McOpCo.

> **Comment:** Ernie Adair - stated the cash flow issue is of concern
>
> **Q:** Ernie Adair - What is negotiable and what isn't when buying McOpCo Restaurant?
>
> **A:** Rick Colon – restaurants are valued by a team in Oakbrook There is zero flexibility in adjusting prices on restaurants. What is on the books is rolled back into the rent.
>
> **Q:** Adair: Is there a possibility for the Operator to look at what is on the books?
>
> **A:** Rick Colon – No

NBMOA Board Meeting Minutes, at 3 (Feb. 6, 2009), attached as **Exhibit "D"** hereto.

146.    Another Black, McDonald's franchisee at the time, Kenneth Manning, from Atlanta, asked a question concerning the rent prices, and Mr. Colon stated that there are "things behind the scenes McDonald's did not publicize." (*Id.*)

147.    Other operators seeking detailed data regarding cash flow and profitability to make informed decisions were told by McDonald's that they would "get back to them." For example,

> **Comment**: Ken Manning –concerned about the raising of rent based on lease hold improvements. We do not have the opportunity to capture that money back. It is an unfair advantage.
>
> **A:** Rick Colon - There are things behind the scene we don't publicize. We can't always raise the rent for lease hold improvements. I have taken the feedback to the group and will take it back again.
>
> **Q**: Larry Tripplett – have concerns with rolling money that

36

is on the books into the rent vs. the price of the restaurant.

**Q:** Rose Andom: Would like a firm answer on whether we can or cannot see the site profitability. (Site Prof) report

**A**: Karen King - will follow up with getting an answer on this question.

(*Id.*)

148.     McDonald's Vice-President & General Manager, McDonald's East Division (Philadelphia), Debbie Mossa, told Black McDonald's franchisees who asked questions about why other operators were ineligible to grow were told that "plans were in place for African American operators," by Debbie Mossa, Vice-President & General Manager, McDonald's East Division (Philadelphia), without ever providing the details of those plans.

149.     In 2011, at the Regional NBMOA meeting in Texas, McDonald's executives reviewed U.S. Franchising and financial information from March 31, 2011 and stated that "the numbers shown were moving ahead."

150.     On June 23, 2011, during the 2nd Quarterly NBMOA Board of Directors Meeting, McDonald's Finance Officer, Zaida Zavitz, represented to Black franchisees, including Plaintiffs, that "75% of those eligible to co-invest take advantage of opportunity to co-invest, and reduce their rent." *See* NBMOA Board Meeting Minutes, at 4 (June 23, 2011), attached as **Exhibit "E"** hereto. McDonald's Finance Officer further stated, "Minimal sales issues/threshold will assist Owner/Operators to get financial assistance." (*See id.)*

151.     During an August 27, 2013, NBMOA Meeting, the focus was on "Closing the CF [Cash Flow] Gap," with a Cash Flow Trend chart from 2006 to 2012 created to intentionally depict a very small gap of no more than $59,000 between the "Region Cash Flow" and "Group [NBMOA members] Cash Flow." A true and correct copy of the "Cash Flow Trend" chart that the NBMOA

presented to Black franchisees during the 2013 NBMOA Meeting is included below in its original form, with the 2013 NBMOA Power Point Presentation attached as **Exhibit "F"** hereto. Plaintiffs and similarly-situated Black franchisees relied on this cash flow data in the form presented to them through the NBMOA, a group created to be their advocates and who they trusted to act as such.



152.    Similarly, during a 2014 NBMOA presentation by McDonald's Franchising Officer, Robert Johnson, McDonald's presented NBMOA members, including Plaintiffs, with cash flow financials intended to minimize the net revenue gap between White and Black McDonald's franchisees. A true and correct copy of the graph is reproduced below, showing a cash flow gap of only approximately $30,000, when, in reality, the gap between White and Black McDonald's franchisees based on net revenue (which is the only number that reflects the individual franchisees' success, as opposed to that of the store) was at least $400,000.

## Franchising and Financial Information 12/31/2013

| Gaps | 12/10 | 12/11 | 12/12 | 9/13 | 12/13 |
|---|---|---|---|---|---|
| Cash Flow | ($20,406) | ($19,107) | ($24,591) | ($30,241) | ($26,255) |
| | | | | | Difference of $3986 |
| Sales | $21,975 | $9,839 | $3,929 | $3,859 | $4,073 |
| A/A Restaurant | 1,349 | 1,394 | 1,406 | 1,413 | 1,410 |
| A/A Operators | 285 | 283 | 276 | 269 | 270 |
| Average A/A | 4.7 | 4.9 | 5.1 | 5.3 | 5.2 |

153.    On December 3, 2015, at the NBMOA's 4th Quarter Board of Directors Meeting at the Biltmore in Coral Gables, Florida, Black franchisees, including the putative Class, presented a proposal for financial assistance for Black franchisees to McDonald's Chief Executive Officer, Mike Soenke, Karen King, and other McDonald's executives. McDonald's sidestepped the request through then-President of McDonald's USA, Mike Andres, who stated, "A lot of financial assistance was given to operators, double what was given in 2014." McDonald's intentionally failed to disclose the data Plaintiffs and the Class would need to determine whether the amount of financial assistance given was meaningful, including whether such relief was temporary or permanent, the original percentage versus the new assistance, and the escalation structure, even after requested by Plaintiffs and similarly-situated Black franchisees.

154.    During the question-and-answer session at the December 3rd meeting, a Black McDonald's franchisee asked:

39

**Q:** Have we had any conversation with Mike Andres on Cash Flow Gap across the system and how it affects African American Operators as opposed to other Operators? Did he have comment regarding the loss of African American Operators across the system, and what is driving that loss?

**A:** Yes. His goal is to turn sales that will help CFG. My goal is to: a) Identify and look at the Bottom 8 markets. This has been agreed to, and we will analyze in the 1st Quarter. b) The second part is loss of sales in the AA community has hurt our Cash Flow. Hopefully, the Atlantic Reconnect Test will be successful. c) We have a brainstorming session with Troy Randolph this afternoon to find creative ways to attract more African American franchisees.

NBMOA Board Meeting Minutes, at 2 (Dec. 3, 2015), attached as **Exhibit "G"** hereto.

155.    Similarly, on December 3, 2015, during a Regional update at a Florida NBMOA meeting, information provided by McDonald's continued the narrative that the cash flow issue was not systemic but owner/operator specific or by Region.

156.    For example, McDonald's executives presented that, collectively, stores in Florida normally have a "positive cash flow and sales compared to other NBMOAs." (*Id*., at 5).

157.    McDonald's provided information intended to lead Plaintiffs and similarly-situated Black franchisees to believe that Black franchisees have an equal opportunity to grow, when in reality a disproportionately large number of Black franchisees were deemed ineligible for growth.[9]

158.    During the same December 3rd meeting, Vice President of U.S. Franchising, McDonald's USA, Troy Brethauer, presented that "while some fundamentals about franchising will not change, [McDonald's] will be more flexible in some ways." (Dec. 3, 2015 NBMOA Board Meeting Minutes, Ex. G, at 5). Mr. Brethauer stated, "McDonald's will begin keeping a

---

[9] In 2004, for example, 44% to 55% of Black McDonald's franchisees within the NBMOA's Central Division were deemed "ineligible for growth" by McDonald's.

"Relocatable Operators List" to assist relocation & growth of operators." (*Id.*) Black franchisees were never included on this list or provided a list to review.

159. Bill Lowery, Sr. Director, Franchise Relations, McDonald's USA, stated at the December 3, 2015 NBMOA's 4th Quarter Board of Directors Meeting that "as of 9/30/15 there were 255 African American Owner/Operators, and the restaurant net increase for AA Owner/Operators is +13 or 4.8%." (*Id.* at 7).

**(v)** ***2016 to Present: McDonald's Uses the NBMOA to Misrepresent the Disparity in Cash Flow Gaps between Black Franchisees and White Franchisees***

160. McDonald's knows that cash flow is easily manipulated and that Black operators in low volume stores will necessarily have less profit than other similarly-situated White franchisees in their Region.

161. McDonald's purposely focused on "cash flow" as a way to compare the viability of stores between Black and White franchisees to conceal any statistics regarding net profits and income, even after requested by Plaintiffs and similarly-situated Black franchisees.

162. McDonald's statistics made it appear as though the gap in success between White and Black franchisees was not significant, and never divulged the real problem of the gap in their net income.

163. McDonald's finance executives knew that manipulating cash flow numbers presented a more positive picture to Black franchisees and concealed their disparate treatment, in that cash flow does not account for a franchisee's unpaid debt, which McDonald's knew was a significant problem associated with the low-volume stores owned by the Black franchisees. For example, the sample chart below demonstrates the misleading nature of attempting to use cash flow to reflect parity between operators:

|  | Black Franchisee | Black Franchisee | White Franchisee |
|---|---|---|---|
| **Average Annual Revenue** | $2,000,000 | $2,000,000 | $2,500,000 |
| **Average expenses** | $1,500,000 | $1,500,000 | $1,500,000 |
| **Debt** | $500,000 *PAID DEBT)* | $500,000 *(UNPAID DEBT)* | $500,000 *PAID DEBT* |
| **Cash flow** | $0 | **500,000** | **500,000** |

164.    In minutes from the NBMOA 2nd Quarter Board Meeting at The Westin Philadelphia on June 23 and 24, 2016, McDonald's executives, including Debbie Roberts, President, East Zone, Steve Kerley, VP-General Manager, Philadelphia Region, Jorge Salvat, QSCVP, Philadelphia Region, Bill Lowery, Sr. Director, Franchise Relations, and Cody Teets, Vice President, Franchise Relations, presented to Plaintiffs and similarly-situated Black franchisees.

165.    Through its executives, McDonald's represented to Plaintiffs and similarly-situated Black franchisees that 85% of temporary rent assistance is allocated to Black franchisees and that there was a potential savings of $140,000 on the Major Remodel Program ("MRP") on the low-volume restaurants. McDonald's stated that Oakland is "working on a plan with the Regional VP to help with rent and other aspects of operation in the inner city."

166.    NBMOA Chairman Roland Parish informed McDonald's executives that "attention was due to the African American consumers who provide 20% of sales, while representing 12% of the population, yet receives only 8-9% of the OPNAD Budget."

42

167.    He expressed the disparity in rent formulas stating that the original model was 8.5% rent; however, when special venues were added, e.g., airports, zoos, etc., the model had to change. He stated that the cost structure is different in the inner city, i.e., high security costs, the economic formula should take this into account.

168.    Debbie Roberts, President East Zone, McDonald's USA, LLC, stated they visited restaurants in Philadelphia and Detroit and became more acquainted with the situations and dangers operators face on a daily basis, yet Detroit remained one of the areas with the lowest volume for the years following, with many operators still denied rent assistance.

169.    During the question-and-answer session, franchisees asked questions regarding diversity:

> **Q:** Will the new Diversity Officer, from the UK, understand race relations in the U.S.?
> **A:** David Fairhurst has more experience with gender diversity than race relations, but he wants to learn. I will invite him to Jamaica. Steve Easterbrook is also meeting with Rev. Jackson, minority groups and is committed to diversity.

NBMOA Board Meeting Minutes, at 5 (June 23, 2016), attached as **Exhibit "H"** hereto.

170.    McDonald's executives also informed franchisees from McDonald's Midwest NBMOA that it was working with Karen King on developing a security plan for urban locations, and actively stated that leases may start to include security.  To date, no Black operator received an offset for high security costs.

171.    Bill Lowery, Franchise Relations Director, also stated that African American cash flow has "kept pace with the GM cash flow," in terms of percentage of sales.



**Figure 3: 2011-2016 Cash Flow Gaps Between Black and Non-Black Operators**

   **(vi)**    ***Bigger Bolder Vision 2020 (BBV2020) Initiative Disproportionately Impacts Black Franchisees***

172.    In 2016, Black Operators, still struggling with cash flow deficits and low profits, were beginning to question the impact of new initiatives such as Bigger Bolder Vision 20/20 being rolled out by new President Stephen Easterbrook and what it would mean for them.

173.    In 2015, Easterbrook replaced McDonald's first Black CEO Don Thompson, to become President and CEO.

174.    Easterbrook handpicked Chris Kempczinki, McDonald's current CEO and then President of McDonald's USA.

175.    Under Easterbrook and Kempczinki's leadership, McDonald's instituted discriminatory policies including, but not limited to, rejecting advertising budget modifications to target Black consumers, denying Plaintiffs and similarly-situated Black franchisees opportunities for growth, confining Plaintiffs and similarly-situated Black franchisees to inner-city or urban areas with higher costs, denying Plaintiffs and similarly-situated Black franchisees' requests for rent relief, and implementing initiatives such as the Bigger Bolder Vision 2020 ("BBV2020"), which disproportionately impacted Black franchisees, including Plaintiff and putative Class Members, in order to force them out of the McDonald's franchise system.

176.    Upon information and belief, McDonald's leadership conducted reports on the impact BBV2020 would have on Plaintiffs and similarly-situated Black franchisees and knew its detrimental effect, and concealed this from Plaintiffs and similarly-situated Black franchisees.

177.    In 2019, Plaintiffs and similarly-situated Black franchisees asked for a review at the national level of the procedures being used by field consultants during business reviews. He also asked McDonald's for a list of owner operators in trouble owner/operators in the McDonald's Corporation through Larry Tripplett, Chairman of the NBMOA, wrote a letter to Charlie Strong, West Zone President Mario Barbosa East Zone President, regarding the, in response to an earlier meeting between McDonald's executives and NBMOA leaders held February 25, 2019.

178.    Mr. Tripplett. McDonald's never provided that information.

179.    Up to this point in time, there was no way for any of the Black operators to know if any other Black operators like themselves were in trouble.

180.    Black franchisees, including Plaintiffs, questioned data provided by McDonald's leadership to the NBMOA. On December 7, 2020, the NBMOA sent an email to members stating that since July 2020, there was "momentum" in sales and guests counts. Specifically, President

Joe Erlinger opened the 4th Quarter NBMOA meeting by stating that average rents were now "lower than the general market by 1.24%."

181.    He continued by stating the NBMOA cash flow gap "has improved."

182.    Mr. Erlinger also stated that there was a focus on growing the NBMOA by 32% through second generation, spousal, and the Registered Applicant program, which is McDonald's process for new franchisee applicants.

183.    There were no hard numbers presented to show the actual rent of NBMOA members to compare against the general market, and no data presented on the number of Black franchisees still deemed ineligible for growth and rewrite, including Plaintiffs, or why children of Black franchisees were not included in NextGen program.

184.    Moreover, there was no feedback as to why Black children who were approved for the Next Gen program were being offered dated McOpCo stores that would put them immediately in debt upon entering the system.

185.    Franchisees, such as Mr. Byrd, who sought out more information, including actual data on rent improvements, had their requests ignored.

186.    At bottom, McDonald's used the NBMOA as a conduit to actively mislead and fraudulently conceal its continuing systematic pattern and practice of discriminatory acts from its Black franchisees.    Based on the foregoing facts, McDonald's succeeded in its efforts to fraudulently conceal the true nature of its racist and discriminatory acts from its Black franchises, who did not discover and/or were lulled or induced into delaying the filing of this claim until after the suit filed by McDonald's corporate executives in 2020.

(vii)    *2020: McDonald's Own Corporate Executives File a Lawsuit, Highlighting the Discriminatory Treatment of Black Franchisees*

187.    In January 2020, for the first time, the concerns expressed by Black franchisees regarding McDonald's discriminatory treatment and the two-tiered system were revealed.

188.    On January 7, 2020, two corporate executives who had also been field consultants and managers assigned to the African American Consumer Markets and who had inspected, reviewed and advised many of Black franchisees, filed a complaint alleging years of discriminatory treatment of Black franchisees by the McDonald's system:

> The disproportionate loss of nearly one-third of the African American franchisees in the Easterbrook and Kempczinski era was intentional or, in the alternative, it was in reckless disregard of plainly foreseeable consequences of business decisions made by Easterbrook and Kempczinski and their minions. Without limitation, McDonald's imposed onerous costs on its franchisees by requiring them to make expensive capital expenditures, most notably through a program known as "Big Bolder Vision 2020" (BBV2020) that McDonald's rolled out in 2017, sparking widespread franchisee discontent. McDonald's knew or recklessly disregarded the likelihood that BBV2020 (among other financial stresses imposed by the Company) would put disproportionate financial stress on African American franchisees and cause a disproportionate number of them to leave the system. McDonald's knew but did it anyway.
>                                . . . .
> 'McDonald's uses strong-arm tactics to drive unwanted franchisees out of the system, such as unfairly grading franchised restaurants and jeopardizing a franchisee's rights under his or her franchise agreement; and then preventing an unwanted franchisee from selling his or her restaurants in an open market.

189.    Moreover, on April 2, 2021, the NBMOA leadership sent its own message to members acknowledging McDonald's tactics in using the NBMOA to shield its unfair treatment of Black franchisees.

190.    Mr. Tripplett, stated in his NBMOA communication that [Black operators] "must never be exploited."

47

The current George Floyd tragedy so amply illustrates that we can no longer wait for change. We must not be used to create false scenarios. It is counter-productive and the African American community who we represent expect the truth. We must never forget history. We must never be exploited. No one controls us and we speak for ourselves. Please contact myself or Vice Chair Tanya Hill-Holliday if you are asked to speak on behalf of African Americans in McDonald's…. We all have collectively said we must be fully integrated into American society and that includes McDonald's.

**C.** **"Big Mac Attack" on Black Franchisees: McDonald's Pattern and Practice of Intentional and Covert Racial Discrimination**

191.   McDonald's sets Black franchisees up for financial failure through a pattern and practice applicable to Plaintiffs and the putative Class of covert, systemic, and continuous discrimination that includes, among other things: (i) steering and restricting Black franchisees' to predominantly Black inner-city and/or rural locations; (ii) excluding Black franchisees from growth opportunities to profitable locations made available to White franchisees; (iii) demanding Black franchisees to reinvest in locations that McDonald's knew would never reap the return on investment; (iv) failing to approve Black franchisees' reasonable requests for financial assistance and/or restructuring plans to account for the substandard locations to which McDonald's steers them; (v) conducting harassing and targeted inspections and generating bad business reviews of Black franchisees' restaurants as pretext for termination and/or denial of rewrite; and/or (vi) employing fear and isolation tactics to force Black franchisees out once they were no longer sufficiently profitable to McDonald's, due to McDonald's steering them toward a financial suicide mission.

**(i) *Take it or Leave it:  Steering and Redlining to High-Cost and Low-Volume Locations***

192.   Upon entry into the McDonald's franchise system, and throughout their franchise terms, McDonald's systematically steered and/or restricted Plaintiffs and putative Class Members

48

to locations with lower margins and greater and more frequent capital expenditures than similarly situated White franchisees.

193.    These predominantly Black neighborhoods are located in the inner cities and/or rural areas, often filled with high-crime, patrons with little to no means to purchase significant meal tickets, leading to low-volume cash sales and high operating costs in the form of higher insurance rates, security costs, and employee turnover.

194.    In comparison, McDonald's offers White franchisees profitable locations and continued growth opportunities.

195.    McDonald's forced these less desirable locations on Plaintiffs and Class Members by, among other things, rushing Plaintiffs and putative Class Members, telling them that it could take months, if not years, to be offered another restaurant if they turned down a site.  McDonald's made Plaintiffs and, upon information and belief, putative Class Members believe that these substandard locations were their only way to obtain a restaurant or continue in the system.

196.    Based on McDonald's misrepresentations and omissions regarding the availability of restaurants, their locations, and future growth opportunities, Plaintiffs and putative Class Members believed that if they did not take the restaurant(s) McDonald's offered them, their chances of entering McDonald's franchise system would be extremely limited.  Plaintiffs and putative Class Members believed that they had equal access to locations within the McDonald's franchise as Whites.

197.    Unbeknownst to Plaintiffs and putative Class Members, McDonald's offered Black franchisees geographic locations in Black neighborhoods where White franchisees did not want to own or operate.  Conversely, and upon information and belief, White franchisees were routinely

given preferred locations and were able to buy and sell restaurants without restriction, allowing them to prosper.

198.    Through this process, McDonald's covertly restricts Plaintiffs and putative Class Members to substandard locations throughout their franchise terms, excludes them from purchasing restaurants in the open market, and thereby deprives them of the ability to achieve the same level of economic success as White franchisees.

199.    What is more, Plaintiffs and putative Class Members had to risk their own safety in these high-crime areas, often contending with drug dealers selling controlled substances inside and outside the restaurant, vagrants hassling customers, and multiple incidents of fights.

200.    Plaintiffs and putative Class Members often had to carry licensed firearms for their personal security. These dangerous environments made it difficult for Plaintiffs and putative Class Members to attract and retain experienced managers and employees.

201.    Plaintiffs and putative Class Members took the bad to get the good, as McDonald's intentionally misled them by, among other things: (i) providing financial representations that McDonald's knew did not—and could not—accurately reflect the net income and revenues of the locations to which it steered Plaintiffs and putative Class Members to; (ii) assurances that these restaurants would be profitable if Plaintiffs and putative Class Members made significant initial investments in rebuilds and/or renovations, encouraging debt to force Plaintiffs and putative Class Members into debt, bankruptcy, and/or economic duress, and more easily cycle them out of the system at a lower buy-back price; and (iii) assurances that any losses would be offset by growth opportunities to better locations, which was the key to any successful McDonald's franchise model.

50

      **(ii)**    ***McDonald's Requires Black Franchisees to Make Renovations to Locations it Knows Will Not Generate a Return on Their Investment***

202.    Despite placing Plaintiffs and putative Class Members in locations McDonald's knew could not succeed under its own franchise model, McDonald's required Plaintiffs and putative Class Members to invest in rebuilds and/or renovations within a short time, offering initial short-term lower rent, but then rapidly escalating for the remaining franchise term, setting Plaintiffs and putative Class Members up for financial failure.

203.    McDonald's knew or should have known that the rebuilds and/or renovations it required would not provide increased sales to Plaintiffs and putative Class Members' locations sufficient to offset their upfront losses.

204.    Plaintiffs and putative Class Members paid for the costs associated with any rebuilds, renovations, and major remodels, often seeking outside financing, and driving them into debt.

205.    McDonald's compounded the financial pressure caused by these significant initial investments by later demanding long-term franchisees, including Plaintiffs and putative Class Members, to make significant and substantial capital investments pursuant to McDonald's modernization programs, such as Bigger Bolder Vision 2020 ("BBV2020"), or assume sole financial responsibility for compliance with McDonald's Corporation's modernization standards, such as Experience of the Future ("EOTF"), which McDonald's knew or should have known put disproportionate financial stress on Black franchisees.

206.    McDonald's imposed these modernization plans on Plaintiffs and, upon information and belief, putative Class Members, without regard for the financial feasibility or benefits for locations it knows or should know cannot sustain the costs and will have the effect of eliminating the older restaurants it steered Black franchisees to.

207.    The renovation requirements imposed by McDonald's on Plaintiffs and putative Class Members under threat of termination are unreasonable, financially untenable, and ultimately discriminatory.

208.    In addition to imposing these unreasonable renovation demands on Plaintiffs and putative Class Members, upon information and belief, McDonald's imposes related costs in connection with these renovations, such as equipment purchases it requires, in excess of market prices.

209.    Even in certain instances where McDonald's contributed to the rebuild and/or renovation costs, McDonald's charged Plaintiffs escalating rent it knew Plaintiffs and putative Class Members could not afford.

210.    Upon information and belief, White franchisees were not immediately required to rebuild and McDonald's placed White franchisees on a voluntary reinvestment program without the same time restrictions.

211.    Once McDonald's USA deems a franchisee ineligible for growth and/or rewrite in its sole discretion, the franchisee is left to foot the bill of any and all rebuild and/or renovation costs imposed by McDonald's Corporation's modernization standards, without any ability to offset the costs through growth opportunities.

212.    While Plaintiffs and putative Class Members were required to spend millions rebuilding and/or renovating their older restaurants, White franchisees spent their money buying additional McDonald's restaurants and expanding their franchise network.

213.    Even McDonald's company-owned "McOpCo" restaurants were kept in disrepair for years until McDonald's turned around and immediately required Plaintiffs and Class Members to reinvest in significant rebuilds and/or renovations as a condition of purchase.

214.    McDonald's rebuild and renovation requirements forced Plaintiffs and putative Class Members to sink their own funds into locations McDonald's knew would not provide any return on investment, benefitting McDonald's as the owner of the real estate, while driving Plaintiffs and Class Members into significant debt.

215.    McDonald's further benefitted through targeted sales to Black consumers in locations where White franchisees reject and/or otherwise do not want to operate, at the expense of Plaintiffs and putative Class Members' net revenue, safety, and ultimate viability as McDonald's franchisees through little to no individual profit and lost growth opportunities into more profitable locations throughout their franchise terms.

**(iii)    *McDonald's Arbitrarily Denies Black Franchisees Opportunities for Growth to Profitable Locations within the Franchise System***

216.    The economics of owning McDonald's franchises is to own more than one location so that overhead costs can be absorbed by the multiple locations and yield a profit to the franchise owners.

217.    McDonald's new restaurant investments are concentrated in markets with strong returns and/or opportunities for long-term growth, according to its annual reports.

218.    Even after Plaintiffs and putative Class Members entered the system through substandard locations, McDonald's continued to deny Plaintiffs and putative Class Members the opportunity to own and operate franchises in more profitable locations, unless these more profitable locations were packaged with low-volume, high-cost locations.

219.    McDonald's knew that to grow a profitable franchise organization in its franchise system, Plaintiffs and putative Class Members needed restaurants with higher sales volume and cash flow to offset the low-volume, high-cost restaurants it offered them.

53

220.    Yet, McDonald's refused reasonable proposals from Plaintiffs and putative Class Members to expand within the McDonald's system by opening McDonald's restaurants at sites Plaintiffs and Class Members were ready, willing, and qualified to operate, offering these profitable locations to White franchisees instead.

221.    McDonald's thwarted the Plaintiffs' and putative Class Members opportunities to grow within the system through the purchase of additional high-volume restaurants in their Region, which were instead offered to White operators.

222.    For no reason other than Plaintiffs' and putative Class Members' race, McDonald's systematically rejected Plaintiffs and Class Members' sites and/or failed to provide Plaintiffs and putative Class Members with any meaningful assistance to locate better restaurants in better neighborhoods.

223.    Plaintiffs and putative Class Members would wait years before McDonald's made an offer for another store, only to find out they were offering another "hood" restaurant, meaning it was a low-volume store, in an economically distressed community, with a high crime rate.  These substandard restaurants were consistently offered to Black owner/operators over White owner-operators.

224.    In certain instances where Plaintiffs and putative Class Members were given the opportunity to purchase a profitable store, it was at a significantly higher premium, with oppressive conditions attached, such as an agreement to purchase other substandard locations as part of a "packaged deal."

225.    Despite McDonald's representations and continued assurances to Plaintiffs and putative Class Members that it would assist in growth opportunities, McDonald's continued to

intentionally deprive Plaintiffs and putative Class Members of any meaningful assistance to find other viable expansion locations over the course of their franchise relationship.

226.    Indeed, McDonald's did the opposite of what it assured Black franchises and went as far as to saturate the market and encroach upon Plaintiffs and putative Class Members' locations by opening McDonald's restaurants just miles apart.

227.    While McDonald's offered impact funds to offset new store competition to White operators up front before the new, competing restaurant became operational, Plaintiffs and putative Class Members were made to "wait and see," until the actual impact could be assessed. This forced Plaintiffs and putative Class Members to continue to operate at a loss, sometimes for more than a year, while they waited for the full impact of the competing restaurants to be realized and assessed.

228.    For no reason other than Plaintiffs' and putative Class Members' race, McDonald's intentionally limited Plaintiffs' and putative Class Members' ability to grow and expand their franchise organization throughout their franchise terms.

229.    Upon information and belief, McDonald's denied Plaintiffs and putative Class Members opportunities for growth, while it gave those opportunities to White franchisees.

**(iv) *McDonald's False Promise of "Rent Relief" and Misleading Financial Assistance***

230.    Despite Plaintiffs and putative Class Members' significant investments and hard work over decades in the McDonald's franchise system, when Plaintiffs and putative Class Members, upon information and belief, requested financial assistance to reduce the rent, McDonald's either denied their requests or rent was temporarily reduced and then escalated causing further financial harm.

231.    By offering temporary financial assistance McDonald's knew it would not allow Plaintiffs and putative Class Members to profit in the locations to which it steered them.

55

McDonald's set Plaintiffs and putative Class Members up for perpetual debt in order to leverage their position against them in all future negotiations.

232.    McDonald's knew when it escalated Plaintiffs' and putative Class Members' rents that it was set too high for Plaintiffs and putative Class Members' locations; yet, McDonald's refused to provide Plaintiffs and putative Class Members with permanent rent relief, even though McDonald's offered this relief to similarly-situated White franchisees.

233.    Through the FDD, McDonald's provided Plaintiffs and putative Class Members with a table of total acquisition and development costs, along with Fixed Percentage Rent rates, explaining how McDonald's sets and controls these costs and rent rates as follows:

> The percentages used in computing monthly payments based on Gross Sales are **determined by McDonald's management** in consideration of the rights being granted by the Franchise Agreement, **the drawing power of the McDonald's restaurant**, the value of the McDonald's System as a whole and **McDonald's interests in obtaining a profit in light of competitive conditions**. All payments made by you to McDonald's constitute a single financial arrangement between you and McDonald's which, taken as a whole and without regard to any designation or description, reflect the value of the rights being made available to you by McDonald's and the services being rendered by McDonald's during the franchise term.  The percentages may vary among franchises depending upon when the franchise was sold as well as other factors. In unusual circumstances that involve special costs, the fees paid by you may be higher than those outlined in this Item 6.

(Emphasis added).

234.    By offering temporary financial assistance McDonald's knew it would not allow Plaintiffs and putative Class Members to profit in the locations to which it steered them. McDonald's set Plaintiffs and Class Members up for perpetual debt in order to leverage their position against them in all future negotiations.

235.     McDonald's knew when it escalated Plaintiffs' and putative Class Members' rents that it was set too high for Plaintiffs and putative Class Members' locations; yet, McDonald's refused to provide Plaintiffs and putative Class Members with permanent rent relief, even though McDonald's offered this relief to similarly-situated White franchisees.

236.     It was only after the recent filings of discrimination lawsuits that McDonald's began offering retroactive rent relief from 2019, permanent rent reductions, and new high-volume restaurants to Black franchisees, conditioned upon signing a general release of all claims.

**(v) *Targeted and Unreasonable Inspections and Grading***

237.     Once Plaintiffs and putative Class Members are in dire financial situations and can no longer pay McDonald's its fees and/or rent, or once they refuse to continue to accept restaurants in crime-ridden neighborhoods with low-volume sales, McDonald's pattern and practice is to begin targeted, rigorous, and unreasonable inspections and harsh grading in order to generate negative business reviews of Plaintiffs and putative Class Members' restaurants as pretext for termination or rewrite denial.

238.     Putative Class Members who speak up, like Jim Byrd, or who have refused to continue to operate in substandard locations, have faced or now face increased and unreasonable inspections by McDonald's, including late at night or at odd hours.

239.     Whereas Plaintiffs and/or putative Class Members generally have positive business reviews prior to experiencing financial hardship and/or rejecting McDonald's offer to continue to operate in substandard locations, that immediately shifts once McDonald's begins harsh grading in a manner that disproportionately impacts Black franchisees as compared to White franchisees.

240.     McDonald's knows and leverages the fact that Plaintiffs and putative Class Members' eligibility for growth and renewal, or "rewrite," of their franchise term depends on business reviews and passing inspections.

241.     By instituting harsher grading standards and through unreasonable inspections, McDonald's negatively impacted Plaintiffs' and putative Class Members' performance ratings as pretext for McDonald's ability to deny Plaintiffs and putative Class Members growth and/or rewrite opportunities.

### (vi) *No Choice But to Sell or Operate at a Loss:  McDonald's Forced Exit Scheme*

242.     Under the oppressive terms of McDonald's USA's Rewrite (New Term) Policy ("McDonald's Rewrite Policy"), Exhibit K to the FDD, McDonald's has absolute and sole discretion with respect to whether a franchisee may or may not be offered a new term franchise, or "rewrite."

243.     Pursuant to McDonald's Rewrite Policy, three (3) years prior to the franchise term expiring, the rewrite process begins.  McDonald's controls the rewrite process:  Only the McDonald's Rewrite Committee has the authority to offer, or decline to offer, a new term franchise. The Rewrite Committee's recommendations are submitted by the Vice President of the Field Office of the Rewrite Committee, compromised of members of McDonald's U.S. management.  The decision of the Rewrite Committee is final.

244.     There is no appeal process of the Rewrite Committee, and no member from a franchisee organization is a part of the decision committee, leaving operators with no recourse other than to sell the store, normally at loss.  McDonald's exercises control in the sale process.

245.     When McDonald's concludes that it will not offer a new term franchise, McDonald's will extend an alternative offer, which will give the Owner/Operator the opportunity

to sell the restaurant business to a **qualified buyer** prior to the expiration of the current franchise. Subject to the terms stated in the alternative offer, which include a release, McDonald's will commit to offer a new term franchise to the **qualified buyer**.

246.    If a franchisee decides to sell the franchise, **McDonald's must consent** in writing, consistent with its customary guidelines for the sale of a McDonald's restaurant franchise, **before** any such transfer may occur.

247.    Due to McDonald's controlling the exit process, there is no way for Plaintiffs and/or Class Members to know the valuation of their restaurants and the amount if sold in an open market.

248.    With the looming threat of further financial penalties, and no process for disputing qualification denials of buyers in the rewrite process controlled by McDonald's, McDonald's places Plaintiffs and Class Member in an untenable position, without any negotiating power.

249.    Plaintiffs and Class Members have suffered substantial damages in amounts that will be proven at trial, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, attorneys' fees, and costs as a result of McDonald's discriminatory practices alleged herein.

**D**.    **McDonald's Discrimination Against James Byrd, Jr.**

250.    Prior to becoming a McDonald's franchisee, Mr. Byrd graduated from Eastern Michigan University with an undergraduate degree in psychology and a master's degree in Personnel and held management positions in numerous Fortune 500 companies.

251.    He worked at Ford Motor Co. and Kroger Food Stores, where he was in human resources and a training manager from 1980 to 1989.

252.    After transitioning to the McDonald's system, Mr. Byrd was actively involved in the McDonald's system his entire career.

59

253. He held leadership positions within the McDonald's system such as Chair of the Nashville Regional Leadership Council, a group of all other McDonald's Owner/Operators in the Nashville Region.

254. Yet, upon entry and throughout his franchise term, Mr. Byrd has been subjected to an arbitrary system of grading and policies, which confined him to low-volume stores with higher operational costs, solely because of his race. His sales were continuously below the national average. *See* Figure 1 below from 2017 2018 Business Review.

255. In contrast, White franchisees in the same Region, such as Fred Tillman, who entered the McDonald's franchise system just a few years before Mr. Byrd, and Mike Retzer, a similarly situated White franchisee, continued to grow and expand their McDonald's organization with high volume stores, with collective sales and net income above the national average, which were not subjected to the arbitrary grading policies to which Mr. Byrd was subjected.

Figure 1: Sales Volume of Houston Levee and Macon

| SALES, GUEST COUNTS AND AVERAGE CHECK PERFORMANCE | | | Memphis, TN. | | | | |
|---|---|---|---|---|---|---|---|
| SALES VOLUME | | 2012 | 2013 | 2014 | 2015 | 2016 | TTM November 2017 |
| Region | Licensee | $ 2,467,684 | $ 2,463,760 | $ 2,416,430 | $ 2,359,645 | $ 2,360,729 | $ 2,418,728 |
| TV Market | Licensee | $ 2,623,228 | $ 2,591,389 | $ 2,539,105 | $ 2,453,374 | $ 2,454,017 | $ 2,511,152 |
| Organization | | $ 2,369,111 | $ 2,348,986 | $ 2,224,698 | $ 2,168,783 | $ 2,168,168 | $ 2,221,870 |
| COLLIERVILLE | 22859 | $ 2,335,668 | $ 2,303,659 | $ 2,201,697 | $ 2,232,344 | $ 2,286,715 | $ 2,353,200 |
| CORDOVA, TN HOUS | 31693 | $ 2,402,554 | $ 2,394,312 | $ 2,247,698 | $ 2,105,222 | $ 2,049,621 | $ 2,090,539 |

256. On or about August 20, 2014, Mr. Byrd sold two (2) of his restaurants to help his financial situation as part of a "4-store package deal," along with Darrell Byrd, to Fred Tillman and his son, Chad, the same White McDonald's franchisees who became the largest franchisee operators in the U.S., with the organization of close to seventy (70) stores, predominantly located in Memphis. Unlike Mr. Byrd, however, McDonald's granted the Tillmans profitable locations to

enable them to offset the high costs associated with the riskier locations it systematically offered to Mr. Byrd.

> **(i)** ***McDonald's Applies Its Inspection and Review Process Unequally, Denying Mr. Byrd Opportunities for Growth, While Helping White Franchisees Prosper***

257.    The primary factor that allows McDonald's franchisees to grow their organization is the purchase of new McDonald's restaurants, with eligibility for such purchases determined by McDonald's, in its sole discretion, through grading on their franchisees' annual business reviews.

258.    In conducting McDonald's business reviews, field consultants evaluate several categories assess performance. If a franchisee receives a negative review, or fails a category, the franchisee will be deemed ineligible for growth and rewrite.

259.    Categories such as the "People standard" and "Financial and Food Safety" standards "have been some of the top areas that McDonald's focuses on in the annual business review."

260.    The review policies and grading formulas were routinely changed, relaxed or overlooked completely for similarly-situated White operators in Mr. Byrd's region, and McDonald's provided them additional help, which ultimately allowed them to purchase additional restaurants.

261.    On February 4, 2015, Mr. Byrd received a score of 5 out of 10 in his Financial Category by his field consultant Dana Lytle, only one point below the necessary 6 points to pass the review. He was immediately deemed ineligible for growth and rewrite.

262.    In the same year, by the same regional managers, on June 23, 2015, Mr. Retzer, a similarly situated White franchisee, failed the People section of his business review for not having three of his restaurants led by a Hamburger University graduate, but was granted a temporary override.

263.     In the same review, Mr. Retzer failed the Financial Category of his business review, receiving a lower score than Mr. Byrd, of 2 financial viability points, out of the six points needed to be considered financially viable.  Unlike Mr. Byrd, however, he was given a temporary override, so that he was not deemed ineligible for growth.

264.     Additionally, in the reinvestment section of his business review, Mr. Retzer was told that if his partner did not partner with him on a Major Remodel Project McDonald's was requesting that he complete, he would be given *an extension* by Jerry Angelotti, a McDonald's Vice President of Quality Service Cleanliness.

265.     Mr. Retzer was also allowed an interim business review, while Mr. Byrd was not, even after he requested one.

266.     An interim business review grants the operator a second chance to be reviewed before being "deemed ineligible for growth" on the official review.  The status of being ineligible stops the operator from the purchase of any stores during that time period.

267.     If operators can delay a negative review, they can continue to purchase stores and grow.

268.     In January 2015, a restaurant was for sale in Germantown, TN, within Mr. Byrd's Region.

269.     Because of the status set by McDonald's, Mr. Byrd was not included on the January 23, 2015 list of operators allowed to bid on that store, which would have been a higher volume store and allowed him to grow in the system. White franchisees who scored lower than Mr. Byrd, like Mr. Retzer, were included on the list.

    **(ii)**     ***McDonald's Confines Mr. Byrd to Low-Volume Stores***

270.    Deeming operators ineligible for growth confines Plaintiffs and similarly-situated Black operators to the same region for years, excludes them from growth opportunities, and is normally the point in time where Black owner/operators are usually forced to sell their stores and exit the system.

271.    If White operators were graded by these same guidelines, they would not have been eligible to purchase stores and grow.

272.    For example, in 2015, five stores owned by Fred Tillman, a White operator, failed a food safety visit, which exceeded McDonald's guidelines which provide that 2 failed visits within a 24-month period would result in the operator/store being placed into McDonald's Improvement Process for Under-Performing Restaurants ("IPUR").

273.    Mr. Tillman was not placed into IPUR status and was allowed to maintain his growth and rewrite status. He purchased eight additional locations in that timeframe. His field service manager, Dana Lytle, gave him extra time in between food safety visits to allow him time to cure and to keep operating.

274.    McDonald's was aware at all material times of Tillman and Retzer's market domination and their profitable locations in the Region, which made it impossible for Black franchisees like Plaintiffs to grow their organizations. As a result, James Byrd now has an increasingly smaller voice in his local advertising co-op to vote on marketing that directly impacts his remaining restaurants.

275.    Likewise, when McDonald's implemented a nationwide consolidation of the total number of franchise organizations across all demographic groups, only those franchisees with the

largest organizations of restaurants remain. This of course disproportionately impacted the Class of Black franchisees like Mr. Byrd whose growth has been systematically restricted.

276. At all relevant times, Mr. Byrd did not know and had no way to discover that McDonald's intentionally limited his opportunity to own and operate a franchise in the open market because of his race.

277. By the date of this filing, Mr. Byrd is still ineligible for growth and rewrite.

(iii)    ***McDonald's Forces Mr. Byrd to Participate in its Modernization Initiative, Acquire Debt, and Remodel, Misrepresenting the Return on Investment***

278. In October 2015, Mr. Byrd was being encouraged by Dana Lytle to complete a remodel of a side-by-side drive thru project on his store in Houston Levee. On or about October 28, 2015, Mr. Byrd communicated by email to Ms. Lytle he did not want to proceed because the cost was too high with little return on investment.

279. Mr. Byrd was told to move forward regardless. He was told by McDonald's he needed to have a plan for the reinvestment by February 2016, only three months later. Mr. Byrd said he could not complete the reinvestment because of his financial status. He was told to speak to the finance team.

280. McDonald's aggressively encouraged Plaintiffs and similarly-situated Black franchisees to complete costly remodels and reinvestments on their dime, including Mr. Byrd, while being fully aware of their current financial status, and the little return on investment associated with those remodels and reinvestments.

281. On December 11, 2015, Mr. Byrd's business review score was still at a 5 for financials. Despite this knowledge, Mr. Byrd's franchise leadership at McDonald's encouraged him to complete the lobby remodel. They did not suggest an extension of time to allow him to cure his financial status.

282.    On March 23, 2016, Mr. Byrd took out a loan from Citizen's Bank to remodel the lobby of his Houston Levee store, an investment of more than $120, 000, equal to the amount of annual profit on his restaurant. McDonald's finance manager, Karen Wojtowicz, was copied on the email to Citizens Bank and communicated with the bank along with Mr. Byrd to ensure all was in place to receive the funds.

283.    On April 4, 2016, Mr. Byrd informed his finance team that he could not do a full remodel project because of his financial status and because he could not take on more debt than was needed. He stated in an email to McDonald's area construction manager of the South Central Team, Arman Parker, that he could only do the interior.

284.    He received a series of follow up emails by McDonald's leaders, including Dana Lytle, "confirming that it was just the interior and not the full remodel, even though Mr. Byrd had informed the entire team several times of the limits on the remodel" due to his financial status.

285.    On May 2, 2016, Mr. Byrd was deemed not eligible for growth and rewrite on his business review.  He did not meet the financial standards. He also did not meet the reinvestment standards, but unsurprisingly, he was given an override to upgrade the dining room on his Houston Levee location.

286.    On August 23, 2016, McDonald's once again encouraged Mr. Byrd to complete the full remodel by September 2016 and stated it would help improve his cash flow.

287.    Mr. Byrd moved forward with the remodeling despite his financial situation at the continuous urging of McDonald's field consultants.

288.    On November 2017, Mr. Byrd was feeling the pressure to remodel and reinvest as a condition to remain in the system.

289. McDonald's was in the process of rolling out its national Bigger Bolder Vision 2020 program that called for a modernization of all restaurants. It was a push by then-McDonald's President, Stephen Easterbrook, to push McDonald's into the future of restaurants, even though, in reality, it was synonymous with pushing small operators like Mr. Byrd and other similarly-situated Black operators out of the system.

290. On November 2, 2017, in an email from McDonald's construction manager, Antawn Smith, Mr. Byrd was told McDonald's would partner with him for the breaking ground at his Macon Store and for the MRP on his Houston Levee store. McDonald's later reneged on that agreement, even after Mr. Byrd had taken out all the loans earlier, to move forward.

291. Mr. Byrd had received a negative rating on his financials for scoring 1 point under what was needed for the previous two years with no support from McDonald's as was received by other similarly-situated White franchisees in the same Region. Rather than receive the sort of help the White franchisees received, Mr. Byrd was pressured by McDonald's to remodel, and only received an override from McDonalds during a reinvestment, which further increased his debt. McDonald's did not give Mr. Byrd any support or an override to support his financial condition.

**(iv)** ***McDonald's Denies Mr. Byrd's Request for Rent Relief and Forces him to Wait Long Periods for any Other Financial Assistance***

292. At no time did Mr. Byrd, receive an interim business review or any other financial assistance such as rent reduction to help improve his eligibility to purchase more profitable stores or to offset the debt and increase profits.

293. Mr. Byrd asked if he could have his rent reduced during his February 7, 2018 business review meeting and again in 2019 and was denied.

294. In fact, McDonald's made his financial matters worse. In 2018, McDonald's approved the opening of two (2) new franchised restaurants in Mr. Byrd's area, it conducted impact

66

studies that showed a high impact on Mr. Byrd's sales. Despite this knowledge, McDonald's told Mr. Byrd that he would have to wait a year before receiving any impact relief, which is money McDonald's provides when a newly developed restaurant in the area impacts another store's sales. Mr. Byrd was forced to go to the McDonald's Ombudsman, an internal company officer that investigations complaints, for help and, even then, McDonald's only awarded him relief for his Macon store, and not his Houston Levee store.

295. By this time, Mr. Byrd's sales volume continued to decrease, and his revenues could not cover the expenses being forced upon him.

296. On June 24, 2019, McDonald's recommended a denial of rewrite for Mr. Byrd's Houston Levee location.

297. In response, Mr. Byrd wrote a letter to McDonald's head of U.S. Franchising Strategy, Laura Eichler, urging her to reconsider this recommendation, given his consistent high marks on operations over the past 30 years, and his commitment to reinvest.

298. Additionally, Mr. Byrd routinely received passing scores on his "Mystery shops," which are when franchise officers or consultants anonymously visit a restaurant to observe how it is operating, on visits] to his restaurants, and on customer service.

299. In September 2019, Mr. Byrd managed to cure all of his outstanding financials, yet McDonald's refused to revert his status to eligible for growth and rewrite, despite this being required per McDonald's guidelines.

300. At no time in the previous 24-month period did McDonald's reduce Mr. Byrd's rent to assist him with his financial status. In fact, McDonald's did the opposite for Mr. Byrd and escalated his rent.

301.    Although Mr. Byrd's Macon and Houston Levee restaurants are subject to higher expenses than similarly-situated White franchisees, and currently average $1 million and $700,000 less than McDonald's national average sales, respectively, McDonald's escalated Mr. Byrd's rent to original rents on or after 2015, at rates of 8.56% on Houston Levee and 13.94% on Macon, which continue to date.

302.    Reduction of rent was controlled by McDonald's field consultants who were aware of Mr. Byrd's financial status.

303.    After this lawsuit was filed in 2020, McDonalds's reversed course and began offering the necessary rent reductions withheld from similarly-situated Black operators for years.

304.    By June 2020, McDonald's had already begun making rounds to the local Black McDonald's owner associations announcing it would disperse rent reimbursement checks dated back to January 2019. It was too late for Mr. Byrd.

305.    On November 12, 2019, McDonald's notified Mr. Byrd that his Houston Levee restaurant is not eligible for a rewrite.  Pursuant to the notification, Mr. Byrd is required to sell or give his restaurant to McDonald's by June 23, 2022.

306.    The denial of a rewrite for his Houston Levee store was a fatal blow to Mr. Byrd as he had reasonably believed in McDonald's promises of growth opportunities. He wanted to stay in the system and continue to operate until, at the very least, the end of his franchise term.

307.    He worked hard to cure his financials and continued to invest money in his McDonald's franchise based on the representations he had received from McDonald's leadership, including that programs would be put in place to assist him, that there was improvement in the cash flow gaps between White and Black franchisees in his region, and that he would be able to turn a profit and finally expand beyond his low-volume stores.

308.    By January 2020, shortly after Mr. Byrd's rewrite decision, McDonald's executives had already informed buyers, including Mike Retzer, regarding the sale of Mr. Byrd's stores.

309.    Due to the rewrite decision, Mr. Byrd would be reduced to a single store operator after more than 30 years, and Mr. Retzer, a White franchisee with stores in the double digits would be awarded more stores, including Mr. Byrd's and other high-volume stores as a "package deal," by McDonald's and offered a leadership position to be even closer to executives making decisions for franchisees. When Mr. Byrd spoke out against McDonald's treatment in response to the denial, inspections of his restaurants grew exponentially. Additionally, he was bullied by executives for hiring legal counsel and completely excluded from routine business visits and meetings.

310.    During a March 2020 meeting, Jim Schugars, a McDonald's Operations Officer for the Nashville field office, threatened Mr. Byrd for seeking legal counsel, telling him that "he hoped his attorneys weren't charging him by the hour because McDonald's had a building full of attorneys that would outlast him."

311.    On March 12, 2021, Clyde Neville, a McDonald's Franchise Business Partner, called Mr. Byrd in advance of an upcoming National Interscholastic Basketball Conference ("NIBC") Championship game, and asked if Mr. Byrd would be doing anything to "endanger the brand," referring to a luncheon and press conference being hosted at the Byrds' Macon restaurant to support an All-American high school athlete in their area who was playing in the game.

312.    Mr. Neville attended the event and later told Mr. Byrd that he was sent by McDonald's for the sole purpose of intimidating the Byrds to stop speaking about injustices they were facing as Black McDonald's operators.

313.    Mr. Neville apologized to Mr. Byrd and stated that he had "been on the phone with McDonald's all day about the Byrds and that if they weren't Black, he would not have had to attend the event."

314.    On March 13, 2021, Mr. Byrd spoke to Paula Collick regarding a high volume McOpCo store in Kentucky that was being sold. It was rumored that the store may go to Black operators. Ms. Collick told Mr. Byrd to keep up the fight against discrimination because, as in the past, the high-volume store would not be going to a Black operator.

315.    On May 4, 2021, Mike Retzer, now president of the Nashville operators group, told Mr. Byrd that Joe Erlinger, President of McDonald's USA, would be in the Memphis region to meet with Mr. Retzer for dinner.

316.    One of the items on the agenda during the visit was to discuss the potential reasons for Mr. Retzer not getting the stores he wanted. The president excluded the Byrds' from his itinerary.

317.    Mr. Byrd's Macon restaurant is subject to a 20-year lease term, expiring in 2028, with eligibility for rewrite three calendar years before that, in 2025.

318.    James Byrd is currently operating the Houston Levee and Macon restaurants. He and his brother Darrell are the only two Black operators in the Memphis area.

**E.**    **McDonald's Discrimination Against Darrell Byrd**

319.    Darrell, like his brother, was actively involved in the community and supported several charitable organizations such as St. Jude Hospital.  He consistently met the standards for both of his stores in operations and received passing scores on customer and brand visits.

320.    Darrell Byrd's restaurants, like his brother's, were in predominantly rural or Black neighborhoods with higher operational costs and revenues that fail to cover expenses over time.

70

321.   Although Mr. Byrd's Arlington location appears to be "high volume" from McDonald's perspective based on gross sales, his sales from his Somerville location are well below the sales of White franchisees in his Region, and, importantly, they fail to make him any profit because of his disproportionately high operational costs.  His Arlington location is used to cover the additional debt and expenses from his Somerville location, leaving him with little overall profit from his two stores collectively.

| SALES VOLUME | | | 2015 | | 2016 | | 2017 | | 2018 | | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FIELD OFFICE | LICENSEE | $ | 2,430,609 | $ | 2,445,225 | $ | 2,516,605 | $ | 2,541,750 | $ | 2,651,887 |
| TV MARKET | LICENSEE | $ | 2,448,550 | $ | 2,449,806 | $ | 2,506,880 | $ | 2,539,418 | $ | 2,628,524 |
| CONSOLIDATED RESULTS* | | $ | 2,580,707 | $ | 2,673,719 | $ | 2,727,020 | $ | 2,654,723 | $ | 2,620,025 |
| ARLINGTON, TN | 29403 | $ | 2,964,128 | $ | 3,033,659 | $ | 3,176,007 | $ | 3,138,642 | $ | 3,095,349 |
| SOMERVILLE | 34976 | $ | 2,197,286 | $ | 2,313,779 | $ | 2,278,033 | $ | 2,170,804 | $ | 2,144,701 |

Sales Volume of Arlington and Somerville

322.   Mr. Byrd continues to be subject to base and percentage rent based solely on McDonald's acquisition and development costs, with percentage rent set as high as 14.5%.

323.   In 2014, McDonald's leveraged Mr. Byrd's economic hardship to scare him and his brother into accepting a "packaged deal" sale with his brother that included Darrell Byrd's most profitable store, which is located in Oakland, resulting in even further economic hardship.

324.   Darrell, who operated in the same region as his brother, experienced the same unfair treatment from McDonald's regional managers such as Dana Lytle.

325.   For example, on February 17, 2015, Darrell was unfairly targeted for closing his Arlington restaurant during an ice storm, when the entire Arlington County was closed, while other White operators in their region made similar adjustments to their staffing and operations, with no repercussions.

(i)     *McDonald's Denies Darrell Byrd's Request for Rent Relief and Deems him "Ineligible for Growth," Blocking his Daughter from the Next Gen Program*

326.    Despite several requests for rent reduction, McDonald's USA Regional Office in 2016, 2018, and 2019 during business review meetings, McDonald's ever-changing field consultants[10] told Mr. Byrd, to not even bother formally applying.

327.    This treatment contradicted McDonald's promises to Mr. Byrd of support, improving cash flow, opportunities for growth, and assistance during hard times.

328.    He continued to do his best in operations and invest in the McDonald's brand upon belief that McDonald's would honor its words and that the positive image McDonald's presented to Mr. Byrd about Black franchisees was true.

329.    McDonald's ultimately deemed Mr. Byrd as "ineligible for growth" in a May 2019 business review, with no hope of financial assistance, to offset his expenses.

330.    This status not only blocked Mr. Byrd from the purchase of any additional (and more profitable) locations needed to offset his existing franchises, but ineligibility also blocked his daughter from gaining entry into the NextGen legacy program. She was denied the opportunity by McDonald's to ever become a franchise owner through no fault of her own.

331.    Unlike similarly situated White franchisees, Mr. Byrd has been restricted to his current area with no assistance from McDonald's, even though McDonald's had the discretion to grant him rent reduction and chose not too until notice of the lawsuit and similar allegations were made by other Black franchisees.

---

[10] In certain years, Mr. Byrd had as many as four different Field Consultants, which is unusual and prevented him from building sustainable relationships with his liaisons to McDonald's corporate office.

332.     In 2020 Darrell's restaurant experienced a shooting in the parking lot and had to close during the investigation.  Darrell received no support from McDonald's for the impact of the closure on his sales.

333.     Darrell Byrd is currently operating the Arlington and Somerville restaurants.

## CLASS ALLEGATIONS

### A.  Class Definition

334.     Plaintiffs seek to certify and maintain a class action under Rules 23(a), (b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery.

335.     Plaintiffs are members of the proposed class they seek to represent and bring this action on behalf of Black McDonald's franchisees and all other similarly situated franchisees who have contracted with McDonald's to own and operate a McDonald's franchise in the United States that comprise (a) national injunctive classes and/or (b) national damage classes (collectively, the "Class").

336.     Plaintiffs bring this suit individually and on behalf of a proposed national class of all other similarly situated persons ("Nationwide Class") consisting of:

> All Black McDonald's franchisees who currently own and operate a McDonald's franchise in the United States between the filing date of this Complaint through and until the discriminatory effects of Defendants' unlawful conduct cease (the "Class Period").

337.     Excluded from the Class are:

    a.    Defendants, their officers, directors, management, legal representatives, employees, assigns, heirs, successors, and wholly owned or partly owned subsidiaries and affiliates;

    b.    Any judges or justices involved in this action and any members of their immediate families;

c. Any Class counsel or their immediate family members;

d. All governmental entities; and

e. Any former McDonald's franchisees and/or their assignees who terminated and/or sold their franchises prior to the filing date of this Complaint.

338. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into sub-classes, or modified in any other way.

339. The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy.

**B. <u>Numerosity and Ascertainability</u>**

340. This action meets the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1) because, upon information and belief, the Class includes over one hundred (100) Black McDonald's franchisees, making individual joinder of Class Members' respective claims impracticable.

341. While the exact number of Class Members is not yet known, there are currently one-hundred and eighty-six (186) Black franchisees according to NBMOA data. The precise number may be ascertained from NBMOA and/or McDonald's records, and through other appropriate discovery.

342. Locating members of the Class would be relatively simple, since McDonald's maintains records of all franchisees, and providing notice to Class Members could be accomplished by Court-approved notice methods.

**C. <u>Predominance of Common Issues</u>**

343. Questions of law or fact are common to all members of the putative Class.

74

344.    Defendants' illegal pattern of steering and restricting Black franchisees to substandard locations because of their race and unlawful practice of denying Black franchisees the same opportunities given to White franchisees, having a common, adverse effect on all Black franchisees, who suffer substantial damages as a result of McDonald's discriminatory practices, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, attorneys' fees, costs, and any and all unnecessary out-of-pocket expenses.

345.    Defendants' fraudulent concealment of the $400,000+ net income gap between Black and White franchisees, effectuated by delivering misleading information regarding a *de minimis* cash flow gap between White and Black franchisees to the NBMOA, had a common, adverse effect on all Black franchisees, who were uniformly misled into believing McDonald's was making significant progress toward parity and was no longer discriminating against its Black franchisees, who, as a result, uniformly continued to suffer substantial damages as a result of McDonald's fraudulent concealment, including, but not limited to, lost profits, lost value of the franchise(s), lost capital contributions, lost investments, lost revenue, lost business opportunities, attorneys' fees, costs, and any and all unnecessary out-of-pocket expenses.

346.    Therefore, common questions of law or fact are prevalent throughout the Class, including, but not limited to:

a.    Whether Defendants engaged in intentional racial discrimination in violation of Section 1981;

b.    Whether Defendants fraudulently concealed from the Class the $400,000+ net income gap between White and Black franchisees; and

c.    Whether the Class has been damaged, and if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or punitive damages to which the Class is entitled.

75

### D. **Typicality**

347. Plaintiffs' claims are typical of the claims of Class Members in that they arise from the same course of conduct by Defendants, share the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiffs and Defendants' conduct affecting Class Members, and Plaintiffs have no interests adverse to the interests other Class Members.

348. Plaintiffs and Class Members sustained damages arising out of the Defendants' wrongful conduct as detailed herein. Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that Defendants have enjoyed ill-gotten gains in the form of real estate McDonald's owns. Plaintiffs and Class Members operate and improve at their expense for decades, allowing Defendants to expand its reach into Black neighborhoods, expand its consumer base, and reap the benefits of improvements by Plaintiffs and Class Members once it ultimately forces Black franchisees out. Plaintiffs and Class Members have been deprived of lost profits and growth opportunities due to money spent in renovation and/or rebuild costs not likewise required of White franchisees as a direct result of Defendants engaging in unlawful conduct. Such damages apply to all Class Members.

349. Furthermore, the factual bases of Defendants' actions and misconduct represent a common thread of misconduct resulting in the common need for objective franchise standards for all Class Members. Plaintiffs' claims are, therefore, typical of the Class.

### E. **Adequacy of Representation**

350. Plaintiffs will serve as fair and adequate Class Representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the Class they seek to represent.

351.    Plaintiffs, members of the Class defined above, are committed to be active and vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature.

352.    Further, there is no antagonism or hostility of interests between Plaintiffs and the Class and there will be no difficulty in the management of this litigation as a class action.

## F.  <u>Superiority</u>

353.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.  Without a class action, Class members risk retaliation and Defendants will remain free from responsibility for its course of discriminatory conduct and will be allowed to continue to force Plaintiffs and Class Members to operate in its riskiest locations or sell on McDonald's terms, at a loss.  Without class treatment, Plaintiffs and similar situated franchisees will be forced to conduct protracted, piecemeal litigation that might risk establishing standards of conduct and/or determinations.

354.    Individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

      b.    The liability claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

      c.    Given the individual Class Members are still under Franchise Agreements with McDonald's, few, if any, Class Members would seek legal redress individually for the wrongs Defendants committed against them for fear of retaliation;

      d.    Absent certification, Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

      e.    When the liability of Defendants has been adjudicated, claims of all Class

Members can be administered efficiently and/or determined uniformly by the Court; and

f.      This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and members of the Class can seek redress for the harm caused to them by Defendants.

355.    Because Plaintiffs seek relief for the entire Class, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants.

356.    Further, no unusual difficulties are likely to be encountered in the management of this class action. Given that a great number of individuals have been impacted by the Defendants' conduct, it is impracticable for Plaintiffs and Class Members to litigate their respective claims individually due to the risk of producing inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. Therefore, the class action mechanism minimizes prospective management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

### Equitable Tolling, the Discovery Rule, and
### Fraudulent Concealment of Discrimination Claim

357.    Plaintiffs hereby plead and invoke the discovery rule, the doctrine of equitable tolling, and/or 735 ILCS 5/13-215, to the extent necessary.

358.    Plaintiffs will show that, after reasonably exercising due diligence, they did not learn that McDonald's actions were intentionally discriminatory and/or fraudulent until after the time periods provided by the applicable statutes of limitations.

359.    McDonald's, through misrepresentations and omissions, affirmatively misled Plaintiffs and actively concealed the pattern and practice of racial discrimination against Black

owner/operators within the McDonald's franchise system from Plaintiffs and the evidence of its continued discrimination against Plaintiffs and similarly-situated Black franchisees.

360.    At all times material to Plaintiffs' claims, McDonald's falsely maintained that it was committed to racial equality, through the Company's Standards of Business Conduct, advertisements, and promises of parity, and misrepresented that it was making progress toward parity by circulating misleading information regarding a *de minimis* cash flow gap between Black and White franchisees in order to conceal the significant net income gap which evidenced McDonald's continued racial discrimination.

361.    Indeed, even as of the August 10, 2020 filing of McDonald's Verified Complaint against its former CEO, Stephen J. Easterbrook, McDonald's continues to represent to the public that "ethical operation of its business is not just a legal imperative, but also a cherished value." *McDonald's Corporation v. Easterbrook*, Case Id. 2020-0658, Verified Compl. [D.E. 1], at ¶ 11 (Del. Ch. Aug. 10, 2020).

362.    McDonald's practice of racial discrimination and fraud was not apparent to Plaintiffs when committed, but became so when viewed in light of the later acts representing a pattern.  Plaintiffs were not bad businesspeople, as McDonald's attempted to lead them to believe; they were victims of McDonald's targeted discrimination against Black franchisees, which McDonald's covered up during years of parity deals and false promises.

363.    As a result of McDonald's actions, Plaintiffs were unaware, and could not know or have learned through reasonable diligence, that remaining in the McDonald's franchise system was, on the basis of their race, depriving them of franchise opportunities offered to White franchisees, and that the deprivation of those contractual rights were a direct and proximate result of McDonald's unlawful acts and omissions.

364.     McDonald's knew this statement, its purported efforts to achieve parity, assurances to its Black franchisees that it no longer discriminated, and promises of assistance to help Black franchisees overcome McDonald's prior racist treatment of them, were false, and made with them intent to deceive its Black franchisees and delay them from discovering and filing their claims.

365.     Plaintiffs and similarly situated Black franchisees relied upon McDonald's misstatements and thus continued to invest significant resources and money into their doomed stores, did not exit the McDonald's franchise system expeditiously, and did not bring litigation against McDonald's until after the previously non-public, concealed information came to light on January 7, 2020, when the *Guster-Hines* lawsuit was filed against McDonald's.

366.     McDonald's is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of the discriminatory McDonald's franchise system because this was non-public information over which McDonald's has exclusive control and McDonald's knew was not available to Plaintiffs.

367.     Accordingly, McDonald's is precluded by the discovery rule, equitable tolling, and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

### COUNT I – VIOLATION OF 42 U.S.C. § 1981
**(On behalf of Plaintiffs and the Nationwide Class)**

368.     Plaintiffs and putative Class Members adopt, reallege, and incorporate paragraphs 1 through 367 above as if set forth in full herein.

369.     The Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, mandates "[e]qual rights under the law" and prohibits discrimination in the "making and enforcement of contracts" on the basis of race. 42 U.S.C. § 1981(a). The right "to make and enforce contracts" under Section 1981 "includes the making, performance, modification, and termination

of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

370.    Plaintiffs and putative Class Members bring this action to redress the deprivation of rights secured under the laws of the United States, 42 U.S.C. § 1981, individually and on behalf of the Nationwide Class, for McDonald's company-wide pattern and practice of intentional and systemic racial discrimination against its Black franchisees.

371.    Plaintiffs and putative Class Members are members of a protected class due to their race as Black citizens who have the same right to make and enforce contracts as White citizens pursuant to 42 U.S.C. § 1981.

372.    Plaintiffs, and putative Class Members are in a contractual franchise relationship with McDonald's, within the meaning of Section 1981, providing that Black citizens have the same right to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the [franchise] relationship" as White citizens." 42 U.S.C. § 1981(b).

373.    McDonald's violated Section 1981 by denying Plaintiffs and putative Class Members the same franchise opportunities made available to White franchisees.

374.    McDonald's treated Plaintiffs and Class Members differently from other similarly-situated franchisees because they are Black, by a covert and continuing discriminatory acts, including, but not limited to:

      a.    Restricting Plaintiffs and Class Members to older, recycled restaurants, in poor-performing and dangerous locations with high operating costs and low-volume sales;

      b.    Requiring Plaintiffs and Class Members to invest in rebuilds and/or renovations within short timeframes not required of White franchisees;

      c.    Excluding Plaintiffs and Class Members from the same growth

opportunities offered to White franchisees;

d.    Failing to provide any legitimate business reasons for repeated denials of franchise opportunities to Plaintiffs and Class Members over many years;

e.    Denying Plaintiffs and Class Members meaningful support to allow them to overcome financial hardships, while White franchisees were routinely provided such assistance, including, but not limited to, permanent rent relief and impact funding;

f.    Depriving Plaintiffs and Class Members of the same legacy of opportunities offered to White franchisees through McDonald's Next Gen program;

g.    Retaliation against Plaintiffs and Class Members for rejecting offers to continue operations in crime-ridden neighborhoods with low-volume sales, including through targeted, increased, and unreasonable inspections;

h.    Disparate treatment with respect to inspections and grading of Plaintiffs and Class Members' restaurants because of their race; and/or

i.    Placing Plaintiffs and Class Members in untenable positions of economic duress, denying them eligibility for growth, so that they are left with no real choice but to exit on McDonald's terms or continue to operate at a loss.

375.    By the conduct described above, McDonald's intentionally and willfully deprives Plaintiffs and Class Members of the same rights enjoyed by White citizens to be free from racial discrimination in the right to enter into contracts and the right to enjoy all of the privileges and benefits of established contractual relationships in violation of 42 U.S.C. § 1981.

376.    But for Plaintiffs' and Class Members' race and McDonald's discriminatory denial of equal franchise opportunities, Plaintiffs and members of the Nationwide Class would not have suffered and would not continue to suffer anguish, humiliation, distress, inconvenience, and loss of enjoyment of life, thereby entitling them to compensatory damages in an amount in excess of the jurisdictional limit, including, without limitation:  special or consequential damages in the form of lost profits and business opportunities; damages for the intangible injury that results from the denial of civil rights under the law; emotional and physical suffering and distress, humiliation,

82

damage to professional reputations and future business prospects; punitive damages in an amount sufficient to deter McDonald's similar wrongful conduct in the future; and an award of attorneys' fees, expert fees, and costs.

377.    As a direct and proximate result of McDonald's conduct, Plaintiffs and Class Members compensatory damages averaging between four million dollars ($4,000,000.00) and five million dollars ($5,000,000.00) in lost profits per store.

378.    McDonald's has acted and continues to act with malice or reckless indifference to the rights of Plaintiffs and Class Members, thereby entitling them to punitive damages.

379.    At all times material, McDonald's had actual knowledge of the wrongfulness of its conduct and the high probability that injury and/or damage to Plaintiffs and Class Members would result, and despite that knowledge, willfully, wantonly, and recklessly pursued its course of conduct.

380.    McDonald's conduct is so gross and flagrant as to show a reckless disregard or a conscious wanton, reckless indifference to consequences or a grossly careless disregard for the life, safety, and/or rights of Plaintiffs and Class Members, and McDonald's actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

381.    McDonald's willful, wanton, malicious, and/or reckless conduct alleged herein warrants the imposition of punitive damages.

382.    Nationwide Class Members shall continue to suffer irreparable injury in the absence of equitable relief.

383.    Plaintiffs and the Nationwide Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that McDonald's conduct, in seeking to prevent

discrimination as described herein, violates Section 1981, and other relief so as to assure that similar discriminatory conduct does not reoccur in the future.

384.    To remedy McDonald's systemic failure to comply with federal law, Plaintiffs and putative Class Members hereby request declaratory judgment requiring McDonald's to, *inter alia*:

      (a) Provide Black franchisees open and equal access to the market of locations to which they are entitled and that meet or exceed McDonald's national average for revenue;

      (b) Require McDonald's to conform to the mandates of Section 1981 and implement objective standards for decisions relating to Black franchisees, including: (i) rewrite decisions; (ii) terminations; (iii) rent adjustments and other financial assistance, accounting for higher operating costs and lower volume sales in certain locations; and/or (iv) rebuild and renovation requirements;

      (c) Require McDonald's to ensure that Black franchisees are offered growth opportunities to the same extent that such growth opportunities are available to other franchisees in the same geographic area; and/or

      (d) Require McDonald's to ensure its grading and inspection standards are fairly and uniformly applied.

384.    Accordingly, Plaintiffs and Nationwide Class Members seek damages from McDonald's and an order with standards above to be implemented by the Court in equity.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for declaratory judgment against Defendants, for compensatory damages, punitive damages, reasonable attorneys' fees, expert fees, costs, and an award of pre-judgment and post-judgment

interest, to be determined at trial, and for such other and further relief both at law and in equity to which Plaintiffs and Class Members may show to be justly entitled.

## COUNT II – FRAUDULENT CONCEALMENT
### (On behalf of Plaintiffs and the Nationwide Class)

385.     Plaintiffs and putative Class Members adopt, reallege, and incorporate the allegations in paragraphs 1 through 367 as if set forth in full herein.

386.     McDonald's concealed material facts from its Black franchisees regarding the growing gap in the net income earned by White franchisees and Black franchisees within the McDonald's franchise system.

387.     McDonald's concealed these material facts with the intention of inducing a false belief on the part of its Black franchisees that McDonald's was no longer actively discriminating against its Black franchisees but instead was working toward, and succeeding in, achieving financial parity between its Black and White franchisees.

388.     McDonald's affirmatively concealed this information, and misled Plaintiffs, by using is executives, regional management, and the NBMOA to disseminate misleading data regarding a *de minimis* cash flow gap between Black and White franchisees to conceal the real problem, which was the growing net income gap between Black and White franchisees.

389.     McDonald's undertook, promoted, and assumed a special relationship of confidence, reliance, superiority, influence, and trust with its Black franchisees such that it had a duty to disclose these material facts so as to enable its Black franchisees to make informed decisions regarding whether they should continue to invest significant resources and money into their stores, remain in the McDonald's franchise system, or bring litigation against McDonald's.

390.     McDonald's placed itself in a position of superiority and influence over its Black franchisees by admittedly discriminating against them and steering them to financially non-viable,

low income, low volume locations with higher operating costs, where McDonald's held them financially captive. McDonald's then assumed a position of trust and confidence over these financially captive Black franchisees by promising to work and partner with them, through the NBMOA, to assist them in overcoming the effects of its racist treatment of them, to achieve financial parity between them and the White franchisees, and to fully disclose to Black franchisees system-wide information which would allow them to accurately monitor and assess McDonald's progress toward achieving financial parity and to compare their financial performance with that of White franchisees. The Black franchisees placed their trust and confidence in McDonald's to help them accomplish these objectives, and McDonald's accepted their trust.

391.   By promising to fully disclose to Black franchisees system-wide information which would allow them to accurately monitor and assess McDonald's progress toward achieving financial parity and to compare their financial performance with that of White franchisees, McDonald's assumed a legal duty to do so in an a true, accurate, and non-misleading fashion.

392.   McDonald's had superior knowledge and absolute control over information regarding the financial of conditions of Black franchisees as compared to White franchisees, including the growing gap in their net income.

393.   Before this information was first made public on January 7, 2020, with the filing of the complaint in *Guster-Hines v. McDonald's USA LLC*, No. 20-00117, Compl. [D.E. 1], ¶¶ 65, 75 (N.D. Ill. Jan. 1, 2020), neither Plaintiffs nor putative class members could have discovered the truth regarding this information through reasonable inquiry or inspection, because it was confidential, only McDonald's had access to it, and McDonald's did not disclose it to Black franchisees—rather, McDonald's concealed it.

394.    From the commencement of the franchise terms, Plaintiffs attended and personally participated in all NBMOA meetings, reviewed, and relied upon all misleading cash flow information McDonald's disseminated to the NBMOA.

395.    The concealed information was such that Plaintiffs and the putative Class members would have acted differently had they been aware of it, namely by mitigating their damages and ceasing to invest significant resources and money into their doomed stores, exiting the McDonald's franchise system expeditiously, and bringing litigation against McDonald's.

396.    Plaintiffs and putative Class members reasonably relied upon McDonald's misleading "cash flow" information designed to conceal the substantial gap in net income earned between Black and White McDonald's franchisees and, based on this misleading information, Plaintiffs believed McDonald's was partnering with them to effectuate equality and parity within the McDonald's franchise system, believed McDonald's conduct was not actionable and thus delayed litigation, remained in the franchise system and continued to invest money into their doomed stores, continued to operate their franchisees under the fraudulently induced belief that the problem was much smaller than it really was and that McDonald's was no longer discriminating against Black Franchisees and was working toward closing the net income and cash flow gaps, and believed that each of their diminishing net profits was individualized rather than a systemic problem.

397.    As a direct and proximate result of Plaintiffs' reasonable reliance on McDonald's concealment of material facts, Plaintiffs and the putative Class members were damaged by incurring excessive operational expenses and insufficient sales volume, resulting in lost profits, lost business opportunities, emotional distress, humiliation, and damage to their professional reputations. Without accurate information, Plaintiffs could not make properly informed decisions

about whether or not to continue to invest, purchase additional stores, or remain franchisees in the McDonald's system.

398.    McDonald's actively concealed this information by, among other things:

(1)    failing to conduct audits when requested by Plaintiffs;

(2)    failing to provide accurate financial information regarding the return of investment for remodels during annual business reviews;

(3)    issuing misleading emails and presentations during NBMOA meetings and local chapter meetings, about the improvements of cash flow gaps, the number of Black franchisees deemed ineligible for growth and the reasons blocking growth;

(4)    seeking to suppress requests for data on McOpCo and the sales of stores by characterizing it as confidential;

(5)    refusing to take action or steps to actively reform the practices and policies complained about;

(6)    failing to disclose studies conducted about the impact of BBV2020 on Black franchisees;

(7)    failing to disclose newbuild restaurants within the region of Black franchisees in a timely manner that could actively impact their current operations and sales; and

(8)    failure to disclose the existence of restaurants for sale in an effort to control the market and "reserve" them for White restaurant owners (8) failing to disclose the real financial data regarding advertising funds.

399. Plaintiffs repeatedly requested information and policies regarding net income, cash flow, eligibility for growth, return on investment after remodels, audits, information regarding practices and policies effecting grading standards and review processes.

400. McDonald's failed to respond to Plaintiffs' inquiries.

401. But for McDonald's fraudulent concealment of the net income gap between Black and White franchisees, Plaintiffs and similarly situated Black franchisees would not have incurred the above referenced damages.

402. The fraud committed by McDonald's further entitles Plaintiffs to punitive damages in an amount to be determined, but at least twice the damages Plaintiffs have suffered as a result of McDonald's fraudulent concealment.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, requests that this Court enter judgment in their favor, and against McDonald's, awarding compensatory and punitive damages in an amount to be proven at trial, along with such other further relief as the Court finds just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs for themselves and on behalf of all others similarly situated, demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

    a. Certification that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Classes;

    b. Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

    c. Award compensatory damages to Plaintiffs and the proposed Classes in an amount to be established at trial, including, without limitation:

(1)     damages in in excess of the jurisdictional limit;

(2)     lost business opportunities because of McDonald's unjustifiable refusal to offer such opportunities to Plaintiffs and the Class;

(3)     excessive and unreasonable costs and expenses due to substandard franchise location;

(4)     insufficient sales volume due to substandard franchise location;

(5)     loss of profits because of excessive expenses and insufficient sales volume due to substandard franchise location;

(6)     loss of franchise value because of inability to extinguish debt and meet operating expenses due to substandard franchise location;

(7)     loss of franchises due to discriminatory conduct; and

(8)     additional damages for emotional and physical suffering and distress, humiliation, damage to professional reputations, and to future busines prospects.

d.   Direct Defendants to make Plaintiffs whole for all earnings and benefits they would have received but for Defendants' discriminatory treatment;

e.   Declaration that the acts and practices complained of herein are violations of 42 U.S.C. § 1981;

f.   An order enjoining McDonald's from engaging in the deceptive, unfair, unconscionable, and unlawful business practices alleged in this Complaint, including, but not limited to requiring Black franchisees to sign broad, general releases in exchange for financial assistance;

g.   Award further injunctive relief, as the Court deems appropriate;

h.   An award of punitive damages in an amount sufficient to deter Defendant's similar wrongful conduct in the future;

i.   An order for an award of attorney's fees, expert fees, and costs, as provided by law;

j.   An award of pre-judgment and post-judgment interest as provided by law; and

k.   For all such other and further relief as may be just and proper.

90

## DEMAND FOR JURY TRIAL

Plaintiffs, individually on behalf of all others similarly situated, demand a trial by jury of all issues so triable as a matter of right.

DATED this 22nd day of July 2021.                    Respectfully submitted,


*/s/ James L. Ferraro*
James L. Ferraro, Esq.                               William R. Fahey, Esq.
Florida Bar No.: 381659                              Illinois Bar No.: 3127912
jlf@ferrarolaw.com                                   bfahey@cooneyconway.com
Daryl D. Parks, Esq                                  COONEY & CONWAY, PC
Florida Bar No.: 54097                               120 N. LaSalle Street, 30th Floor
ddp@ferrarolaw.com                                   Chicago, IL 60602
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222
**THE FERRARO LAW FIRM, P.A.**

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

James L. Ferraro, an attorney, hereby certifies that on July 22, 2021, he caused the foregoing document, and Exhibits submitted in support thereof, to be electronically filed using the CM/ECF system, which will send notice of this filing to all counsel of record.

<i><u>/s/ James L. Ferraro</u></i><br>
THE FERRARO LAW FIRM, P.A.<br>
600 Brickell Avenue, 38th Floor<br>
Miami, Florida 33131<br>
(305) 375-0111